**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| SPEED RMG PARTNERS, LLC, ROBBY GORDON, AND TODD ROMANO, | ) ) ) | Case No.  0:20-cv-00609-SRN-LIB |
| *Plaintiffs*, | ) ) ) | |
| v. | ) ) | |
| ARCTIC CAT SALES INC., ARCTIC CAT INC., TEXTRON SPECIALIZED VEHICLES, INC., AND TEXTRON, INC,, | ) ) ) ) | |
| *Defendants*. | ) ) ) | |

**SECOND AMENDED COMPLAINT FOR BREACH OF CONTRACT, INTENTIONAL AND/OR RECKLESS MISREPRESENTATION, NEGLIGENT MISREPRESENTATION, AND FRAUDULENT CONCEALMENT**

Plaintiffs Speed RMG Partners, LLC ("Speed Partners"), Robby Gordon, and Todd Romano (collectively, "Plaintiffs") complain against Defendants Arctic Cat Sales Inc., Arctic Cat Inc., Textron Specialized Vehicles Inc., and Textron Inc. (collectively "Defendants" or "Arctic Cat/Textron") as follows:

## NATURE OF THE ACTION

1.      By this Complaint Plaintiffs seek damages they have suffered and will suffer as a result of Defendants' breach of a Product Development and Marketing Agreement entered into between the parties as of July 31, 2015 (the "Agreement"), and fraud and deceit practiced by Defendants in connection with the Agreement.  A true and correct copy of the Agreement is attached hereto as Exhibit A.

## THE PARTIES, JURISDICTION AND VENUE

2.      Speed RMG Partners, LLC is a limited liability company with principal offices and operations located in Anaheim, California and Charlotte, North Carolina. Robby Gordon and Todd Romano are the sole members and sole owners of membership units of Speed Partners.

3.      Robby Gordon is an individual resident and citizen of North Carolina. Mr. Gordon also maintains business facilities and operations located in Anaheim, California, Orange California, and Charlotte, North Carolina.

4.      Todd Romano is an individual resident and citizen of Utah.

5.      On information and belief, Arctic Cat Sales, Inc. is a Minnesota corporation, with a principal place of business at 600 Brooks Avenue, Thief River Falls, Minnesota, and is the legal predecessor in interest to Textron Specialized Vehicles Inc.

6.      On information and belief, Arctic Cat Inc. is a Minnesota corporation, with a principal place of business at 600 Brooks Avenue, Thief River Falls, Minnesota, and is and/or was at all material times the owner and alter ego of Arctic Cat Sales, Inc.

7.      On information and belief, Arctic Cat Sales, Inc. and Arctic Cat Inc. are and/or at all material times were engaged in a joint enterprise and/or joint venture owned and controlled by Arctic Cat Inc. with respect to the matters alleged herein.

8.     On information and belief, Textron Specialized Vehicles Inc. is a Delaware corporation with a principal place of business at 1451 Marvin Griffin Road, Augusta, Georgia and is the legal successor in interest to Arctic Cat Sales, Inc.

9.     On information and belief, Textron Inc. is a Delaware corporation with a principal place of business at 40 Westminster Street, Providence, Rhode Island, and is the owner, alter ego, and/or legal successor in interest to Arctic Cat Inc.

10.     On information and belief, Textron Specialized Vehicles Inc. and Textron Inc. are and/or at all material times were engaged in a joint enterprise and/or joint venture owned and controlled by Textron Inc. with respect to the matters alleged herein.

11.     On information and belief, Textron Inc. is owner and alter ego of Textron Specialized Vehicles Inc.  All Defendants engaged in a conspiracy in connection with the unlawful breaches, misrepresentations, and concealment alleged in this complaint, and combined to participate in or direct wrongful acts, including at the direction of Textron's Inc.'s Chief Executive Officer.

12.     Defendants are corporations and/or other forms of business entities, with sales, marketing, manufacturing facilities, and operations located in this Judicial District. Arctic Cat Sales Inc. and Arctic Cat Inc. are collectively referred to herein as "Arctic Cat."  Textron Specialized Vehicles Inc. and Textron Inc. are collectively referred to herein as "Textron."  Defendants are at times collectively referred to herein as Arctic Cat/Textron.

13.     The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1).  There is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.

14.     Plaintiffs initially filed this action in the United States District Court for the Central District of California.  On February 25, 2020, Honorable Fernando M. Olguin issued an order transferring venue to this Judicial District pursuant to 28 U.S.C. § 1404(a) based on the convenience of the parties and witnesses.

/ / /

## FACTUAL BACKGROUND

15.     The Agreement was negotiated in the summer of 2015, and became effective July 31 of that year.

16.     At all relevant times for the purposes of this complaint, Arctic Cat was engaged in the powersports manufacturing and sales business, including snowmobiles, all-terrain vehicles, and side-by-side off-road vehicles.

17.     At the time the Agreement was executed, Arctic Cat suffered from a very poor reputation for quality, durability, and value of its side-by-side vehicles, and was unable to develop a meaningful share of the growing and highly profitable market for such vehicles.

18.     Internationally famous racer, race team owner, entrepreneur, and off-road expert Robby Gordon is one of the two principals in Speed Partners.  Powersports business entrepreneur and off-road racer Todd Romano is the other principal of Speed Partners.

19.     From February of 2009 until January of 2012, Robby Gordon was under contract to Polaris Industries to assist in the design and development of Polaris side-by-side vehicles.  In connection with that work, Robby Gordon invented the 4 seat sport side-by-side vehicle.

20.     The Polaris sport side-by-side vehicle revolutionized the industry, and allowed Polaris Industries to further develop and exploit the burgeoning side-by-side market.  As a result, Polaris Industries became the industry leader in the 4 seat sport side-by-side vehicle line, and was able to market its side-by-side products as the best and most innovative in the industry.

21.     Mr. Romano is the founder of Dragonfire Racing, the premier distributor of aftermarket accessories for side-by-side vehicles.

### Pre-Formation Discussions

22.     Prior to the summer of 2015, Mr. Romano had a business relationship with various personnel at Arctic Cat.

23.     By the summer of 2015, Arctic Cat was aware of Mr. Gordon's success with the design and development of the Polaris Industries side-by-side vehicles, and was aware of Mr. Romano's success in the side-by-side accessories business.

