# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

|  |  |
|---|---|
| ) | |
| ) | |
| SPEED RMG PARTNERS, LLC, ROBBY ) | Case No.  20-cv-00609-NEB-LIB |
| GORDON, AND TODD ROMANO, ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | |
| ) | |
| ARCTIC CAT INC., ARCTIC CAT SALES ) | |
| INC., TEXTRON INC., AND TEXTRON ) | |
| SPECIALIZED VEHICLES INC., ) | |
| ) | |
| *Defendants.* ) | |
| ) | |
| ) | |

## *PLAINTIFFS SPEED RMG PARTNERS, LLC, ROBBY GORDON AND TODD ROMANO'S OPPOSITION TO MOTION FOR A PROTECTIVE ORDER TO PRECLUDE THE DEPOSITION OF SCOTT DONNELLY*

## I.      **INTRODUCTION.**

Arctic Cat Parties'[1] Motion for a Protective Order to Preclude the Deposition of Scott Donnelly (the "Motion") constitutes a transparent effort to stonewall Speed RMG Parties[2] from obtaining discoverable information through the deposition of Mr. Donnelly, the CEO of defendant Textron Inc. (the entity that acquired Arctic Cat).  Because Mr. Donnelly had oversight and ultimate decision-making authority concerning the wrongs underlying this action, and did in fact make the decisions that gave rise to the claims herein, the Motion fails on multiple levels and should be denied in its entirety.

Before reaching the merits of the Motion, Arctic Cat Parties failed to engage in a good faith meet and confer before burdening the Court with this needless and costly Motion, which alone warrants denial of the Motion.  Rather than engage in any meaningful discussion with Speed RMG Parties, Arctic Cat Parties sent an email containing general legal boilerplate and then filed this Motion without waiting for a response, at a time when Mr. Donnelly's deposition was not even on calendar. (Declaration of Steven A. Nichols ["Nichols Decl."], ¶ 9.)

Even if the Court were to consider the merits of Arctic Cat Parties' arguments (it should not), they each fail.  *First*, Arctic Cat Parties have the burden to set forth facts showing that they will suffer some concrete harm if the protective order does not issue. *General Dynamics Corp. v. Selb Mfg. Co*., 481 F.2d 1204, 1212 (8th Cir. 1973).  The

---

[1]      The term "Arctic Cat Parties" collectively refers to defendants Arctic Cat Sales Inc., Arctic Cat Inc., Textron Specialized Vehicles Inc., and Textron Inc.  In places, this Opposition also collectively refers to (1) Arctic Cat Sales Inc. and Arctic Cat Inc. as "Arctic Cat" and (2) Textron Specialized Vehicles Inc., and Textron Inc. as "Textron."
[2]      The term "Speed RMG Parties" collectively refers to plaintiffs Speed RMG Partners, LLC, Robby Gordon, and Todd Romano.

Motion is completely devoid of any allegations or evidence of such harm, except for generalized assertions that the deposition would inconvenience Mr. Donnelly. Such generalizations are patently deficient under Federal Rule 26.

**Second**, the Arctic Cat Parties cannot carry their burden to show that other relevant considerations weigh against permitting Mr. Donnelly's deposition. *See Bombardier Recreational Prods., Inc. v. Arctic Cat, Inc.*, No. 12-cv-2706 (MJD/LIB), 2014 WL 5685463, at *2 (D. Minn. Sept. 24, 2014). More specifically, Arctic Cat Parties offer only bald, self-serving assertions that Mr. Donnelly has no unique knowledge of facts underlying this lawsuit, none of which assertions are actually supported with a declaration from Mr. Donnelly. (*See, e.g.,* Dkt. 210, Declaration of John Collins ["Collins Decl."], ¶ 5 ["I was the primary decision-maker regarding the development of vehicles governed by the Agreement during my time as TSV's VP of the Off-Road Division."].) Despite Mr. Collins' suggestions to the contrary, Mr. Donnelly was in fact the executive that oversaw the Arctic Cat integration with Textron, received regular briefings on Arctic Cat vehicles, and made the final decisions regarding product development, including the final decision on the development of the Wildcat XX – the only vehicle actually produced by Arctic Cat under the Agreement.. (Declaration of Michael Anderson ["Anderson Decl."], ¶¶ 6-13 ["Mr. Donnelly was pleased with the presentation and approved the recommendation to fund and proceed with development of the Wildcat XX."].) Therefore, Mr. Donnelly's motivation in approving or vetoing product development, approval of funding for the development of vehicles under the Agreement, and oversight of Arctic Cat cannot be obtained from other sources, such as ground-level, day-to-day employees. Indeed, because Mr. Donnelly personally made

these decisions, he is the only person capable of providing direct testimony as to his reasons therefor.  Consequently, Arctic Cat Parties' entire premise of its Motion is false: i.e., that Mr. Donnelly "played no role in the managing of that relationship [between Speed RMG Parties and Arctic Cat Parties] or in any of the events giving rise to the claims in this lawsuit."  (Motion, at p. 1.)

