# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

|  |  |
|---|---|
| SPEED RMG PARTNERS, LLC, ROBBY GORDON, AND TODD ROMANO, | Case No.  20-cv-00609-NEB-LIB |
| *Plaintiffs*, |  |
| v. |  |
| ARCTIC CAT INC., ARCTIC CAT SALES INC., TEXTRON INC., AND TEXTRON SPECIALIZED VEHICLES INC., |  |
| *Defendants.* |  |

### *PLAINTIFFS SPEED RMG PARTNERS, LLC, ROBBY GORDON AND TODD ROMANO'S OPPOSITION TO MOTION FOR A PROTECTIVE ORDER TO PRECLUDE THE DEPOSITION OF KEVIN HOLLERAN*

## I.    **INTRODUCTION.**

Arctic Cat Parties'[1] Motion for a Protective Order to Preclude the Deposition of

Kevin Holleran (the "Motion") constitutes a transparent effort to stonewall Speed RMG

Parties[2] from obtaining discoverable information of a *former* employee of defendant

Textron Specialized Vehicles Inc., whose knowledge is thus not obtainable through

standard, party discovery mechanisms.  The Motion fails on multiple levels and should be

denied in its entirety.

Before reaching the merits of the Motion, Arctic Cat Parties failed to engage in a

good faith meet and confer before burdening the Court with this needless and costly

Motion, which alone warrants denial of the Motion.  Rather than engage in any

meaningful discussion with Speed RMG Parties, Arctic Cat Parties sent an email

containing legal boilerplate and then filed this Motion without waiting for a response, at a

time when Mr. Holleran's deposition was not even on calendar.  (Declaration of Steven

A. Nichols ["Nichols Decl."], ¶¶ 8-9.)

Even if the Court were to consider the merits of Arctic Cat Parties' arguments (it

should not), they each fail.  ***First***, the so-called "apex doctrine" – invoked to prevent the

depositions of high-level executives without  knowledge of the facts at issue – does not

apply to Mr. Holleran because he is not a current executive of the Arctic Cat Parties.

(*See* Motion at p. 2; *PHL Variable Insurance Co. v. 2008 Christa Joseph Irrevocable*

---

[1]     The term "Arctic Cat Parties" collectively refers to defendants Arctic Cat Sales Inc., Arctic Cat Inc., Textron Specialized Vehicles Inc., and Textron Inc.  In places, this Opposition also collectively refers to (1) Arctic Cat Sales Inc. and Arctic Cat Inc. as "Arctic Cat" and (2) Textron Specialized Vehicles Inc., and Textron Inc. as "Textron."
[2]     The term "Speed RMG Parties" collectively refers to plaintiffs Speed RMG Partners, LLC, Robby Gordon, and Todd Romano.

*Trust Midas Life Settlements LLC*, No. 10–CV–03001 (PJS/TNL), 2012 WL 12896244, at *5 (D. Minn. Sept. 21, 2012) (doctrine not applicable for former employee).)

*Second*, Arctic Cat Parties have the burden to set forth facts showing that they will suffer some concrete harm if a protective order does not issue. The Motion is completely devoid of any allegations or evidence of such harm, except for a generalized assertion that the deposition would inconvenience Mr. Holleran.

*Third*, the Arctic Cat Parties cannot carry their burden to show that other relevant considerations weigh in favor of prohibiting Mr. Holleran's deposition. After Arctic Cat's acquisition by Textron Inc., Arctic Cat Parties' agents continued to represent vehicles would be released under the parties' product development agreement. (*See* Dkt. 164 (SAC) ¶¶ 89, 91, 93.) Although Mr. Holleran was no longer an employee of the Arctic Cat Parties when Textron Specialized Vehicles, Inc.'s Vice President John Collins sent correspondence refusing to proceed with the contractually required vehicles, and stating "there isn't a business case for any of the other models listed in the [A]greement that justifies moving forward" (*id.*, ¶ 99), Mr. Holleran's testimony is highly relevant to show whether Arctic Cat Parties knew of the alleged lack of any "business case" for the vehicles in 2017 at the time of Textron's acquisition, years prior to Mr. Collins' communication, and/or whether Textron failed to evaluate this aspect of Arctic Cat's business prior to its acquisition.

## II.   FACTUAL AND PROCEDURAL BACKGROUND.

### A.   *Arctic Cat Parties' Contractual Breaches and Fraud*

#### 1.   *Background of the Dispute: the Agreement*

This lawsuit arises from claims related to a Product Development and Marketing

Agreement (the "Agreement") entered among plaintiffs Speed RMG Partners, LLC, Robby Gordon, Todd Romano, and defendant Arctic Cat Sales Inc., negotiated in 2015. (*See* Dkt. 164 (SAC) ¶ 1; Dkt. 29-1; Dkt. 29-2.)  At that time, Arctic Cat suffered from a poor reputation for the quality of its side-by-side vehicles and was unable to develop a meaningful market share.  (Dkt. 164 (SAC) ¶ 17.)  Given the industry know-how of Gordon and Romano (*id.* ¶¶ 18-21), Arctic Cat Sales Inc. CEO Chris Metz and other Arctic Cat management discussed developing a relationship with them that could enable Arctic Cat to secure a share of the growing side-by-side market.  (*Id.* ¶ 25.)