24.     Also by that time, Mr. Gordon had independently developed a number of specific vehicle and component designs and design ideas which could be utilized in various types of vehicles, including sport and other side-by-side vehicles, and which could further revolutionize the side-by-side industry.

25.     Mr. Romano used his contacts to coordinate meetings and phone calls to include himself, Robby Gordon, Arctic Cat CEO Chris Metz, and other Arctic Cat management personnel to discuss a possible relationship that would enable Arctic Cat to position itself to secure a meaningful share of the rapidly growing side-by-side market.

26.     At various times during the course of negotiations with Speed Partners in the summer of 2015, Arctic Cat CEO and President Chris Metz stated that Arctic Cat wanted to completely revamp its side-by-side product line.

27.     Also during the summer of 2015 and thereafter, Mr. Metz stated that Arctic Cat intended to aggressively pursue the side-by-side market through a series of staged product releases, and that it wanted to partner with Robby Gordon and Todd Romano for those purposes.

28.     Also during the summer of 2015 and thereafter, Mr. Metz repeatedly represented that Arctic Cat was committed to growing its market share by dramatically improving the quality and innovations of its vehicle line, and to release new side-by-side models in each Model Year with increasing options and product offerings for a series of at least 5 years beginning with Model Year 2016.

29.     Also during the summer of 2015, Mr. Metz and others at Arctic Cat indicated that Arctic Cat was properly funded and prepared to invest in sufficient product development, marketing, production and distribution to meet its stated goals.

30.     The representations identified herein were made in conversations and communications with Todd Romano and/or Robby Gordon.

**Terms of the Agreement**

31.     These discussions led to formation of the Agreement on or about July 31, 2015.

32.     Arctic Cat and Speed Partners agreed to a Product Development and Marketing Agreement with a 5 year term.

33.     Under the Agreement, Speed Partners agreed to provide vehicle and product designs and annual updates for existing and new Arctic Cat side-by-side vehicles which were identified as the "Special Royalty Vehicles."

34.     Arctic Cat agreed to pay annual royalties to Speed Partners for the Special Royalty Vehicles as detailed in Exhibit D to the Agreement.

35.     Exhibit D to the Agreement identifies the royalty rates to be paid by Arctic Cat for each vehicle, and lists minimum numbers of Limited Edition (LE) Special Royalty Vehicles for each Model Year of the Agreement.

36.     Arctic Cat also promised to pay royalties to Speed Partners after expiration of the 5 year term of the Agreement for so long as such vehicles continued to incorporate a substantial amount of the "novel" designs and innovations provided by Speed Partners.

37.     To determine novelty of the designs, the Agreement provided that Speed Partners would identify the novel features of its designs, and that Arctic Cat was required to accept those designs as novel before incorporating them into the vehicles.

38.     In keeping with Arctic Cat's pre-formation representations, Exhibit D to the Agreement provides that Arctic Cat will produce and sell Special Royalty Vehicles in all years of the Agreement beginning with Model Year 2016 and continuing through Model Year 2020.

39.     Also in keeping with Arctic Cat's representations, Exhibit D provides that the models will be released in staged releases each year, with increasing options, variety, and innovations year over year throughout the term of the Agreement.

40.     Also in keeping with Arctic Cat's representations, Exhibit D provides that certain models will phase in and replace other models which will phase out over the term

of the Agreement.

41.     In addition to royalties for the Special Royalty Vehicles, the Agreement also provides that Arctic Cat will pay "Halo Royalties" and "Pivot Royalties" to Speed Partners based on sales of other Wildcat vehicles in Arctic Cat's product line that were not Special Royalty Vehicles, to the extent sales of such vehicles exceed the baseline levels during each year of the Agreement.

42.     The minimum numbers of Special Royalty Vehicles and other vehicles in excess of the agreed baselines for which royalties were to be paid in each Model Year as identified in the "MY column" of Exhibit D of the Agreement are as follows:

- 2,000 vehicles for Model Year 2016
- 11,000 vehicles for Model Year 2017
- 13,000 vehicles for Model Year 2018
- 17,000 vehicles for Model Year 2019
- 17,000 vehicles for Model Year 2020

43.     In addition to royalties to be paid for vehicles, the Agreement also provides that Speed Partners would receive royalties on a complete line of accessories and aftermarket products to be designed by Speed Partners and produced and sold by Arctic Cat using the "Speed" brand and trademarks belonging to Mr. Gordon.

44.     During the summer of 2015 in the numerous communications leading to the formation of the Agreement, Mr. Metz represented to Mr. Romano and Mr. Gordon that the accessories and aftermarket product line would be constructed using universal products that would be suitable for use on other side-by-side brands so that they could be sold through Arctic Cat dealers and on the Arctic Cat website to owners of virtually all brands of side-by-side vehicles.

45.     Mr. Metz repeated these representations in his presentation to Arctic Cat dealers at the Orlando Arctic Cat dealer show in August of 2015 where he described the "kick butt line" of accessories as being one of the "three important legs" of the new "strategic relationship" with Speed Partners (along with products and marketing).

46.     Also during the summer of 2015, Mr. Metz provided a written estimate of anticipated royalties to be paid to Speed Partners under the Agreement totaling $12,300,000 per year.

47.     The Agreement also provides that Robby Gordon and Todd Romano will provide their exclusive personal endorsements of the Arctic Cat product line, and their marketing and product activation input for use in marketing Arctic Cat vehicles.

48.     The Agreement provides that Arctic Cat will incur the costs of, and will participate in marketing the Special Royalty Vehicles through various events and activities, including dirt shows, trade shows, off-road events, off-road racing, race sponsorships, car shows, social media, dealer shows, and other similar events and activities.

49.     The Agreement also provides that Arctic Cat will jointly confer with Speed Partners at least 60 days in advance of making any marketing decision involving discretionary marketing activities.

### Arctic Cat's Breach of Contract

50.     Immediately after the Agreement was finalized, Speed Partners developed and delivered the prototype for the Robby Gordon Limited Edition Wildcat X vehicle, the first planned Special Royalty Vehicle.  Speed Partners did so in accordance with the schedule set out in the Agreement.

51.     At or about the same time, Speed Partners was asked to help improve an existing vehicle development project, code-named "Zeus."