## II.    FACTUAL AND PROCEDURAL BACKGROUND.

### A.    *Arctic Cat Parties' Contractual Breaches and Fraud*

#### 1.    *Background of the Dispute: the Agreement*

This lawsuit arises from claims related to a Product Development and Marketing Agreement (the "Agreement") entered among plaintiffs Speed RMG Partners, LLC, Robby Gordon, Todd Romano, and defendant Arctic Cat Sales Inc., negotiated in 2015. (*See* Dkt. 164 (SAC) ¶ 1; Dkt. 29-1; Dkt. 29-2.)  At that time, Arctic Cat suffered from a poor reputation for the quality of its side-by-side vehicles and was unable to develop a meaningful market share.  (Dkt. 164 (SAC) ¶ 17.)  Given the industry know-how of Gordon and Romano (*id.* ¶¶ 18-21), Arctic Cat Sales Inc. CEO Chris Metz and other Arctic Cat management discussed developing a relationship with them that could enable Arctic Cat to secure a share of the growing side-by-side market.  (*Id.* ¶ 25.)

At the time that the parties were negotiating the Agreement, Arctic Cat personnel made numerous representations to induce Speed RMG Parties to enter the Agreement, which Speed RMG Parties relied on in entering the Agreement in July 2015.  (*Id.* ¶¶ 26-29, 31.)   Speed RMG Partners, LLC agreed to provide vehicle and product designs and annual updates for existing and new side-by-side vehicles identified as "Special Royalty Vehicles."  (*Id.* ¶ 33.)  In turn, the Agreement required Arctic Cat to produce Special

Royalty Vehicles and pay royalties to Speed RMG Partners, LLC.  (*Id.* ¶¶ 33-43.)

From the start, Arctic Cat failed to meet its obligations.  Contrary to the terms of the Agreement and its public statements, Arctic Cat Parties did not produce or sell Special Royalty Vehicles in model years 2016 or 2017.  Also, Arctic Cat initially requested that Speed RMG Parties help improve an existing vehicle development project code-named Zeus.  (*Id.* ¶ 51.)  Arctic Cat CEO Chris Metz subsequently lied to Gordon by telling him that the Zeus project was discontinued, although Arctic Cat continued to devote its limited resources to that project, in competition with the Special Royalty Vehicles and to the detriment of the production of vehicles under the Agreement.  (*Id.* ¶¶ 54, 55, 75.)  Correspondingly, Arctic Cat continued to induce Speed RMG Parties to believe it would perform under the Agreement despite its failure to produce Special Royalty Vehicles – although it had already formed the intention to end the Agreement. (*Id.* ¶¶ 61, 63.)

2. *Arctic Cat's Breach of the Agreement*

In January of 2017, it was announced that Textron would acquire Arctic Cat.  (*Id.* ¶ 69.)  Despite Textron's acquisition, Arctic Cat Sales Inc. still failed to produce the Special Royalty Vehicles, with the exception of a single vehicle called the "Wildcat XX." (*Id.* ¶ 85.)  All the while, though, Arctic Cat continued to represent that it would proceed with production of the Special Royalty Vehicles.  In fact, in July of 2018, the parties entered into a supplemental Addendum to the Agreement, signed by Textron Specialized Vehicles Inc., providing for the possible development of additional Limited Edition Vehicles.  (*Id.* ¶ 94.)  Yet at that time, Arctic Cat was an insolvent organization, it had been under severe cash pressure since September of 2016, its engineering program was

off-track, and it lacked the resources and support necessary to proceed with the promised

vehicles.  (*Id.* ¶ 76.)  Arctic Cat Parties fraudulently concealed these facts from Speed

RMG Parties so that they would continue to provide design and engineering services.

(*Id.*)

Ultimately, Arctic Cat Parties produced only a single side-by-side model (the

Wildcat XX).  (*See id.* ¶ 85.)  In early 2019, John Collins, the Vice President at Textron

Specialized Vehicles, Inc., advised Speed RMG Parties that, contrary to earlier

commitments, Arctic Cat Parties would not proceed with any more vehicles in 2019.  (*Id.*

¶ 98.)  On January 25, 2019, Mr. Collins sent email correspondence confirming in writing

that "there isn't a business case for any of the other models listed in the agreement that

justifies moving forward."  (*Id.* ¶¶ 99-100.)  This communication marked a wholesale

refusal by Arctic Cat Parties to proceed with production and release of vehicles as

required by the Agreement and as represented by both Metz and Collins.

3.     *Mr. Donnelly's Involvement in the Breach*

Mr. Donnelly is the President and CEO of Textron Inc., which acquired Arctic Cat

in January 2017.  In that role, Mr. Donnelly makes the final decision on all consequential

business-related matters after gathering input and recommendations from employees such

as Mr. Collins.  (Anderson Decl., ¶¶  6, 9.)  To that end, Mr. Donnelly conducts annual

Strategic Business Reviews ("SBR's"), typically in the late spring or early summer, at

which the leads of each division present their business plans and performance data to Mr.

Donnelly for his analysis.  (*Id.*, ¶ 7.)  As part of the SBR's, Mr. Donnelly conducts a full

review of powersports vehicle development plans and decided which to release on an

annual basis.  (*Id.*)  Although Mr. Donnelly often heeded the judgment of his division

leads, he still departed from that guidance at his discretion, particularly for more consequential business matters.  (*Id.*, ¶ 9.)