At the time that the parties were negotiating the Agreement, Arctic Cat personnel made numerous representations to induce Speed RMG Parties to enter the Agreement, which Speed RMG Parties relied on in entering the Agreement in July 2015.  (*Id.* ¶¶ 26-29, 31.)  Speed RMG Partners, LLC agreed to provide vehicle and product designs and annual updates for existing and new side-by-side vehicles identified as "Special Royalty Vehicles."  (*Id.* ¶ 33.)  In turn, the Agreement required Arctic Cat to produce Special Royalty Vehicles and pay royalties to Speed RMG Partners, LLC.  (*Id.* ¶¶ 33-43.)

From the start, Arctic Cat failed to meet its obligations.  Contrary to the terms of the Agreement and its public statements, Arctic Cat Parties did not produce or sell Special Royalty Vehicles in model years 2016 or 2017.  Also, Arctic Cat initially requested that Speed RMG Parties help improve an existing vehicle development project code-named Zeus.  (*Id.* ¶ 51.)  Arctic Cat CEO Chris Metz subsequently lied to Gordon by telling him that the Zeus project was discontinued, although Arctic Cat continued to devote its limited resources to that project, in competition with the Special Royalty Vehicles and to the detriment of the production of vehicles under the Agreement.  (*Id.*

¶¶ 54, 55, 75.)  Correspondingly, Arctic Cat continued to induce Speed RMG Parties to believe it would perform under the Agreement despite its failure to produce Special Royalty Vehicles – although it had already formed the intention to end the Agreement. (*Id.*  ¶¶ 61, 63.)

2.     *Arctic Cat's Breach of the Agreement*

In January of 2017, it was announced that Textron would acquire Arctic Cat.  (*Id.* ¶ 69.)  Despite Textron's acquisition, Arctic Cat Sales Inc. still failed to produce the Special Royalty Vehicles, with the exception of a single vehicle called the "Wildcat XX." (*Id.* ¶ 85.)  All the while, though, Arctic Cat continued to represent that it would proceed with production of the Special Royalty Vehicles.  In fact, in July of 2018, the parties entered into a supplemental Addendum to the Agreement, signed by Textron Specialized Vehicles Inc., providing for the possible development of additional Limited Edition Vehicles.  (*Id.* ¶ 94.)  Yet at that time, Arctic Cat was an insolvent organization, it had been under severe cash pressure since September of 2016, its engineering program was off-track, and it lacked the resources and support necessary to proceed with the promised vehicles.  (*Id.* ¶ 76.)  Arctic Cat Parties fraudulently concealed these facts from Speed RMG Parties so that they would continue to provide design and engineering services. (*Id.* ¶¶ 76, 135.)

Ultimately, Arctic Cat Parties produced only a single side-by-side model (the Wildcat XX).  (*See id.* ¶ 85.)  In early 2019, John Collins, the Vice President at Textron Specialized Vehicles, Inc., advised Speed RMG Parties that, contrary to earlier commitments, Arctic Cat Parties would not proceed with any more vehicles in 2019.  (*Id.* ¶ 98.)  On January 25, 2019, Mr. Collins sent email correspondence confirming in writing

that "there isn't a business case for any of the other models listed in the agreement that justifies moving forward." (*Id.* ¶¶ 99-100.)  This communication marked a wholesale refusal by Arctic Cat Parties to proceed with production and release of vehicles as required by the Agreement and as represented by both Metz and Collins.

### 3.   *Mr. Holleran's Role in the Dispute*

Mr. Holleran was former President and Chief Executive Officer of Textron's Industrial segment from 2008 through October 2018.  (Dkt. 211-1 at 3.)  As such, Mr. Holleran was present for the acquisition of Arctic Cat.  As conceded by the Motion, Mr. Holleran was responsible for overseeing the due diligence undertaken before the acquisition.  (Motion at p. 3.)   Day-to-day, on-the-ground employees, such as Mr. Collins, provided information and briefings to Mr. Holleran.  (*Id.* at pp. 3, 8.)