52.     Also at or about that time, Arctic Cat stated that it would be taking orders from its dealers for the Robby Gordon Special Royalty Vehicles beginning in August of 2015 for delivery to dealers in November of 2015.  These representations were made by Mr. Metz and Arctic Cat Vice President, Tracy Crocker.  The representations were made to and in the presence of Robby Gordon, Todd Romano, numerous Arctic Cat dealers at the August 2015 Arctic Cat dealer show, and in public announcements from Arctic Cat.

/ / /

53.     However, contrary to the terms of the Agreement, including Exhibits A and D thereto, and contrary to Arctic Cat's numerous representations, public announcements, and statements to its dealers and to Plaintiffs, Arctic Cat/Textron did not produce Special Royalty Vehicles under the Agreement for Model Year 2016 or Model Year 2017; Arctic Cat/Textron failed to sell such vehicles for Model Year 2016 and Model Year 2017, including the wholesale failure to market and sell vehicles in the most significant and relevant marketplace for such vehicles, that being southern California and other parts of the southwest, and Arctic Cat/Textron failed to make royalty payments as required by the Agreement for those Model Years.  Arctic Cat/Textron's only explanation for its breach was that it needed more time to ready itself to perform.

54.     In or about August of 2015, Mr. Metz told Mr. Gordon that the Zeus project was being discontinued altogether.  In Mr. Gordon's presence, Mr. Metz told the Arctic Cat engineers working on the Zeus project that they were not to proceed further with Zeus.  In lieu of Zeus, the engineers were directed to focus their efforts on the Robby Gordon-designed vehicles.

55.     Unbeknownst to Speed Partners, however, and contrary to Mr. Metz's representations, Arctic Cat continued to devote money and engineering resources, manpower, facilities, and materials to surreptitiously develop the Zeus vehicle in competition with the Robby Gordon vehicles.

56.     Arctic Cat officially launched the Robby Gordon Limited Edition Sport vehicle at its dealer show in August of 2015, took dealer orders for the vehicle, and thereafter cancelled the launch and cancelled the dealer orders.

57.     Arctic Cat followed the same pattern with the Robby Gordon Limited Edition Wildcat X:  first launching the vehicle and taking dealer orders only to later cancel the launch and cancel the orders.

58.     Throughout this period, Arctic Cat repeatedly asserted that Speed Partners' designs were not novel.  However, Arctic Cat/Textron ultimately incorporated nearly all of the Speed Partners designs into its vehicles in contravention of the express provision of

the Agreement requiring that Arctic Cat acknowledge novelty of the designs before incorporating them into a vehicle.

59.     Novelty is a legal requirement for patent protection.  Arctic Cat's position that the designs were not novel amounted to an assertion that the designs were not patentable.  Thus, Arctic Cat declined to prosecute patents or pay for patent prosecution work despite the express provisions of the Agreement imposing those obligations on Arctic Cat.  Instead, Arctic Cat encouraged Speed Partners to seek patents for its designs, to file patent applications, and to pay for patent prosecution costs.

60.     Mr. Gordon assumed responsibility for patenting the novel aspects of his designs, and obtained several patents on various of his designs, with several other patents having received a notice of allowance, and yet other patent applications pending on various of his designs.

61.     On or about February 8, 2016, Arctic Cat issued written notice to its dealers in which it cancelled the launch of the Wildcat Sport and Wildcat X RG Pro Special Royalty Vehicles that had been launched at the August 2015 Dealer Show, cancelled the dealer orders for those vehicles, and stated its intention not to proceed with the Special Royalty Vehicles for model year 2016.  Speed Partners immediately notified Arctic Cat that the cancellations were "totally unacceptable."  In response, Arctic Cat represented in a writing dated February 9, 2016:  "This is not a matter 'if' only a matter of when."  Arctic Cat further represented in the same writing that Arctic Cat would release the previously launched Special Royalty Vehicles as early releases for Model Year 2017.

62.     Speed Partners relied on these representations in not exercising its contractual right to take its designs to other manufacturers as expressly allowed by the Agreement.

63.     Also in February of 2016, Arctic Cat formed the intention to end the Agreement and shut down the project with Speed Partners.  In furtherance of that intention, Arctic Cat sent personnel to meet with Mr. Gordon at Speed Partners' facility in North Carolina to communicate Arctic Cat's intention to end the Agreement.

However, instead of communicating its secret intention at the February 2016 meeting, Arctic Cat CEO Chris Metz represented to Mr. Gordon in the presence of others that Arctic Cat/Textron would produce Special Royalty Vehicles in the future under the Agreement and that Speed Partners would have complete design control.

64.     On or about February 19, 2016, following Arctic Cat's breach of the Agreement, Arctic Cat's counsel presented its written request that Mr. Gordon execute assignments to Arctic Cat of the patent applications that Arctic Cat's counsel had encouraged Mr. Gordon to file in August of 2015.

65.     One of the vehicles to be developed and sold under the Agreement is the "Robby Gordon Built Wildcat XX Race Vehicle."  According to the Agreement, this vehicle would be "race legal for Class 1900 participation in BITD [Best In The Desert] and SCORE International" (the two premier off-road racing series).  In furtherance of its February 2016 written representation that it would release the first Special Royalty Vehicles in late 2016 as Model Year 2017 vehicles, Arctic Cat agreed to and did sell parts to Speed Partners in July of 2016 for construction of the Robby Gordon Built Wildcat XX Race Vehicles for participation in the November 2016 Baja 1000, the biggest and most important race event in the SCORE International racing series.

66.     However, shortly before the November 2016 Baja 1000, Arctic Cat abruptly notified Speed Partners that contrary to the Agreement, Speed Partners should not brand the race vehicles as "Wildcat" vehicles because Arctic Cat was not ready to proceed with the promised early release of the Model Year 2017 Special Royalty Vehicles as represented by Arctic Cat in February of 2016.

67.     By late 2016, Arctic Cat had reported that it had not proceeded with the required Special Royalty Vehicles and other planned activities and obligations under the Agreement because it lacked the financial resources to proceed.

68.     Arctic Cat stated that it did not have the financial strength to manufacture and market the vehicles, and that the reason it did not proceed with the Limited Edition Wildcat X and Sport vehicles was because it lacked the money, resources, and

engineering support to do so.  In December of 2016, Arctic Cat furloughed staff reportedly due to its inability to fund its expenses.