By way of illustration, on May 22, 2017 – five months after Textron, Inc. acquired Arctic Cat – Michael Anderson, the former Director of New Product Innovation at Arctic Cat, sent slides to Mr. Collins for his presentation to Mr. Donnelly scheduled for the following day.  (*Id.*, ¶ 13, Ex. 2 ["Attached are the slides I prepared for tomorrow's presentation with Donnelly."].)  The presentation concerned the Wildcat XX (i.e., one of the vehicles to be developed and sold under the Agreement), including details on the product, development timeline, future editions, capital expenditures, and margin analysis. (*Id.*)  The presentation also included issues that would need to be addressed before proceeding with production of the Wildcat XX, such as costs and anticipated returns on investment.  (*Id.*)  Mr. Anderson and Mr. Collins both recommended that Textron proceed with development of the Wildcat XX, which Mr. Donnelly approved.  (*Id.*)  With Mr. Donnelly's ultimate approval, development of the Wildcat XX ensued.  (*Id.*)

As a further example, on September 25, 2018 – four months before Mr. Collins sent his email repudiating the Agreement – Mr. Collins sent an email to Kevin Holleran attaching a presentation titled "Donnelly Dirt[3] Review Collins," with the body of the email providing: "For tomorrow."  (Declaration of Steven A. Nichols ["Nichols Decl."], ¶ 10, Ex. 2.)  The 57-page presentation begins with an agenda that includes a high level financial summary, an objective to "Drive Retail," "Improve Channel Make-up," "Marketing Strategy," and "Gross Margin Performance," and a subtitle identifying an

---

[3]   The Textron division focusing on the development of off-road powersports vehicles was commonly referred as the "dirt" division.  (Anderson Decl., ¶ 5.)

objective of improving gross margin by reducing cost of goods sold and improving business profitability. (*Id*.) The presentation goes on to feature financial performance and profitability models for the Wildcat XX and new plans for marketing initiatives, adding dealers and culling non-compliance dealers, and moving product. (*Id.*)

Then, on April 7, 2019 – just over six weeks after Mr. Collins sent the repudiation email – Bill Rhinesmith sent an email to Mr. Collins and others with a presentation titled "Dirt Product Strategy" attached, which showed their plan for various Tracker (Bass Pro) vehicles, including the Wildcat XX sold as the Tracker XTR 1000. (Nichols Decl., ¶ 11, Ex. 3.) The cover email provides: "Scott has indicated that he is not interested in the XTR/XXmarket . . . ." (*Id*.) ("Scott" might refer to Scott Donnelly or Scott Ernest, although the former is more plausible because the latter was largely responsible for cultivating the Bass Pro relationship.) Considered in conjunction with the prior presentations for Mr. Donnelly, it is reasonable to infer that Mr. Donnelly made the ultimate decision to terminate the Agreement, which Holleran and Collins implemented.

Furthermore, allegations of a shareholder suit reinforce Mr. Donnelly's role in Arctic Cat affairs. On August 22, 2019 – six months after Mr. Collins' repudiation email – shareholders filed a lawsuit against Textron, Inc. and two top executives, including Mr. Donnelly, for violations of federal securities laws, alleging that Textron failed to disclose that when it purchased Arctic Cat there was an aged inventory problem with the Arctic Cat dealers; that the inventory problem impacted Textron's ability to sell new products through the dealers; that it would continue to impact sales for some appreciable time into the future; and that the Textron stock price plummeted as a result of delayed disclosure of the problem. (*See Bldg. Trades Pension Fund of W. Pa. v. Textron Inc. et al.*, case no.

1:19-cv-07881, S.D.N.Y., Dkt. 39.)  Although the Court recently granted Textron's motion to dismiss  (*id.*, Dkt. 50), with that decision currently on appeal in the Second Circuit in case no. 20-2746, the operative complaint contains a plethora of allegations related to Mr. Donnelly's direct involvement in the "Arctic Cat turnaround plan."  (*See, e.g., id.,* Dkt. 39, ¶ 6 ["The Arctic Cat turnaround team monitored the progress of the plan on a regular basis by accessing Arctic Cat dealer sales and inventory data and reports. Throughout 2017-18, Holleran and Collins met with Defendants Donnelly and Connor multiple times at the Company's Providence, Rhode Island headquarters.  Further, members of the Arctic Cat turnaround team monitored through regular meetings, including meetings with sales representatives or Arctic Cat dealers."]; ¶ 94 ["By early 2018, Textron delivered just eight Wildcat XX side-by-side vehicles. . . . [confidential informant] left multiple voicemails and sent text messages to Defendant Donnelly looking for answers regarding the unfulfilled orders and engineering issues."]; etc.)

In short, there is ample evidence of Mr. Donnelly's direct involvement in the integration of Arctic Cat, as well as his ultimate decision-making authority on all consequential business matters.  Moreover, by way of this Opposition, Speed RMG parties have presented direct evidence from a former Arctic Cat executive that it was Mr. Donnelly that "approved the recommendation to fund and proceed with development of the Wildcat XX," i.e., the only vehicle Arctic Cat actually produced under the Agreement.  (Anderson Decl., ¶ 13.)   Based on the foregoing, it is highly unlikely that Mr. Collins sent his January 25, 2019 email repudiating the Agreement without Mr. Donnelly's direction or active involvement.  (*Id.*, ¶ 10.)