Furthermore, allegations of a shareholder suit reinforce Mr. Holleran's role in Arctic Cat's acquisition.  On August 22, 2019 – six months after Mr. Collins' repudiation email – shareholders filed a lawsuit against Textron, Inc. and two top executives for violations of federal securities laws, alleging that Textron failed to disclose that when it purchased Arctic Cat there was an aged inventory problem with the Arctic Cat dealers; that the inventory problem impacted Textron's ability to sell new products through the dealers; that it would continue to impact sales for some appreciable time into the future; and that the Textron stock price plummeted as a result of delayed disclosure of the problem.  (*See Bldg. Trades Pension Fund of W. Pa. v. Textron Inc. et al.*, case no. 1:19-cv-07881, S.D.N.Y., Dkt. 39.)  Although the Court recently granted Textron's motion to dismiss  (*id.*, Dkt. 50), with that decision currently on appeal in the Second Circuit in case no. 20-2746, the operative complaint contains a plethora of allegations related to Mr.

Holleran's direct involvement in the "Arctic Cat turnaround plan." (*See, e.g., id.,* Dkt. 39, ¶ 6 ["The Arctic Cat turnaround team monitored the progress of the plan on a regular basis by accessing Arctic Cat dealer sales and inventory data and reports. Throughout 2017-18, Holleran and Collins met with Defendants Donnelly and Connor multiple times at the Company's Providence, Rhode Island headquarters. Further, members of the Arctic Cat turnaround team monitored through regular meetings, including meetings with sales representatives or Arctic Cat dealers."]; ¶ 94 ["On multiple occasions starting in early 2018, [confidential informant] expressed his concerns about Textron failing to deliver on orders on the telephone with Holleran as well as Collins. On each occasion, neither Holleran nor Collins provided any assurances that orders for 2018 vehicles would be fulfilled anytime soon."]; etc.)

Mr. Holleran remained involved with Arctic Cat, and its vehicle development in particular, after its acquisition. Mr. Holleran often chided Mr. Collins that Arctic Cat's profitability needed to improve, and he participated in decisions such as product branding. (*See* Dkt. 211-1 at 7, 15.) He also hosted Arctic Cat events to promote its new vehicles. For example, in April 2017, Mr. Holleran and Mr. Collins hosted an event for Arctic Cat dealers at an airplane hangar at Fort Worth, Texas's Alliance Airport, during which they previewed new products with a Fall 2017 release date, including a new "crossover" vehicle, and certain details of the Wildcat XX, to be released in Spring 2018. (*See* https://www.snowtechmagazine.com/textron-outlines-future-arctic-cat/ )

Accordingly, in its initial disclosures, the Speed RMG Parties identified Mr. Holleran as an individual likely to have discoverable information, particularly on the following topics: "Knowledge of the parties' performance under the Agreement and

Arctic Cat Parties' breaches; Arctic Cat Parties' election to produce vehicles and subsequent refusal to do so; Arctic Cat Parties' business decisions; Arctic Cat Parties' decision to sell Wildcat vehicles through the Bass Pro Shop 'Tracker' brand and market impact of that decision; Arctic Cat Parties' vehicle launches and dealership orders." (Nichols Decl., ¶ 12, Ex. 4.)

Mr. Holleran was replaced with Scott Ernest as CEO at Textron Specialized Vehicles, and Mr. Ernest went about terminating dealerships and selling the Wildcat XX through Bass Pro.   (*See* Dkt. 211-1 at 3, 15.)  Just four months later, Mr. Collins sent his January 2019 email repudiating the Agreement.  (Dkt. 164 (SAC) ¶¶ 99-100.)

### B.      *The Parties' Meet and Confer Efforts Regarding Mr. Holleran's Deposition*

On January 6, 2021, Speed RMG Parties' counsel informed Arctic Cat Parties' counsel that he was "in the process of making contact with Holleran" and requested confirmation that the Arctic Cat Parties would not produce Mr. Holleran, a former employee, for deposition.  (Nichols Decl., ¶ 4, Ex. 1.)  The following day, Arctic Cat Parties' counsel responded that he would check with his client.  (*Id.*, ¶ 5, Ex. 1.)  On January 11, Arctic Cat Parties' counsel informed Speed RMG Parties that he would seek a protective order to prevent Mr. Holleran's deposition, stating: "we will be representing him in connection with any deposition.  However, we again view the deposition as not reasonable or necessary as he was a CEO, and any information you would ask of him could have been obtained from others, such as Collins."  (*Id.*, ¶ 6, Ex. 1.)