### Arctic Cat is Acquired by Textron

69.     In January of 2017, it was announced that Arctic Cat would be acquired by Textron as part of a $247,000,000 merger transaction.  The all-terrain vehicles and side-by-side models that had been branded as Arctic Cat vehicles were either discontinued or re-branded as Textron Off-Road Vehicles.

70.     In February of 2017, Arctic Cat proceeded with its previously planned dealer show in Minneapolis/Saint Paul.  At that dealer show, Arctic Cat launched the Wildcat XX 2 seat and 4 seat versions as designed and developed by Speed Partners.  Also at the February 2017 dealer show, Arctic Cat solicited and took dealer orders for the Wildcat XR 2 seat and 4 seat versions.

71.     Arctic Cat informed its dealers and others present at the February 2017 dealer show that it was proceeding immediately with production of the long awaited Wildcat XX for 2017, and that the 4 seat version of the Wildcat XX would follow soon thereafter.

72.     John Collins is a Vice President at Textron Specialized Vehicles, Inc. and is the individual who was identified to Speed Partners as the person in charge of the Arctic Cat side-by-side program following Textron's acquisition of Arctic Cat.

73.     Shortly after the February 2017 dealer show, Mr. Collins advised Speed Partners that Textron was considering whether to proceed with the Speed Partners program, and that Textron may instead prefer to get "a divorce" and "buy-out" the Agreement with Speed Partners.

74.     Notwithstanding the representations made to dealers and others at the February 2017 dealer show, Textron immediately put on hold the production and sale of the Wildcat XX and the Wildcat XR vehicles in both 2 seat and 4 seat versions.

75.     Mr. Collins also revealed to Speed Partners that contrary to Mr. Metz' representations and statements, while Speed Partners had been painstakingly working on

designs and innovations for the Wildcat XX vehicle, Arctic Cat had continued to develop the "Zeus" vehicle in secret.

76.    Mr. Collins did not disclose and actively concealed the fact that by March of 2017, he had discovered that the financial condition at Arctic Cat was far worse than had been publicly disclosed, that it was an insolvent organization, that it had been under severe cash pressure since September of 2016, that the Arctic Cat engineering program was off-track and lacked the resources and support necessary to proceed with the promised vehicles, and that there was overwhelming internal conflict and resistance between Arctic Cat management and its engineering personnel that impaired Arctic Cat's development of the Special Royalty Vehicles.

77.    Mr. Collins announced that despite the history of delays and broken promises to the Arctic Cat dealers and Speed Partners, instead of proceeding with the Specialty Royalty Vehicles, Textron intended to set up a "competition" between the Wildcat XX as designed and developed by Speed Partners and the secret Zeus vehicle to determine which vehicle performed better.  Mr. Collins stated that the test would also include competing vehicles from Polaris, CanAm, and Yamaha to determine whether the Wildcat XX was "best in class."

78.    This action and course of conduct is inconsistent with Arctic Cat/Textron's express and implied obligations under the Agreement, as well as Arctic Cat's history of representations and assurances.

79.    In or about June of 2017, the comparison of the various competing vehicles including the Zeus to the Speed Partners Wildcat XX established that Speed Partners' designs and its vehicle were vastly superior.  Not only did the Wildcat XX out-perform the engineering and designs of the Arctic Cat Zeus vehicle, but it also outperformed the Yamaha YXZ, Can Am Turbo X, and the Polaris Turbo vehicles.  The Wildcat XX was unanimously found to be the "best in class" vehicle.  This was established as part of an independent test performed at Textron's direction.

/ / /

80.     As a result, Textron reluctantly agreed to finally proceed with full production and sale of the Speed Partners-designed Wildcat XX side-by-side, a vehicle that was launched in August of 2015 and February of 2017, and as to which Arctic Cat had repeatedly communicated its election to proceed as provided in the Agreement.

81.     However, on or about June 12, 2017, Mr. Collins sent correspondence to the Arctic Cat dealers in which he unilaterally and without notice to Speed Partners cancelled the Wildcat X RG Pro in all configurations and editions, and cancelled all dealer orders for the Wildcat X RG Pro, a vehicle that Arctic Cat had launched and for which it accepted dealer order in August of 2015 and again in February of 2017, and as to which Arctic Cat repeatedly communicated its election to proceed.

82.     In or about December of 2017, a meeting was held to discuss Textron's request to re-negotiate terms of the Agreement.  In particular, Textron complained that the royalties to be paid to Speed Partners under the Agreement were too high.

83.     At the meeting in December of 2017, Textron presented a written spreadsheet to Speed Partners in which Textron represented that it would proceed with the following Special Royalty Vehicles to be developed under the Agreement:  the Sport XX, the Sport XX Limited, the Wildcat XX 64 Naturally Aspirated Base Unit, the Wildcat XX 67 Mud Unit, the Wildcat XX 67 Rock Unit, the Wildcat XX 72 Naturally Aspirated Vehicle, the Wildcat XX 72 Speed Baja Unit, the Wildcat XX 64 Turbo Vehicle, the Wildcat XX 72 Turbo Vehicle, the Wildcat XX 4 Seat 64 Naturally Aspirated Base Unit, the Wildcat XX 4 Seat 72 Naturally Aspirated Unit, the Wildcat XX 4 Seat 64 Turbo Vehicle, and the Wild Cat XX 4 Seat 72 Turbo Vehicle.  The writing also contained Mr. Collins' proposed new royalty rates for each of the promised vehicles. Mr. Collins participated in the meeting and endorsed the representations contained in the spreadsheet as presented to Speed Partners.  This same product mix of vehicles to be developed by Textron under the Agreement was presented by Textron to Speed Partners multiple times thereafter.

/ / /

84.     Speed Partners relied on the representations by Textron that it elected to and would proceed with the vehicles identified in the spreadsheet in not exercising its contractual right to take its designs to other manufacturers as expressly allowed by the Agreement.

85.     The Wildcat XX was finally released by Textron in Model Year 2018, and quickly became the talk of the industry.  The Speed Partners designed Wildcat XX was so well received that it was named by UTV Magazine as the UTV Of The Year for 2018 and again for 2019.