**B.**     *The Parties' Meet and Confer Efforts Regarding Mr. Donnelly's Deposition*

Arctic Cat Parties' objection to the deposition of Mr. Donnelly was first raised in a phone call between counsel on January 4, 2021 and was again discussed on January 5, 2021. (Nichols Decl., ¶ 2.)  During those calls, Arctic Cat Parties' counsel indicated that they objected to Mr. Donnelly's deposition based on the apex doctrine and suggested that Mr. Donnelly had no involvement in the decisions to produce or not produce vehicles under the Agreement, but agreed to investigate his involvement further. (*Id.*)

After those conversations, on January 6, 2021, counsel for the Speed RMG Parties sent an email to counsel for the Arctic Cat Parties, stating as follows: "As for Donnelly, we are not able to make a final decision on his deposition at this time.  As discussed, we understand that he was involved in managing important issues pertaining to the relationship with our clients.  From our last conversation, I understood that you were going to seek information pertaining to his involvement and let us know whether you still objected to his deposition." (*Id.*, ¶ 3, Ex. 1.)   Counsel for Arctic Cat Parties responded, but did not address the portion of the email inquiring about Mr. Donnelly's involvement in decision-making concerning the Agreement with Speed RMG Parties. (*Id.*)

On January 12, 2021 counsel for Speed RMG Parties requested that Arctic Cat Parties "cite me to the key case or cases that you rely on for the proposition that these current and former employees are not subject to deposition in our case based on their title or involvement." (*Id.*, ¶ 7, Ex. 1.)   The following day, Arctic Cat Parties' counsel sent along a paragraph of legal boilerplate (which is copied word-for-word in the legal standard section of their Motion at page 10), which reads as follows:

The court's inquiry is more exacting under Rule 26 when a party attempts to depose a high-level executive like a President or CEO. "[C]ourts are wary of allowing parties to depose high-level executives where the deposing party fails to establish that the executive has some unique knowledge relevant and critical to the case at hand." *Id.* (citing *Cardenas v. Prudential Ins. Co. of Am.*, No. 99-cv-1421 (JRT/FLN), 2003 WL 21293757, at *1 (D. Minn. May 16, 2003) (affirming magistrate judge's grant of protective order because company executives possessed no unique information about the case)). This cautious approach is for good reason, given the "tremendous potential for abuse or harassment" associated with allowing depositions of high-level executives. *Id.* at *3 (quoting *Apple Inc. v. Samsung Elec. Co., Ltd.*, 282 F.R.D. 259, 263 (N.D. Cal. 2012) (recognizing policy for apex doctrine while considering whether to grant motion for protective order)). Thus, when determining whether to allow such an "apex deposition, courts consider (1) whether the deponent has unique first-hand, nonrepetitive knowledge of the facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods." *Id.* (quoting *Apple Inc.*, 282 F.R.D. at 263). Courts consider these factors before moving on to general considerations surrounding a protective order. *Cardenas*, 2003 WL 21293757, at *1.

(*Id.*, ¶ 8, Ex. 1.) This legal boilerplate was prefaced by the conclusory assertion that "you have the ability to get the answer to the question of whose decision it was not to proceed with other XX variants from witnesses you already deposed . . . . Other fact witnesses who are not CEO's of Textron or Former CEO's of TSV, may know this as well." (*Id.*) Rather than waiting for a response or attempting to discuss further by telephone, the Arctic Cat Parties filed the instant Motion, even though the deposition of Mr. Donnelly was not even on calendar and counsel had not reported on his investigation concerning Mr. Donnelly's involvement. (*Id.*, ¶ 9.)

## III.   LEGAL STANDARD

Rule 26(c)(1) of the Federal Rules of Civil Procedure states that a "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). "The burden is therefore upon the movant to show the necessity of [a protective order's] issuance, which contemplates a particular and specific demonstration of fact, as distinguished from

stereotyped and conclusory statements." *Gen. Dynamics Corp. v. Selb Mfg. Co*., 481 F.2d 1204, 1212 (8th Cir. 1973). Protective orders which totally prohibit the deposition of an individual are rarely granted absent extraordinary circumstances. *Rolscreen Co. v. Pella Products of St. Louis, Inc*., 145 F.R.D. 92, 96 (S.D. Iowa 1992) (citing *Salter v. Upjohn Co*., 593 F.2d 649, 651 (5th Cir.1979)); *see also Raml v. Creighton Univ*., No. 8:08CV419, 2009 WL 3335929, at *2 (D. Neb. Oct. 15, 2009) ("A motion seeking to prevent the taking of a deposition is regarded unfavorably by the courts, and it is difficult to persuade a court to do so.").

"There is no per se rule barring depositions of top corporate executives," but senior executives are afforded special consideration before allowing their depositions to proceed. *Cardenas v. Prudential Ins. Co. of Am.*, Civ. No. 99-1421 (JRT/FLN), 2003 WL 21293757, at *1 (D. Minn. May 16, 2003) (citing *Salter v. Upjohn Co*., 593 F.2d 649, 651 (5th Cir. 1979)). In determining whether to allow an apex deposition, courts consider: (1) whether the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods. *Bombardier Recreational Prods., Inc. v. Arctic Cat, Inc*., No. 12-cv-2706 (MJD/LIB), 2014 WL 5685463, at *2 (D. Minn. Sept. 24, 2014), *citing Apple Inc. v. Samsung Electronics Co., Ltd*, 282 F.R.D. 259, 263 (N.D. Cal. 2012). In conducting that two-pronged analysis, "[the] party seeking to prevent a deposition carries a heavy burden to show why discovery should be denied." *Id.* Because of the heavy burden that party must bear, "it is very unusual for a court to prohibit the taking of a deposition altogether absent extraordinary circumstances. When a witness has personal knowledge of facts relevant to the lawsuit, even a corporate

president or CEO is subject to deposition.  A claimed lack of knowledge, by itself is insufficient to preclude a deposition." *Id.*

## IV.   <u>ARGUMENT</u>

### A.   *The Motion Should Be Denied Because the Arctic Cat Parties Failed to Engage in a Good Faith Meet and Confer*

Before the Court even reaches the merits of the Motion, Arctic Cat Parties' failure to engage in a good faith meet and confer before burdening this Court with needless and costly motion practice warrants denial of the Motion.