On January 12, 2021 counsel for Speed RMG Parties requested that Arctic Cat Parties "cite me to the key case or cases that you rely on for the proposition that these

current and former employees are not subject to deposition in our case based on their title or involvement.."  (*Id.*, ¶ 7, Ex. 1.)   The following day, Arctic Cat Parties' counsel sent along a paragraph of legal boilerplate (which is copied word-for-word in the legal standard section of their Motion at pages 6-7), reading as follows:

> The court's inquiry is more exacting under Rule 26 when a party attempts to depose a high-level executive like a President or CEO.  "[C]ourts are wary of allowing parties to depose high-level executives where the deposing party fails to establish that the executive has some unique knowledge relevant and critical to the case at hand."  *Id.* (citing *Cardenas v. Prudential Ins. Co. of Am.*, No. 99-cv-1421 (JRT/FLN), 2003 WL 21293757, at *1 (D. Minn. May 16, 2003) (affirming magistrate judge's grant of protective order because company executives possessed no unique information about the case)).  This cautious approach is for good reason, given the "tremendous potential for abuse or harassment" associated with allowing depositions of high-level executives.  *Id.* at *3 (quoting *Apple Inc. v. Samsung Elec. Co., Ltd.*, 282 F.R.D. 259, 263 (N.D. Cal. 2012) (recognizing policy for apex doctrine while considering whether to grant motion for protective order)).  Thus, when determining whether to allow such an "apex deposition, courts consider (1) whether the deponent has unique first-hand, nonrepetitive knowledge of the facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods."  *Id.* (quoting *Apple Inc.*, 282 F.R.D. at 263).  Courts consider these factors before moving on to general considerations surrounding a protective order.  *Cardenas*, 2003 WL 21293757, at *1.

(*Id.*, ¶ 8, Ex. 1.)  This legal boilerplate was prefaced by the conclusory assertion that "you have the ability to get the answer to the question of whose decision it was not to proceed with other XX variants from witnesses you already deposed . . . . Other fact witnesses who are not CEO's of Textron or Former CEO's of TSV, may know this as well."  (*Id.*)  Rather than waiting for a response or attempting to discuss further by telephone, the Arctic Cat Parties filed the instant Motion, even though the deposition of Mr. Holleran was not even on calendar.  (*Id.*, ¶ 9.)

## III.   **LEGAL STANDARD**

Rule 26(c)(1) of the Federal Rules of Civil Procedure states that a "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment,

oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). "The burden is therefore upon the movant to show the necessity of [a protective order's] issuance, which contemplates a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Gen. Dynamics Corp. v. Selb Mfg. Co*., 481 F.2d 1204, 1212 (8th Cir. 1973). Protective orders which totally prohibit the deposition of an individual are rarely granted absent extraordinary circumstances. *Rolscreen Co. v. Pella Products of St. Louis, Inc*., 145 F.R.D. 92, 96 (S.D.Iowa 1992) (citing *Salter v. Upjohn Co*., 593 F.2d 649, 651 (5th Cir.1979)); *see also Raml v. Creighton Univ*., No. 8:08CV419, 2009 WL 3335929, at *2 (D. Neb. Oct. 15, 2009) ("A motion seeking to prevent the taking of a deposition is regarded unfavorably by the courts, and it is difficult to persuade a court to do so.").

"There is no per se rule barring depositions of top corporate executives," but senior executives are afforded special consideration before allowing their depositions to proceed. *Cardenas v. Prudential Ins. Co. of Am.*, Civ. No. 99-1421 (JRT/FLN), 2003 WL 21293757, at *1 (D. Minn. May 16, 2003) (citing *Salter v. Upjohn Co*., 593 F.2d 649, 651 (5th Cir. 1979)). In determining whether to allow an apex deposition, courts consider: (1) whether the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods. *Bombardier Recreational Prods., Inc. v. Arctic Cat, Inc*., No. 12-cv-2706 (MJD/LIB), 2014 WL 5685463, at *2 (D. Minn. Sept. 24, 2014), *citing Apple Inc. v. Samsung Electronics Co., Ltd*, 282 F.R.D. 259, 263 (N.D. Cal. 2012). In conducting that two-pronged analysis, "[the] party seeking to prevent a deposition carries a heavy burden to show why discovery should be denied." *Id.*

Because of the heavy burden that party must bear, "it is very unusual for a court to prohibit the taking of a deposition altogether absent extraordinary circumstances. When a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject to deposition. A claimed lack of knowledge, by itself is insufficient to preclude a deposition." *Id.*

## IV.   <u>ARGUMENT</u>

### A.   *The Motion Should Be Denied Because the Arctic Cat Parties Failed to Engage in a Good Faith Meet and Confer*

Before the Court even reaches the merits of the Motion, Arctic Cat Parties' failure to engage in a good faith meet and confer before burdening this Court with needless and costly motion practice warrants denial of the Motion.

The Federal Rules of Civil Procedure and this Court's Local Rules require that parties meet and confer in an attempt to resolve discovery disputes before filing motions for protective orders. *See* Fed. R. Civ. P. 26(c)(1); LR 7.1(a) ("the moving party must, if possible, meet and confer with the opposing party in a good-faith effort to resolve the issues raised by the motion"). A certification must accompany any discovery motion, and the certification must show that a good-faith effort was made to resolve disputes before filing the motion. Fed. R. Civ. P. 26(c)(1) ("The motion must include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action.").