86.     On February 25, 2018, Textron conducted its dealer show at which it launched the Wildcat XX yet again.  Mr. Collins himself conducted the presentation to the dealers in the presence of Speed Partners' Mr. Gordon and Mr. Romano.  In doing so, Mr. Collins played a video tape of the Speed Partners' designed Wildcat XX in various performance conditions.  During his presentation pertaining to the Wildcat XX, and consistent with the spreadsheet previously presented to Speed Partners in December 2017, Mr. Collins made the following further representations, among others to the same effect:  "This isn't the last new product you'll see today.  Not the last new product you'll see from Textron Off-Road.  And over the next 12 months we are delivering on our commitment to give you a steady drumbeat, a steady drumbeat of new products."

87.     In not exercising its contractual right to take its designs to other manufacturers as expressly allowed by the Agreement, Speed Partners relied on the representations by Textron that it elected to and would proceed with a "steady drumbeat" of new off-road products consistent with the vehicles identified in the spreadsheet presented by Mr. Collins to Speed Partners.

88.     In March of 2018, Textron transmitted email correspondence to Speed Partners accepting as novel a small and limited subset of the numerous patent claims that Mr. Gordon had submitted for patent protection to the United States Patent and Trademark Office years earlier, all of which Arctic Cat/Textron had previously asserted were not novel in writing.

**Textron Announcements and Cancellation of Vehicle Releases**

89.     In the spring and summer of 2018, Mr. Collins conducted meetings with Mr. Gordon, Mr. Romano and others in which Mr. Collins represented that Arctic Cat/Textron would proceed with the long awaited 4 seat version of the Wildcat XX for sale in early 2019.

90.     Speed Partners had provided the prototype for the 4 seat vehicle in 2016, and a four seat version was displayed at the Arctic Cat dealer show in February of 2017.

91.     Also at meetings in the spring and summer of 2018, Mr. Collins represented that Arctic Cat/Textron would proceed with three new Limited Edition versions of the Wildcat XX:  the Rock Edition, Mud Edition, and Baja Edition.

92.     Under the terms of the Agreement, Speed Partners would receive enhanced royalty payments for such Limited Edition vehicles.

93.     In the spring of 2018 and at various prior times, Michael D. Anderson (the Director of New Product Innovation of Arctic Cat/Textron) represented to Mr. Romano and Mr. Gordon that the four seat version of the Wildcat XX vehicle would be released in early 2019, and that the Turbo version of the two seat Wildcat XX would be released later in 2019 as a "mid-year release."

94.     In or about July of 2018, the parties entered into a supplemental Addendum to the Agreement providing for the possible development of a total of five additional Limited Edition vehicles.  A true and correct copy of the Addendum is attached hereto as Exhibit A.

95.     In the summer of 2018, Mr. Collins informed Speed Partners that notwithstanding the contractual obligation and overall plan as expressed in the Agreement to have the Wildcat SST serve as the next generation and replacement for the Wildcat XX LE, Arctic Cat/Textron would not proceed with the Wildcat SST or SST Jr. at any time.

96.     Once again, Speed Partners had been asked to build and design new products, and once again they complied.  Speed Partners built prototypes for the three

new Limited Edition vehicles that Mr. Collins requested.  Mr. Collins inspected the prototype vehicles developed by Speed Partners and described them as "bad ass."

97.     Thereafter, Arctic Cat/Textron presented and displayed the vehicles at industry trade and marketing shows, and they were uniformly well received.

98.     However, in early 2019, Mr. Collins advised Speed Partners that contrary to his earlier commitments, Arctic Cat/Textron had now decided not to proceed with release of the promised Wildcat XX 4 seat version in 2019, not to proceed with the promised turbo version of the Wildcat XX, and would not proceed with the other contractually required vehicles.  At or about the same time, Mr. Collins also advised that Arctic Cat/Textron had decided not to proceed with the three Limited Edition vehicles.

99.     On January 25, 2019, Mr. Collins sent email correspondence in which Arctic Cat/Textron flatly refused to proceed with the contractually required marketing meeting requested by Speed Partners, and reaffirmed that they would not proceed with contractually required vehicle production, development, and sales.  The January 2019 email correspondence even went so far as to suggest that Speed Partners should go elsewhere to have its vehicles produced.

100.    The January 25, 2019 email contains the following statements:

- "We will not pursue the XX Turbo or XX Crew [4 seat version] for 2020."

- "As previously discussed, there isn't a business case for any of the other models listed in the agreement that justifies moving forward, and we encourage your team to pursue other partners as appropriate.  We are not standing in your way."

- "At present, 100% of our engineering focus is on unit cost out.  We cannot and will not produce units which are margin losers for us after rebating."

- "There will be no meeting scheduled to discuss the current status with Scott."

101.    Thus, the original delay and ultimate refusal to release the Robby Gordon Limited Edition Wildcat X and Sport proved to be only the first failures in what has now

become a wholesale refusal by Arctic Cat/Textron to proceed with production and release of vehicles as required by the Agreement and as represented by both Mr. Metz and Mr. Collins, and the failure by Arctic Cat/Textron to make royalty payments as required by the Agreement.

102.    Over the course of the three and one-half years of the Agreement, Arctic Cat/Textron announced and then subsequently cancelled vehicle releases in October of 2015, January of 2016, August of 2016, November of 2016, February of 2017, July of 2017, spring of 2018, summer of 2018, fall of 2018, and most recently, January of 2019.

103.    Despite legal and contractual obligations to Speed Partners, and despite having communicated its election to proceed with the vehicle designs provided by Speed Partners, Arctic Cat/Textron has:  (a) refused to proceed with the SST and SST Jr. vehicles; (b) refused to proceed with the Limited Edition vehicles; (c) refused to provide planned release dates for the Wildcat XX 4 seat vehicle or the Wildcat XX Turbo vehicle; (d) refused to proceed with the Robby Gordon Limited Edition Wildcat X; (e) refused to proceed with the Limited Edition Sport; (f) refused to proceed with the three Wildcat XX Limited Edition vehicles; (g) refused to proceed with meetings to discuss these marketing decisions; (h) refused to proceed with previously approved race marketing programs for the SCORE Baja off-road race events; (i) refused to proceed with vehicle development as represented and promised in the Agreement; (j) failed to make royalty payments due under the agreement; (k) refused to acknowledge novelty as to all but a small subset of Mr. Gordon's designs and patent claims; (l) failed to allocate ten vehicles to Speed Partners each year as agreed; and (m) generally failed to meet its fundamental legal and contractual duties and obligations.