The Federal Rules of Civil Procedure and this Court's Local Rules require that parties meet and confer in an attempt to resolve discovery disputes before filing motions for protective orders.  *See* Fed. R. Civ. P. 26(c)(1); LR 7.1(a) ("the moving party must, if possible, meet and confer with the opposing party in a good-faith effort to resolve the issues raised by the motion").  A certification must accompany any discovery motion, and the certification must show that a good-faith effort was made to resolve disputes before filing the motion.  Fed. R. Civ. P. 26(c)(1) ("The motion must include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action.").

 "Confer" means to make a genuine effort to resolve the dispute by determining (1) what the requesting party is actually seeking, (2) what the responding party is reasonably capable of providing, and (3) what specific genuine issues cannot be resolved without judicial intervention.  *Cotracom Commodity Trading Co. v. Seaboard Corp.,* 189 F.R.D. 456, 459 (D. Kan. 1999) (holding that four phone calls by the movant did not satisfy the meet-and-confer requirement where all calls occurred while opposing counsel

was on vacation because the requirement is intended to require counsel to "converse, confer, compare views, consult and deliberate"). For example, the meet-and-confer requirement is not satisfied by leaving a vague message, *Alexander v. Federal Bureau of Investigation,* 186 F.R.D. 197, 198-99 (D.D.C. 1999), or by sending a letter discussing the discovery issue. *Ross v. Citifinancial, Inc.*, 203 F.R.D. 239 (S.D. Miss. 2001).

This requirement is meant to encourage the parties to communicate on discovery disputes and conserve judicial resources. *See Taylor v. Florida Atl. Univ.*, 132 F.R.D. 304, 305 (S.D. Fla. 1990), aff'd sub nom. *Taylor v. Popovich*, 976 F.2d 743 (11th Cir. 1992). The court can deny the motion if the movant has not conferred properly. *See, e.g., Kidwiler v. Progressive Paloverde Ins.*, 192 F.R.D. 193, 196-97 (N.D. W. Va. 2000); *In re Rhodes Companies, LLC*, 475 B.R. 733, 742 (D. Nev. 2012).

The Arctic Cat Parties engaged in a woefully inadequate meet-and-confer before bringing the instant Motion. When counsel for Speed RMG Parties requested authority supporting the position that Mr. Donnelly should not be deposed, counsel for Arctic Cat Parties responded with an email consisting of boilerplate, general legal citations, which counsel then incorporated into the legal standard section of the Motion. (Motion at p. 10; Nichols Decl., ¶ 8, Ex. 1.) That legal boilerplate was prefaced only by the conclusory assertion that other witnesses may have pertinent information. (*Id.*) Nowhere in that email does Arctic Cat Parties ever suggest that "Mr. Donnelly played no role in the managing of the relationship [between Arctic Cat Parties and Speed RMG Parties] or in any of the events giving rise to the claims in this lawsuit." (*Id.*) Rather than await a response, initiate a phone call, or try to reach a compromise, Arctic Cat Parties' counsel filed the instant Motion, at a time when Mr. Donnelly's deposition was not eve on

calendar.  (*Id.*, ¶ 9.)

Therefore, this meet-and-confer does not constitute a good-faith effort to avoid costly and burdensome motion practice.  Nor did it comport with the meet-and-confer requirement of Federal Rule 26.   This alone is fatal to the Motion.

**B.**    ***The Arctic Cat Parties Cannot Carry Their Burden of Establishing that the Court Should Prohibit the Deposition of Mr. Donnelly***

1.    *The Arctic Parties Carry the Burden of Demonstrating that Issuance of a Protective Order Is Warranted*

Even if the Court overlooks the Motion's procedural failing (it should not), it also fails on the merits.  As an initial matter, the Motion repeatedly attempts to foist the burden onto Speed RMG Parties.  *See, e.g.,* Motion at p. 2 (asserting without authority: "for such a deposition to take place, the party seeking the deposition has the burden to establish that the deposition is absolutely necessary").  This is wrong.  Rather, "[the] party seeking to prevent a deposition carries a heavy burden to show why discovery should be denied," and, as a result, "it is very unusual for a court to prohibit the taking of a deposition altogether absent extraordinary circumstances."  *Bombardier*, 2014 WL 5685463, at *2, *citing Apple Inc.*, 282 F.R.D. at 263.

For example, in *Serrano v. Cintas Corp.*, 699 F.3d 884 (6th Cir. 2012), the Sixth Circuit held that the district court improperly relied on the apex doctrine to forbid the deposition of high-level executives unless there was a showing of their unique knowledge, reasoning that instead a showing must be made to justify a protective order – *not* to defeat a protective-order motion: "In keeping with this principle, while we sometimes have considered the need for the deposition — i.e. its potential to result in

relevant testimony — in reviewing the grant or denial of a protective order, we have not abandoned the requirement that one of the harms listed in Rule 26(c)(1)(A) must be specified in order warrant a protective order." *Id.* at 901.  Accordingly, the court would not credit the executive's "bald assertion" that being deposed would impose a significant burden. *Id., citing, e.g., Conti v. American Axle and Mfg., Inc.*, 326 F. App'x 900, 907 (6th Cir. 2009) (abuse of discretion to grant a protective order to apex official who had not made exceptional showing required to prevent the ordinary application of the discovery rules).