"Confer" means to make a genuine effort to resolve the dispute by determining (1) what the requesting party is actually seeking, (2) what the responding party is reasonably capable of providing, and (3) what specific genuine issues cannot be resolved

without judicial intervention. *Cotracom Commodity Trading Co. v. Seaboard Corp.,* 189 F.R.D. 456, 459 (D. Kan. 1999) (holding that four phone calls by the movant did not satisfy the meet-and-confer requirement where all calls occurred while opposing counsel was on vacation because the requirement is intended to require counsel to "converse, confer, compare views, consult and deliberate").  For example, the meet-and-confer requirement is not satisfied by leaving a vague message, *Alexander v. Federal Bureau of Investigation,* 186 F.R.D. 197, 198-99 (D.D.C. 1999), or by sending a letter discussing the discovery issue.  *Ross v. Citifinancial, Inc.*, 203 F.R.D. 239 (S.D. Miss. 2001).

This requirement is meant to encourage the parties to communicate on discovery disputes and conserve judicial resources. *See Taylor v. Florida Atl. Univ.*, 132 F.R.D. 304, 305 (S.D. Fla. 1990), aff'd sub nom. *Taylor v. Popovich*, 976 F.2d 743 (11th Cir. 1992).  The court can deny the motion if the movant has not conferred properly.  *See, e.g., Kidwiler v. Progressive Paloverde Ins.*, 192 F.R.D. 193, 196-97 (N.D. W. Va. 2000); *In re Rhodes Companies, LLC*, 475 B.R. 733, 742 (D. Nev. 2012).

The Arctic Cat Parties engaged in a woefully inadequate meet-and-confer before bringing the instant Motion.  On January 6, 2021, Speed RMG Parties' counsel informed Arctic Cat Parties' counsel that he was "in the process of making contact with Holleran" and requested confirmation that the Arctic Cat Parties counsel would not produce Mr. Holleran, a former employee, for deposition.  (Nichols Decl., ¶ 4, Ex. 1.)  The following day, Arctic Cat Parties' counsel responded that he would check with his client.  (*Id.*, ¶ 5, Ex. 1)  On January 11, Arctic Cat Parties' counsel informed Speed RMG Parties that he would seek a protective order to prevent Mr. Holleran's deposition, stating: "we will be representing him in connection with any deposition.  However, we again view the

deposition as not reasonable or necessary as he was a CEO, and any information you would ask of him could have been obtained from others, such as Collins." (*Id.*, ¶ 6, Ex. 1.) When counsel for Speed RMG Parties requested authority supporting the position that Mr. Holleran should not be deposed, counsel for Arctic Cat Parties responded with an email consisting of boilerplate, general legal citations, which counsel then incorporated into the legal standard section of its Motion. (Motion at p. 10; Nichols Decl., ¶ 8, Ex. 1.)   That legal boilerplate was prefaced only by the conclusory assertion that other witnesses may have pertinent information. (*Id.*)  Rather than await a response, initiate a phone call, or try to reach a compromise, Arctic Cat Parties' counsel filed the instant Motion, when Mr. Holleran's deposition was not even on calendar. (*Id.*, ¶ 9.)

This meet-and-confer does not constitute a good-faith effort to avoid burdensome motion practice.  Nor did it comport with the meet-and-confer requirement of Federal Rule 26.  This alone is fatal to the Motion.

**B.** ***The Apex Doctrine Does Not Apply to Mr. Holleran Because He Is No Longer Employed By the Arctic Cat Parties***

The sole basis for this Motion is the apex doctrine, which provides some limitations on conducting depositions of high level executives.  However, the apex doctrine does not apply to Mr. Holleran because he is no longer employed by Arctic Cat Parties.  *See PHL Variable Insurance Co. v. 2008 Christa Joseph Irrevocable Trust Midas Life Settlements LLC*, No. 10–CV–03001 (PJS/TNL), 2012 WL 12896244, at *5 (D. Minn. Sept. 21, 2012) ("Unlike Polkinghorn, Shaeffer is no longer a Phoenix employee.  Thus, the argument that he is an apex deponent rings hollow."); *citing State ex. rel Ford Motor Co. v. Messina*, 71 S.W.3d 602, 607 (Mo. 2002) (finding arguments

that a former CEO and President was an apex deponent were moot because he was no longer employed by that company); *see also Van Den Eng v. Coleman Co., Inc*., No. 05–MC–109–WEB–DWB, 2005 WL 3776352 (D. Kan. Oct. 21, 2005) ("Phillips is no longer working for Coleman, militating against the application of the Apex doctrine in this case."). This fact alone is fatal to Artic Cat Parties' Motion.