104.    In addition to its ongoing breaches, false promises and misrepresentations as described above, Arctic Cat/Textron has taken a series of actions that impair Speed Partners' right to receive Halo and Pivot royalties, as well as royalties for the accessories and aftermarket products, all as required by the Agreement.

105.   Most notably, Arctic Cat/Textron entered into an agreement or a series of agreements to market certain Arctic Cat/Textron Wildcat vehicles through Bass Pro Shops and using the Bass Pro Shops "Tracker" brand.  These actions are inconsistent with the marketing and branding terms of the Agreement and the implied covenant of good faith and fair dealing, and directly impair Speed Partners' entitlement to receive Halo and Pivot royalties and other benefits of the Agreement.

106.   More recently, Plaintiffs learned that in addition to marketing other Arctic Cat/Textron Wildcat vehicles through the Bass Pro Shops "Tracker" brand, Defendants have also allowed Bass Pro Shops to completely re-brand Speed Partners' Special Royalty Vehicle, the Wildcat XX, and sell it through the Bass Pro Shops "Tracker" brand at a substantial discount.

107.   Pursuant to the Agreement, Speed Partners provided a detailed set of designs for accessories and aftermarket products, and in consultation with Arctic Cat personnel, developed a complete product brochure for accessories and aftermarket products as contemplated by the Agreement.

108.   Although Arctic Cat/Textron initially proceeded with some aspects of the accessories and aftermarket program, Arctic Cat/Textron ultimately failed to fully implement the program, and told Speed Partners to pursue the accessories program itself, in sharp contrast to the statements made by Chris Metz and others at Arctic Cat.

109.   Notwithstanding Arctic Cat/Textron's wholesale breach, Speed Partners has met its obligations, patiently cooperated with and assisted Arctic Cat/Textron in their efforts to cure their breaches, and generally demonstrated its willingness to work with Arctic Cat/Textron as it worked through its problems.  But Plaintiffs' cooperation has been met with a high-handed disregard for Plaintiffs' rights under the Agreement and otherwise at law.

/ / /

/ / /

/ / /

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

110.    Plaintiffs incorporate and allege the preceding paragraphs as though fully set forth herein.

111.    Plaintiffs Speed Partners, Robby Gordon, and Todd Romano, entered into the Agreement with Arctic Cat on or about July 31, 2015.

112.    Speed Partners has performed all terms of the Agreement required of it to be performed in the manner specified by the Agreement, including by endeavoring to develop new vehicles as contemplated by the Agreement.

113.    Arctic Cat, and its successor in interest Textron failed to perform under the contract by various acts and omissions, including, without limitation, the following:

    a.    failing to pay royalties to Plaintiffs as required by the Agreement;

    b.    failing to produce, market and sell Special Royalty Vehicles in 2016 and 2017 as required by the Agreement;

    c.    failing to market and sell the minimum number of Special Royalty Vehicles each year from 2016 to the present as detailed in the Agreement;

    d.    failing to develop the accessories and aftermarket product line as provided in the Agreement;

    e.    refusing to acknowledge novelty of Plaintiffs' designs before incorporating the designs into vehicles;

    f.    refusing to proceed with the SST and SST Jr.  vehicles as required by the Agreement;

    g.    refusing to proceed with the Limited Edition vehicles as provided in the Agreement;

    h.    refusing to provide planned release dates for the Wildcat XX 4 seat vehicle or the Wildcat XX Turbo vehicle;

    i.    refusing to proceed with the Robby Gordon Limited Edition Wildcat X as required by the Agreement;

j.      refusing to proceed with the Limited Edition Sport vehicle as provided in the Agreement;

k.      refusing to proceed with the 3 Wildcat XX Limited Edition vehicles as requested by Mr. Collins;

l.      refusing to proceed with contractually required marketing meetings to discuss these marketing decisions and others;

m.      refusing to proceed with previously approved race marketing programs for the SCORE Baja off-road race events;

n.      refusing to proceed with vehicle development as represented and promised in the Agreement;

o.      failing to allocate ten vehicles to Speed Partners each year as required by the Agreement; and

p.      generally failing to meet its fundamental legal and contractual duties and obligations.

114.    As a result of Defendants' breaches of the Agreement, Plaintiffs have been harmed, and are entitled to damages in an amount to be determined at trial, plus interest thereon at the legal rate.

## **SECOND CLAIM FOR RELIEF**

### **(Breach of Implied Covenant of Good Faith and Fair Dealing)**

115.    Plaintiffs incorporate and allege the preceding paragraphs as though fully set forth herein.

116.    Plaintiffs Speed Partners, Robby Gordon, and Todd Romano, entered into the Agreement with Arctic Cat on or about July 31, 2015.

117.    Speed Partners has performed all terms of the Agreement required of it to be performed in the manner specified by the Agreement.

118.    Arctic Cat, and its successor in interest Textron, unfairly interfered with Plaintiffs' right to receive the benefits of the contract, including by intentionally failing to pursue reasonable efforts to manufacture, produce, distribute, market, develop, and sell

the Special Royalty Vehicles and other vehicles and accessories, by repeatedly launching, taking orders, and then cancelling vehicle launches, by intentionally harming the market for the vehicles by rebranding the vehicles and allowing them to be sold at substantially lower prices through unauthorized channels, and by surreptitiously diverting needed development resources to be used on a competing vehicle.

119.    As a result of Defendants' interferences, Plaintiffs have been harmed, and are entitled to damages in an amount to be determined at trial, plus interest thereon at the legal rate.