Thus, the Arctic Cat Parties bear the burden of establishing that Mr. Donnelly should not be deposed because some concrete harm would materialize.  The Arctic Cat Parties do not meet this burden.  The Motion is rife with bald, self-serving assertions that Mr. Donnelly lacks relevant knowledge (but not from Mr. Donnelly himself), but is wholly devoid of any concrete allegations of hardship that would befall Mr. Donnelly or Arctic Cat Parties if the deposition were to proceed.  *See Gen. Dynamics Corp.*, 481 F.2d at 1212 (movant must show "good cause," i.e., particular and specific demonstration of fact taking into account the parties' relative hardships).   Reading the Motion charitably, it comes closest to establishing hardship with its baseless accusations that "Speed Partners only want to depose Mr. Donnelly to cause harassment and inconvenience[.]" (Motion at p. 16.)  The Motion provides absolutely no facts substantiating this purported "inconvenience" to Mr. Donnelly, however – let alone "inconvenience" sufficient to justify the denial of discovery.

Even if the Motion had attempted to set forth some concrete facts showing that the deposition is too much of an "inconvenience" for Mr. Donnelly, the mere fact that the

executive has a busy schedule and claims no unique knowledge is simply *not* a basis for foreclosing otherwise proper discovery. *Scott v. Chipotle Mexican Grill, Inc*., 306 F.R.D. 120, 122 (S.D.N.Y. 2015); *see also Johnson v. Jung,* 242 F.R.D. 481, 486 (N.D. Ill. 2007) (assuming that the CEO travelled 30% of the time, that left 70% of the time still available for the deposition: "As with the President of the United States—who also travels frequently and on business that is no less important than [the deponent's]— scheduling, not prohibition, accommodates and harmonizes the inevitably competing interests involved in discovery matters."). In short, Rule 26 requires that Arctic Cat Parties make a concrete showing of "annoyance, embarrassment, oppression, or undue burden or expense" that will materialize if the protective order does not issue. They do not do so. On this basis alone, the Motion should be denied.

Even if the Arctic Cat Parties had articulated any concrete injury that would result from the deposition of Mr. Donnelly (they have not), the deposition of Mr. Donnelly is still proper because Mr. Donnelly is and was the final decision-maker on all consequential business matters (including the development of Artic Cat powersports vehicles, such as the Wildcat XX) and, therefore, is the only person who can provide testimony regarding the considerations underlying his decisions.

        2.     *Mr. Donnelly Has Unique First-Hand, Non-Repetitive Knowledge of the Facts At Issue in the Case*

Throughout the Motion, the Arctic Cat Parties reiterate that Mr. Donnelly "as President, CEO, and Chairman of the Board of Textron Inc. is not involved in the day-to-day operations" (Motion at p. 5), he was "only peripherally apprised of the progress of the Agreement," (*id.* at p. 7), and "Mr. Collins was one of Mr. Donnelly's sources of

information for the Speed Partners project." (*Id.*)  In other words, Mr. Collins handled the day-to-day operations and reported to Mr. Donnelly; the two occupied discrete roles with distinct responsibilities and perspectives.  This argument essentially concedes that Mr. Donnelly has unique knowledge – namely his birds-eye view of Arctic Cat operations and ultimate decision-making authority – which renders his testimony entirely distinct from that offered by on-the-ground employees such as Mr. Collins.

Indeed, while employees such as Mr. Collins handled day-to-day operations, Mr. Donnelly exercised ultimate authority over decisions such as which vehicles would be developed based on information including performance data and financial forecasts provided by those employees.  (Anderson Decl., ¶¶ 8, 9.)  While Mr. Donnelly often accepted his employees' recommendations as to which vehicles to develop, he occasionally did not, instead exercising his own discretion.  (*Id.*, ¶ 9.)  Mr. Donnelly is the only individual who can testify regarding his perspective and motives in authorizing or rejecting development of certain vehicles, such as those subject to the Agreement. Importantly, such decision-making occurred in the context of Mr. Donnelly's unique role in salvaging Arctic Cat, which was insolvent with an aged inventory problem.  (*See* Dkt. 164 (SAC) ¶¶ 76, 135; *see also Bldg. Trades Pension Fund of W. Pa. v. Textron Inc. et al.*, case no. 1:19-cv-07881, S.D.N.Y., Dkt. 39, ¶ 6.)

As such, the testimony that Mr. Donnelly can offer regarding production of Arctic Cat vehicles under the Agreement is entirely distinct from that of employees such as Mr. Collins.  *See Rolscreen Co. v. Pella Products of St. Louis, Inc*., 145 F.R.D. 92, 97 (S.D. Iowa 1992) (denying motion for protective order: "Although [deponent's] deposition testimony may prove to be duplicative in some respects from that provided by lower

ranking executives, individuals with greater authority may have the final word on why a

company undertakes certain actions, and the motives underlying those actions."); *see also*

*Zimmerman v. Al Jazeera America, LLC*, 329 F.R.D. 1, 7 (D.D.C. 2018) (plaintiffs could

depose major media conglomerate's acting director general because his authorization of

the at-issue documentary gave him unique knowledge: "Only Dr. Souag can describe his

approval and decision-making process.  Although Dr. Souag may lack an independent

recollection of that review, Plaintiffs are nonetheless entitled to explore the topic and Dr.