Former party executives do not fall within the ambit of the apex doctrine because the discovery obtained through the party would not incorporate the former executive's knowledge, which is only testable through his or her deposition. As one court explained:

> The Court, however, does not find the apex doctrine determinative in this instance, because Ms. Tolstedt is no longer employed by Wells Fargo. As a result, Wells Fargo's responses to written discovery based on corporate knowledge would not include the information that Ms. Tolstedt possesses. Similarly, depositions of other employees would not necessary overlap with her personal knowledge. In fact, a deposition is one of the only discovery methods available to ascertain what Ms. Toldstedt knows. If Ms. Tolstedt does not possess first-hand knowledge, the deposition will, presumably, be short.

*Carroll v. Wells Fargo & Company*, No. 3:15-cv-02321-EMC (KAW), 2016 WL 8673482, at *7 (N.D. Cal. Dec. 9, 2016); *see also LivePerson, Inc. v. [24]7.Ai, Inc*., No. 3:17-cv-01268-JST(KAW), 2018 WL 1319424, at *2 (N.D. Cal. Mar. 14, 2018) ("the Court does not find the apex doctrine determinative, because Mr. Murphy is no longer employed by LivePerson. … Since Mr. Murphy is no longer employed by LivePerson, a deposition is virtually the only discovery method available to ascertain his personal knowledge."). Put differently, because Mr. Holleran is not employed by Arctic Parties, the Speed RMG Parties cannot ascertain his knowledge through standard, party discovery tools – but only through Mr. Holleran's deposition.

Therefore, the apex doctrine does not apply to Mr. Holleran and the Motion –

which depends upon its application – fails.

**C.     *The Arctic Cat Parties Cannot Carry Their Burden of Establishing that the Court Should Prohibit the Deposition of Mr. Holleran***

1.     *The Arctic Parties Carry the Burden of Demonstrating that Issuance of a Protective Order Is Warranted*

The Motion repeatedly attempts to foist the burden onto Speed RMG Parties. (*See, e.g.,* Motion at p. 8, 10.)  This is wrong.  Rather, "[the] party seeking to prevent a deposition carries a heavy burden to show why discovery should be denied," and, as a result, "it is very unusual for a court to prohibit the taking of a deposition altogether absent extraordinary circumstances." *Bombardier*, 2014 WL 5685463, at *2, *citing Apple Inc.*, 282 F.R.D. at 263.

For example, in *Serrano v. Cintas Corp.*, 699 F.3d 884 (6th Cir. 2012), the Sixth Circuit held that the district court improperly relied on the apex doctrine to forbid the deposition of high-level executives unless there was a showing of their unique knowledge, reasoning that instead a showing must be made to justify a protective order – *not* to defeat a protective-order motion: "In keeping with this principle, while we sometimes have considered the need for the deposition — i.e. its potential to result in relevant testimony — in reviewing the grant or denial of a protective order, we have not abandoned the requirement that one of the harms listed in Rule 26(c)(1)(A) must be specified in order warrant a protective order." *Id.* at 901.  Accordingly, the court would not credit the executive's "bald assertion" that being deposed would impose a significant burden.  *Id., citing, e.g., Conti v. American Axle and Mfg., Inc.*, 326 F. App'x 900, 907 (6th Cir. 2009) (abuse of discretion to grant a protective order to apex official who had

not made exceptional showing required to prevent the ordinary application of the discovery rules).

Thus, Arctic Cat Parties bear the burden of establishing that Mr. Holleran should not be deposed because some concrete harm would materialize.  The Arctic Cat Parties do not meet this burden.  The Motion is rife with bald, self-serving assertions that Mr. Holleran lacks relevant knowledge (but not from Mr. Holleran himself), but is wholly devoid of any concrete allegations of hardship that would befall Mr. Holleran or Arctic Cat Parties if the deposition were to proceed.  *See Gen. Dynamics Corp.*, 481 F.2d at 1212 (movant must show "good cause," i.e., particular and specific demonstration of fact taking into account the parties' relative hardships).   In fact, the only portion of the Motion that even comes close to establishing any such hardship provides in part as follows: "There is no reason to justify the significant burden and inconvenience in requiring Mr. Holleran, who is currently the CEO and President of a business that is neither a party to this litigation nor in any way related to TSV, to take time away from those duties . . . ."  (Motion at 12.)

This conclusory statement is patently deficient.  The mere fact that the executive has a busy schedule and claims no unique knowledge is simply *not* a basis for foreclosing otherwise proper discovery.  *Scott v. Chipotle Mexican Grill, Inc*., 306 F.R.D. 120, 122 (S.D.N.Y. 2015); *see also Johnson v. Jung,* 242 F.R.D. 481, 486 (N.D. Ill. 2007) (assuming that the CEO travelled 30% of the time, that left 70% of the time still available for the deposition: "As with the President of the United States—who also travels frequently and on business that is no less important than [the deponent's]—scheduling, not prohibition, accommodates and harmonizes the inevitably competing interests

involved in discovery matters.").