## THIRD CLAIM FOR RELIEF

### (Intentional Misrepresentation)

120.    Plaintiffs incorporate and allege the preceding paragraphs as though fully set forth herein.

121.    As alleged herein, Defendants represented to Plaintiffs that each of the following facts were true:

a.    Defendants would pay royalties to Speed Partners in accordance with the Agreement;

b.    Defendants were committed to completely revamping their line of off-road vehicles, including side-by-side vehicles;

c.    Defendants were committed to partnering with Plaintiffs to improve the quality, reliability, and reputation of defendants off-road vehicles in its powersports industry;

d.    Defendants were committed to working exclusively with Mr. Gordon to develop, market, and sell a new line of off-road side-by-side vehicles;

e.    Defendants were committed to releasing new side-by-side models in each Model Year with increasing options and product offerings;

f.    Defendants were committed to working exclusively with Mr. Romano to develop, market, and sell a new line of accessories and aftermarket products for side-by-side vehicles;

g.      Defendants had abandoned the Zeus project and all of their off-road resources would be devoted to development of Plaintiffs' vehicles; and

h.      Defendants had the financial ability to support the new strategic partnership with Speed Partners to develop new side-by-side vehicles and accessories;

i.      Defendants would devote the necessary resources to product development, would market and sell the Special Royalty Vehicles, would proceed with those vehicles as to which they communicated their election to proceed, would make and communicate their elections honestly and in good faith, and would take appropriate steps to protect patent and intellectual property rights associated with Plaintiffs' designs and inventions in exchange for Plaintiffs' actions in developing the designs, granting certain intellectual property rights, and endorsing the products.

j.      Defendants elected to proceed with the Wildcat X RG Pro in 2 seat and 4 seat configuration;

k.      Defendants elected to proceed with the Wildcat XX in 4 seat configuration;

l.      Defendants elected to proceed with the Wildcat Sport;

m.      Defendants elected to proceed with the Sport XX and the Sport XX Limited;

n.      Defendants elected to proceed with the Wildcat XX 64 Naturally Aspirated Base Unit;

o.      Defendants elected to proceed with the Wildcat XX 67 Mud Unit and the Wildcat XX 67 Rock Unit;

p.      Defendants elected to proceed with the Wildcat XX 72 Naturally Aspirated Vehicle, and the Wildcat XX 72 Speed Baja Unit;

q.      Defendants elected to proceed with the Wildcat XX 64 Turbo Vehicle and the Wildcat XX 4 Seat 64 Naturally Aspirated Base Unit;

r.      Defendants elected to proceed with the Wildcat XX 72 Turbo Vehicle;

        s.      Defendants elected to proceed with the Wildcat XX 4 Seat 72 Naturally Aspirated Unit and the Wildcat XX 4 Seat 64 Turbo Vehicle;

        t.      Defendants elected to proceed with the Wildcat XX 4 Seat 72 Turbo Vehicle;

        u.      Defendants would provide a steady drumbeat of additional new off-road vehicles following the February 2018 launch of the Wildcat XX 2 seat vehicle;

        v.      It was not a matter of "if" the Wildcat X RG Pro and the Wildcat Sport would be released by Arctic Cat, it was only a matter of "when" those vehicles would be released;

        w.      Defendants would release the Wildcat X RG Pro and Wildcat Sport as Model Year 2017 vehicles in late 2016;

        x.      From February of 2016 forward, Plaintiffs would have complete design control for the Special Royalty Vehicles; and

        y.      The Zeus vehicle program was cancelled in late 2015.

    122.   At the time those representations were made by Defendants' officers and agents, Defendants knew that the representations were false. Alternatively, the representations were made recklessly without knowledge of whether the facts stated were true or false.

    123.   Defendants intended Plaintiffs to rely on the representation in order to induce Plaintiffs to enter into the Agreement, to induce Plaintiffs to perform under the Agreement, and to induce Plaintiffs to provide valuable designs and intellectual property that Defendants would improperly claim as their own.

    124.   Plaintiffs reasonably relied on Defendants' representations to their detriment by entering into the Agreement, performing their obligations under the Agreement, foregoing other opportunities, foregoing their contractual right to take their designs to other manufacturers as expressly allowed by the Agreement, expressing a willingness to assign certain of Mr. Gordon's patent applications to Defendant Arctic Cat Sales Inc., and allowing their names, likenesses, designs and intellectual property to be

used and commercially exploited by Arctic Cat/Textron. Plaintiffs spent time, money, and resources complying with their duties under the Agreement, and sacrificed or abandoned potential alternative partnerships and business ventures.

125. Plaintiffs were harmed in that they spent time, money, and resources complying with their duties under the Agreement, and sacrificed or abandoned potential alternative partnerships and business ventures.

126. Plaintiffs' reliance on Defendants' representation was a substantial factor in causing Plaintiffs' harm.

## **FOURTH CLAIM FOR RELIEF**

### **(Negligent Misrepresentation)**

127. Plaintiffs incorporate and allege the preceding paragraphs as though fully set forth herein.

128. As alleged herein, Defendants represented to Plaintiffs that each of the following facts were true:

a. Defendants would pay royalties to Speed Partners in accordance with the Agreement;

b. Defendants were committed to completely revamping their line of off-road vehicles, including side-by-side vehicles;

c. Defendants were committed to partnering with Plaintiffs to improve the quality, reliability, and reputation of defendants off-road vehicles in its powersports industry;

d. Defendants were committed to working exclusively with Mr. Gordon to develop, market, and sell a new line of off-road side-by-side vehicles;

e. Defendants were committed to releasing new side-by-side models in each Model Year with increasing options and product offerings;

f. Defendants were committed to working exclusively with Mr. Romano to develop, market, and sell a new line of accessories and aftermarket products for side-by-side vehicles;

g.      Defendants had abandoned the Zeus project and all of their off-road resources would be devoted to development of Plaintiffs' vehicles; and

h.      Defendants had the financial ability to support the new strategic partnership with Speed Partners to develop new side-by-side vehicles and accessories;

i.      Defendants would devote the necessary resources to product development, would market and sell the Special Royalty Vehicles, would proceed with those vehicles as to which they communicated their election to proceed, would make and communicate their elections honestly and in good faith, and would take appropriate steps to protect patent and intellectual property rights associated with Plaintiffs' designs and inventions in exchange for Plaintiffs' actions in developing the designs, granting certain intellectual property rights, and endorsing the products.