Souag's standard practice for reviewing documentaries, at a deposition.").

In arguing that Mr. Donnelly's deposition should not occur, Arctic Cat Parties

offer the self-serving assertion that Mr. Donnelly was not involved in the decision to

pursue other vehicles under the Agreement.  (Motion at p. 12.)   This bald assertion is

contrary to the documents produced (which confirm that Mr. Donnelly was briefed on

vehicles encompassed by the Agreement), his general oversight of vehicles developed,

Mr. Donnelly's management style (which included holding regular meetings and SBR's),

and his responsibility for salvaging Arctic Cat, which was insolvent with and aged

inventory problem.  (*See* Anderson Decl., ¶¶ 7-13.)  Indeed, the Motion even

acknowledges that Mr. Donnelly "received his information from Mr. Collins and other

employees of Arctic Cat Parties" at such briefings.  (Motion at 5, 13, 15; *see also* Collins

Decl., ¶ 7.)   It is thus apparent that Mr. Donnelly has knowledge relevant to the subject

matter of this litigation.  *See EEOC v. JBS USA, LLC*, No. 8:10CV318, 2012 WL

5328735, at *2 (D. Neb. Oct. 29, 2012) (denying motion for protective order where it was

acknowledged that defendant's CEO "was briefed and updated about events" and

"offered [his employees] opinions regarding the situation" because it was "very likely"

that the CEO has relevant information).

Although Mr. Collins declares that Mr. Donnelly "was not involved in . . . [the] decision to not proceed with other vehicles under the Agreement," (Collins Decl., ¶ 15), this conclusory and self-serving assertion is not decisive on the issue (nor is it persuasive, given the other evidence of Mr. Donnelly's involvement). (*See* Anderson Decl., ¶¶ 6-13 ["Mr. Donnelly was pleased with the presentation and approved the recommendation to fund and proceed with development of the Wildcat XX."]; Nichols Decl., ¶¶ 10-11, Ex. 2, 3.) For example, in *Wal-Mart Stores, Inc. v. Vidalakis*, No. 5:07-MC-00039-RTD, 2007 WL 4591569, at *2 (W.D. Ar. Dec. 28, 2007), the court denied a motion for a protective order where the movant provided the declaration of an employee attesting that "he is primarily responsible for the oversight" of the at-issue project and that the proposed deponents "are 'generally' not involved in the negotiations or the details of the transaction." Despite the employee's assertions, the court held: "The affidavit of Mr. Calloway does not dissuade the court that the Robert Bray and Karen Roberts may have knowledge that Mr. Calloway does not possess." *Id.* The same is true here: Mr. Collins' declaration is not decisive, particularly in light of the fact that only Mr. Donnelly can testify as to the reason he approved or declined to approve development of vehicles under the Agreement.

Even assuming *ad arguendo* that Mr. Donnelly actually lacks knowledge concerning the Agreement (although it is clear that he has relevant knowledge), Speed RMG Parties are nevertheless entitled to test that purported lack of knowledge (such as to confirm his connection to Mr. Collins' January 2019 repudiation email or lack thereof) and obtain information related to more general matters uniquely within his knowledge,

such as the insolvency of Arctic Cat and the high-level decision-making process at Textron relating to its decision to approve and fund Arctic Cat vehicle development. *See Rolscreen Co.*, 145 F.R.D. at 97 (denying motion for protective order as follows: "[Plaintiff's] mere incantation of [deponent's] status as president and his claim of limited knowledge cannot be a basis for insulating [deponent] from appropriate discovery. [Defendant] should be permitted to ascertain what knowledge [deponent] has . . . . [Defendant] is entitled to 'test' Bevis's professed lack of knowledge . . . ."); *see also Morales v. E.D. Etnyre & Co.*, 229 F.R.D. 661, 663 (D.N.M. 2005) (plaintiffs entitled to depose CEO where it was possible that the CEO had personal knowledge regarding the defendant's policies, authorization or ratification of actions, and record keeping).

Therefore, it is beyond dispute that Mr. Donnelly received briefing concerning vehicles subject to the Agreement and exercised final decision-making authority on vehicle development under that Agreement.  Given Mr. Donnelly's unique high-level view, his testimony is not interchangeable with a day-to-day, on-the-ground employee like Mr. Collins.  This distinguishes the scenario at-hand from the cases on which the Arctic Cat Parties rely in their Motion.  First, the Motion relies on *Bluewater Music Servs. Corp. v. Spotify USA Inc.*, Nos. 3:17-cv-01051, 3:17-cv-1052, 3:17-cv- 01256, 3:17-01616, 2019 WL 6904599, at *3-*4 (M.D. Tenn. Mar. 25, 2019).  There, the court prevented the deposition of the co-founder, Chairman and CEO of Spotify because Spotify agreed to make "numerous" other high-ranking officials available for deposition and, importantly, the CEO resided in Sweden "substantially increasing the burdens associated with not only taking the deposition but also conducting necessary and reasonable preparation for the deposition."  Conversely, there is no adequate substitute

for Mr. Donnelly's testimony and no showing has been made of any unreasonable burden imposed by the deposition.