In short, Rule 26 requires that Arctic Cat Parties make a concrete showing of "annoyance, embarrassment, oppression, or undue burden or expense" that will materialize if the protective order does not issue.  They do not do so.  On this basis alone, the Motion should be denied. Even if the Arctic Cat Parties had articulated any concrete injury that would result from the deposition of Mr. Holleran (they have not), the deposition of Mr. Holleran is still proper because Mr. Holleran has unique knowledge concerning the Arctic Cat acquisition, due diligence performed before that acquisition, and Textron's knowledge of Arctic Cat's insolvency.

> 2.   *Mr. Holleran Has Unique First-Hand, Non-Repetitive Knowledge of the Facts At Issue in the Case*

As Arctic Cat Parties acknowledge, Mr. Holleran was responsible for overseeing the due diligence process before Textron acquired Arctic Cat.  (Motion at p. 3.)  Mr. Holleran's perspective is thus critical because, after Arctic Cat's acquisition by Textron Inc., Arctic Cat Parties' agents continued to represent vehicles would be released under the Agreement.  (Dkt. 164 (SAC) ¶¶ 83, 84, 87, 89, 93.)  After Mr. Holleran departed from Textron, Mr. Collins sent correspondence refusing to proceed with the contractually required vehicles, and stating "there isn't a business case for any of the other models listed in the [A]greement that justifies moving forward."  (*Id.* ¶¶ 99-100.)  Generally, companies conduct business case analyses before devoting time and resources to a project – not years later.  Mr. Holleran's testimony is highly relevant to show whether Arctic Cat Parties knew of the alleged lack of any "business case" for the vehicles in 2017 at the time of Textron's acquisition, years prior to Mr. Collins' communication, and/or whether

Textron failed to evaluate this aspect of Arctic Cat's business prior to its acquisition.

Moreover, the testimony that Mr. Holleran can offer regarding Arctic Cat's insolvency and inability to perform under the Agreement is entirely distinct from that of employees such as Mr. Collins.  Mr. Collins reported to Mr. Holleran, who had a high-level, birds-eye view of the Arctic Cat acquisition and problems it posed.  (*See* Motion at p. 3-4; *Rolscreen Co. v. Pella Products of St. Louis, Inc.*, 145 F.R.D. 92, 97 (S.D. Iowa 1992) (denying motion for protective order: "Although [deponent's] deposition testimony may prove to be duplicative in some respects from that provided by lower ranking executives, individuals with greater authority may have the final word on why a company undertakes certain actions, and the motives underlying those actions."); *see also Zimmerman v. Al Jazeera America, LLC*, 329 F.R.D. 1, 7 (D.D.C. 2018) (plaintiffs could depose major media conglomerate's acting director general because his authorization of the at-issue documentary gave him unique knowledge: "Only Dr. Souag can describe his approval and decision-making process.  Although Dr. Souag may lack an independent recollection of that review, Plaintiffs are nonetheless entitled to explore the topic and Dr. Souag's standard practice for reviewing documentaries, at a deposition.").)

Indeed, Arctic Cat Parties' concession that Mr. Collins regularly briefed Mr. Holleran essentially concedes that Mr. Holleran has relevant and discoverable information.  (Motion at p. 3-4; *see EEOC v. JBS USA, LLC*, No. 8:10CV318, 2012 WL 5328735, at *2 (D. Neb. Oct. 29, 2012) (denying motion for protective order where it was acknowledged that defendant's CEO "was briefed and updated about events" and "offered [his employees] opinions regarding the situation" because it was "very likely" that the CEO has relevant information).)

Even assuming *ad arguendo* that Mr. Holleran actually lacks knowledge concerning Arctic Cat's insolvency (although it is clear that he has relevant knowledge), Speed RMG Parties are nevertheless entitled to test that purported lack of knowledge. *See Rolscreen Co.*, 145 F.R.D. at 97 (denying motion for protective order as follows: "[Plaintiff's] mere incantation of [deponent's] status as president and his claim of limited knowledge cannot be a basis for insulating [deponent] from appropriate discovery. [Defendant] should be permitted to ascertain what knowledge [deponent] has . . . . [Defendant] is entitled to 'test' Bevis's professed lack of knowledge . . . .").