j.      Defendants elected to proceed with the Wildcat X RG Pro in 2 seat and 4 seat configuration;

k.      Defendants elected to proceed with the Wildcat XX in 4 seat configuration;

l.      Defendants elected to proceed with the Wildcat Sport;

m.      Defendants elected to proceed with the Sport XX and the Sport XX Limited;

n.      Defendants elected to proceed with the Wildcat XX 64 Naturally Aspirated Base Unit;

o.      Defendants elected to proceed with the Wildcat XX 67 Mud Unit and the Wildcat XX 67 Rock Unit;

p.      Defendants elected to proceed with the Wildcat XX 72 Naturally Aspirated Vehicle, and the Wildcat XX 72 Speed Baja Unit;

q.      Defendants elected to proceed with the Wildcat XX 64 Turbo Vehicle and the Wildcat XX 4 Seat 64 Naturally Aspirated Base Unit;

r.      Defendants elected to proceed with the Wildcat XX 72 Turbo Vehicle;

s.      Defendants elected to proceed with the Wildcat XX 4 Seat 72 Naturally Aspirated Unit and the Wildcat XX 4 Seat 64 Turbo Vehicle;

t.      Defendants elected to proceed with the Wildcat XX 4 Seat 72 Turbo Vehicle;

u.      Defendants would provide a steady drumbeat of additional new off-road vehicles following the February 2018 launch of the Wildcat XX 2 seat vehicle;

v.      It was not a matter of "if" the Wildcat X RG Pro and the Wildcat Sport would be released by Arctic Cat, it was only a matter of "when" those vehicles would be released;

w.      Defendants would release the Wildcat X RG Pro and Wildcat Sport as Model Year 2017 vehicles in late 2016;

x.      From February of 2016 forward, Plaintiffs would have complete design control for the Special Royalty Vehicles; and

y.      The Zeus vehicle program was cancelled in late 2015.

129.   At the time those representations were made by Defendants' officers and agents, Defendants had no reasonable grounds for believing the representations to be true when they were made, and failed to use reasonable care and competence in obtaining and communicating information to Plaintiffs.

130.   Defendants intended Plaintiffs to rely on the representation in order to induce Plaintiffs to enter into the Agreement, to induce Plaintiffs to continue to perform under the Agreement, and to induce Plaintiffs to provide valuable designs and intellectual property that Defendants would improperly claim as their own.

131.   Plaintiffs reasonably relied on Defendants' representations to their detriment by entering into the Agreement, performing their obligations under the Agreement, foregoing other opportunities, foregoing their contractual right to take their designs to other manufacturers as expressly allowed by the Agreement, expressing a willingness to assign certain of Mr. Gordon's patent applications to Defendant Arctic Cat Sales Inc., and allowing their names, likenesses, designs and intellectual property to be

used and commercially exploited by Arctic Cat/Textron.  Plaintiffs spent time, money, and resources complying with their duties under the Agreement, and sacrificed or abandoned potential alternative partnerships and business ventures.

132.    Plaintiffs were harmed in that they spent time, money, and resources complying with their duties under the Agreement, and sacrificed or abandoned potential alternative partnerships and business ventures.

133.    Plaintiffs' reliance on Defendants' representation was a substantial factor in causing Plaintiffs' harm.

## FIFTH CLAIM FOR RELIEF

### (Fraud—Concealment)

134.    Plaintiffs incorporate and allege the preceding paragraphs as though fully set forth herein.

135.    Defendants intentionally concealed from, failed to disclose to, or prevented Plaintiffs from discovering certain facts, including at least the following:

a.    Contrary to Defendants' representations, they did not discontinue the Zeus project in 2015;

b.    Contrary to Defendants' representations, they did not direct their engineering staff to work exclusively on the development of the Robby Gordon-designed vehicles;

c.    Defendants did not have the financial ability to support the new strategic partnership with Speed Partners to develop new vehicles and accessories as alleged herein;

d.    The financial condition of Arctic Cat was far worse than had been publicly disclosed and that it was an insolvent organization;

e.    Arctic Cat had been under severe cash pressure since September of 2016;

f.    The Arctic Cat engineering program was off-track and lacked the resources and support necessary to proceed with the promised vehicles;

g.      Arctic Cat formed the intention to end the Agreement in February of 2016, and would thereafter demand transfer of Speed Partners' designs and patent rights with no intention and no ability to proceed with the development, manufacturing, and sale of the Special Royalty Vehicles; and

h.      There was overwhelming internal conflict and resistance between Arctic Cat management and its engineering personnel that impaired Arctic Cat's development of the Special Royalty Vehicles.

136.    Plaintiffs did not know these facts.

137.    Defendants intended to deceive Plaintiffs by concealing these facts. Defendants had special knowledge of the material facts and knew that Plaintiffs were not able to obtain the true information within Defendants' knowledge, and Defendants made statements which were misleading given other facts that Defendants knew to be true as alleged herein.

138.    Had the omitted information been disclosed, Plaintiffs reasonably would have behaved differently.

139.    Plaintiffs relied on the absence of the facts concealed and were harmed by entering into the Agreement, performing their obligations under the Agreement, foregoing other opportunities, foregoing their contractual right to take their designs to other manufacturers as expressly allowed by the Agreement, expressing a  willingness to assign certain of Mr. Gordon's patent applications to Defendant Arctic Cat Sales Inc., and allowing their names, likenesses, designs and intellectual property to be used and commercially exploited by Arctic Cat/Textron.  Plaintiffs spent time, money, and resources complying with their duties under the Agreement, and sacrificed or abandoned potential alternative partnerships and business ventures.

140.    Defendants' concealment was a substantial factor in causing Plaintiffs' harm.

## **PRAYER FOR RELIEF**

WHEREFORE, Speed Partners requests the following relief:

1.      An award of damages for Breach of Contract, together with prejudgment interest and costs;

2.      An award of damages for Fraud and Deceit, together with prejudgment interest and costs;

3.      Plaintiffs' costs of suit herein;

4.      For such further legal and equitable relief as the court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of any and all issues triable of right by jury.

Dated:  September 1, 2020          By:      / s/ Steven A. Nichols

RUTAN & TUCKER, LLP
Steven A. Nichols (*Pro Hac Vice*)
snichols@rutan.com
Bradley A. Chapin (*Pro Hac Vice*)
bchapin@rutan.com
Benjamin C. Deming (*Pro Hac Vice*)
bdeming@rutan.com
Steven J. Goon (*Pro Hac Vice*)
sgoon@rutan.com
611 Anton Boulevard, Suite 1400
Costa Mesa, CA  92626
Tel:  (714) 641-5100
Fax:  (714) 546-9035

DADY & GARDNER, P.A.
J. Michael Dady (#0389434)
jmdady@dadygardner.com
John D. Holland (#028614X)
jholland@dadygardner.com
5100 IDS Center,
80 South 8th Street
Minneapolis, MN  55402
Tel:  (612) 359-3504
Fax:  (612) 359-3507

*Attorneys for Plaintiffs*
*Speed RMG Partners, LLC, Robby*
*Gordon, and Todd Romano*