Second, the Motion cites *3M Co. v. ACS Indus., Inc.*, No. 15-1889 (PAM/JSM), 2016 WL 9308317, at *3 (D. Minn. Mar. 10, 2016).  There, the court prevented the deposition of a high-level executive where defendant's *only* reason for deposing that individual was that he had signed plaintiff's interrogatory responses, defendant provided no evidence that the interrogatory responses were inaccurate, and the executive provided a declaration that he had no substantive knowledge of the issues underlying the action, reasoning: "whether Ginter did a good or bad job in verifying the responses to these interrogatories, is of no moment.  The point is that the responses are the sworn answers of 3M, and 3M will have to live with them throughout the pendency of this case."  Speed RMG Parties offer no like rationale here, and the case is thus inapposite.

Third, Arctic Cat Parties rely heavily on a patent infringement case, *Bombardier Recreational Prods., Inc. v. Arctic Cat, Inc.*, No. 12-cv-2706 (MJD/LIB), 2014 WL 5685463, at *2 (D. Minn. Sept. 24, 2014).  The patent infringement claims in that case concerned the position of a snowmobile rider upon a snowmobile seat and the style of snowmobile frame, where the plaintiff argued that defendant's CEO possessed relevant knowledge regarding the infringement claims due to "[his] generic statement on a brochure, his presence at meetings, and his name cc'd on documents."  Of course, the patent infringement claims of *Bombardier* are more technical and specialized than the product development allegations at-issue here, which limited the universe of individuals with relevant, unique knowledge.

Finally, the Motion also relies on *Hanson v. Loparex Inc.*, No. 09-cv-1070

(MJD/SRN), 2010 WL 11432148, at *2-*3 (D. Minn. Sept. 27, 2010).  There, the court denied a motion to compel *without prejudice* to determine whether the movant could obtain the requested information from other sources first, inviting movant to bring the motion again if it could not do so.  Here, by contrast, the parties have already engaged in considerable written discovery and numerous depositions (as discussed further below), but have not obtained the high-level information they seek from Mr. Donnelly. Moreover, no other witness can competently offer testimony as the reason for Mr. Donnelly's decision to approve or not approve the development of vehicles under the Agreement.

In short, Arctic Cat Parties have failed to demonstrate that Mr. Donnelly's high-level, decisive role in approving or vetoing product development, among other matters, can be substituted by the testimony of the day-to-day employees, like Mr. Collins, who reported to Mr. Donnelly and heeded his direction.

### 3. *The Speed RMG Parties Have Exhausted Less Intrusive Discovery Mechanisms*

As an initial matter, Arctic Cat Parties assert: "Speed Partners must show that the deposition of an apex witness is the least intrusive method of obtaining that information. *Bombardier*, 2014 WL 5685463, at *3."  (Motion at 20.)  *Bombardier* does not so hold. Rather, *Bombardier* instructs, when evaluating whether to permit an apex deposition to proceed, courts generally consider: "whether the party seeking the deposition has exhausted other less intrusive discovery methods."  *Bombardier*, 2014 WL 5685463, at *3.  As reiterated above, the burden of proof for issuance of the protective order lies with Arctic Cat Parties.  *Id.* ("[A]  party seeking to prevent a deposition carries a heavy burden

to show why discovery should be denied.")  To be clear, Speed RMG Parties have found no law requiring it to prove that the deposition of Mr. Donnelly is the "least intrusive method" of obtaining relevant information as a prerequisite for taking his deposition.

Moreover, in arguing that Speed RMG Parties have not exhausted less intrusive discovery means, Arctic Parties provide a laundry list of upcoming depositions and a general overview of the deponents' knowledge.  Critically, as explained above, none of those deponents can offer the same perspective as Mr. Donnelly – that of the high-level decision-maker with ultimate sign-off on which products proceed to development and responsibility for salvaging a dysfunctional Arctic Cat.  *See, e.g., U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co*., 112 F. Supp. 3d 122 (S.D. N.Y. 2015) (policyholder not precluded from calling insurance company's CEO as witness, despite argument that other witnesses could provide testimony about the same general subject: "Even if other witnesses could provide testimony . . . Wehr had great familiarity with Phoenix's high-level decision-making regarding investments.  As an official charged with overseeing Phoenix's investments and profitability writ large, Wehr's testimony could be of particular value to a jury, and U.S. Bank is entitled to present it.").  Indeed, only Mr. Donnelly has personal knowledge as to why he approved or disapproved the development of vehicles under the Agreement.  Accordingly, there are no other less intrusive means for securing this critical information and evidence.

## III.  *CONCLUSION*

For the foregoing reasons, the Speed RMG respectfully request that the Court deny the Motion in its entirety and permit the deposition of Scott Donnelly to proceed.

Dated:  February 4, 2021

Respectfully submitted,

By: _____ */s/ Steven A. Nichols* _____

RUTAN & TUCKER, LLP
Steven A. Nichols (*pro hac vice*)
snichols@rutan.com
Bradley A. Chapin (*pro hac vice*)
bchapin@rutan.com
Benjamin C. Deming (*pro hac vice*)
bdeming@rutan.com
Steven J. Goon (*pro hac vice*)
sgoon@rutan.com
611 Anton Boulevard, Suite 1400
Costa Mesa, CA  92626
Tel:  (714) 641-5100
Fax:  (714) 546-9035

DADY & GARDNER, P.A.
Michael Dady (#0389434)
jmdady@dadygardner.com
John D. Holland (#028614X)
jholland@dadygardner.com
5100 IDS Center,
80 South 8th Street
Minneapolis, MN  55402
Tel:  (612) 359-3504
Fax:  (612) 359-3507

*Attorneys for Plaintiffs*
*Speed RMG Partners, LLC, Robby*
*Gordon, and Todd Romano*