Arctic Cat Parties cite two cases that purportedly support preventing Mr. Holleran's deposition – *3M Co. v. ACS Industries, Inc*. and *Select Comfort Corp. v. Tempur Sealy Int'l, Inc.* – both of which are inapposite.  In *3M Co. v. ACS Indus., Inc.*, No. 15-1889 (PAM/JSM), 2016 WL 9308317, at *3 (D. Minn. Mar. 10, 2016), the court prevented the deposition of a high-level executive where defendant's *only* reason for deposing that individual was that he had signed plaintiff's interrogatory responses, defendant provided no evidence that the interrogatory responses were inaccurate, and the executive provided a declaration that he had no substantive knowledge of the issues underlying the action, reasoning: "whether Ginter did a good or bad job in verifying the responses to these interrogatories, is of no moment.  The point is that the responses are the sworn answers of 3M, and 3M will have to live with them throughout the pendency of this case."  This reasoning has no application to the case at hand.

Likewise, in *Select Comfort Corp. v. Tempur Sealy Int'l, Inc.,* No. 13- CV-2451 (DWF/SER), 2015 WL 12803579, at *2 (D. Minn. Apr. 7, 2015), defendant moved to compel the deposition of plaintiff's CEO with respect to statements that she made in

investor-relation telephone calls during 2013, and with respect to plaintiff's "motive" for initiating the litigation.  The Court found the latter topic privileged.  *Id.* at *3.  As to the former, it was established that the CEO relied on a script during the at-issue phone calls and "[t]here is also no evidence that [she] brought new, fresh ideas to the table in connection with these issues."  *Id.*  Conversely, here, Speed RMG Parties seek to depose Mr. Holleran with regard to a topic that he directly oversaw, obliging the inference that he had ideas different from those entertained by his subordinates, such as Mr. Collins.

In short, Arctic Cat Parties have failed to demonstrate that Mr. Holleran's high-level role in overseeing the Arctic Cat acquisition and Textron's due diligence concerning the same, among other matters, can be substituted by the testimony of the day-to-day employees, like Mr. Collins, who would transmit Mr. Holleran briefings.

3.   *The Speed RMG Parties Have Exhausted Less Intrusive Discovery Mechanisms*

In arguing that Speed RMG Parties have not exhausted less intrusive discovery means, Arctic Parties argue that Mr. Holleran's knowledge is discoverable through a Rule 30(b)(6) deposition and/or Mr. Holleran's subordinates.  This argument is infirm because Mr. Holleran is no longer employed by the Arctic Cat Parties.  As such, Mr. Holleran's unique knowledge would not be encapsulated by any such discovery mechanisms directed to the Arctic Cat Parties.  *See Caroll*, 2016 WL 8673482, at *7 (acknowledging that, with a former party executive, "depositions of other employees would not necessary overlap with her personal knowledge").

Speed RMG Parties are entitled to explore with Mr. Holleran issues including the aged inventory problem with the Arctic Cat dealers; how that the inventory problem

impacted Textron's ability to sell new products through the dealers; whether it was known that the problem would continue to impact sales for some appreciable time into the future; whether Textron knew in 2017 that Arctic Cat could not perform under the Agreement; and/or whether Textron failed to evaluate this aspect of Arctic Cat's business prior to its acquisition. As the executive tasked with managing Textron's due diligence of Arctic Cat, Mr. Holleran is uniquely positioned to provide this information.

In short, Speed RMG Parties did not seek to take Mr. Holleran's deposition right out of the gate, but only after having engaged in over a year of written discovery, as well as numerous depositions, which have narrowed the outstanding issues and compelled the inference that Mr. Holleran had special oversight of Arctic Cat, its integration with Textron, its insolvency, and its corresponding inability to perform under the Agreement, among other issues relevant to this litigation. Thus, Speed RMG Parties have exhausted less intrusive discovery means.

## III.    *CONCLUSION*

For the foregoing reasons, the Speed RMG respectfully request that the Court deny the Motion in its entirety and permit the deposition of Kevin Holleran to proceed.

Dated:  February 4, 2021                    Respectfully submitted,

By: _____ */s/ Steven A. Nichols* _____

RUTAN & TUCKER, LLP
Steven A. Nichols (*pro hac vice*)
snichols@rutan.com
Bradley A. Chapin (*pro hac vice*)
bchapin@rutan.com
Benjamin C. Deming (*pro hac vice*)
bdeming@rutan.com
Steven J. Goon (*pro hac vice*)
sgoon@rutan.com
611 Anton Boulevard, Suite 1400
Costa Mesa, CA  92626

Tel:  (714) 641-5100
Fax:  (714) 546-9035

DADY & GARDNER, P.A.
Michael Dady (#0389434)
jmdady@dadygardner.com
John D. Holland (#028614X)
jholland@dadygardner.com
5100 IDS Center,
80 South 8th Street
Minneapolis, MN  55402
Tel:  (612) 359-3504
Fax:  (612) 359-3507

*Attorneys for Plaintiffs*
*Speed RMG Partners, LLC, Robby*
*Gordon, and Todd Romano*