UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Speed RMG Partners, LLC, Robby Gordon, and Todd Romano, | Case No. 20-CV-00609 NEB/LIB |
| Plaintiffs, | **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Arctic Cat Sales Inc., Arctic Cat Inc., Textron Specialized Vehicles Inc., and Textron Inc., | |
| Defendants. | |

## INTRODUCTION

Speed RMG Partners, LLC, Robby Gordon, and Todd Romano ("Speed") allege five claims against Arctic Cat Sales Inc., Arctic Cat Inc., Textron Specialized Vehicles Inc. (collectively "Arctic Cat"),[1] and Textron Inc. Two claims focus on Arctic Cat's alleged breach of contract, and three tort claims on alleged fraud and misrepresentation. Defendants move this Court pursuant to Federal Rule of Civil Procedure 56(c) for summary judgment on all claims.

## STATEMENT OF UNDISPUTED FACTS[2]

Arctic Cat is a leading manufacturer and seller of powersports vehicles

---

[1] Before March 2017, "Arctic Cat" comprises Arctic Cat Inc. and Arctic Cat Sales Inc. After March 2017, when those entities were acquired by Textron Specialized Vehicles Inc. ("TSV"), "Arctic Cat" encompasses both entities plus TSV.

[2] For the procedural history of this litigation, see Dkt. 112 at 3-4.

such as snowmobiles, ATVs, and side-by-side vehicles (including Arctic Cat's "Wildcat" line). (Declaration of William L. Moran ("Moran Decl.") Ex. 1 ¶ 13).

Throughout Spring 2015, Speed communicated with Arctic Cat on a potential business relationship and agreement for the design, development and marketing of side-by-side vehicles. (*Id*. ¶ 14). Speed held itself out as skilled designers of powersports vehicles, with the capabilities and resources to provide designs that Arctic Cat could develop into commercially successful vehicles. (*Id*. ¶ 15; Moran Decl. Ex. 2).

A letter of intent was executed in July 2015. (Moran Decl. Ex. 3 at 15-16; Moran Decl. Ex. 4). Negotiations continued throughout July 2015. (Dkt. 122, ¶¶ 3-5). Romano, primary negotiator for Speed, testified that these preliminary discussions were not relied upon to define the commitments of the parties and the "definitive agreement" controlled the relationship. (Moran Decl. Ex. 5 at 254-256, 263). Romano previously had been involved in "tons" of contracts. (*Id.* at 263). Gordon too had been a party to "hundreds" of contracts with vendors and sponsors and provided input to Romano from his experience with a previous royalty contract with Polaris, which had also ended with Gordon suing Polaris.[3] (Moran Decl. Ex. 7 at 51-52). Steve Nichols, Speed's counsel in this litigation and in the Polaris litigation, "provided counsel to Speed [ ] in connection with the

---

[3] Unlike here, the Polaris agreement had an *express* minimum royalty guarantee ("Gordon shall be paid a [royalty] on a *minimum* of 5,000 Gordon RZR Product units in each year of this Agreement in which Gordon RZR Products are sold to the Polaris dealer network."). (Moran Decl. Ex. 34 § 3(c)).

negotiation" of the Arctic Cat contract. (Dkt. 27 ¶ 3; Moran Decl. Ex. 38).

On July 31, 2015, Arctic Cat and Speed entered into a written Product Development and Marketing Agreement ("Agreement"). (Moran Decl. Ex. 6). Speed agreed to deliver designs of side-by-side vehicles to Arctic Cat, and Arctic Cat retained the sole and unconditional discretion for final approval of product design and marketing decisions. The language is unambiguous: "Arctic Cat shall have, *in its sole discretion*, final approval over all branding and product design decisions." (*Id.* at 2 (emphasis added))*.* Similarly, for "Future Design Opportunities," the Agreement states that "Arctic Cat shall have the right of first refusal … under this Agreement to elect to manufacture said vehicle" and with respect to "any Powersports vehicle design or prototype produced by Speed RMG" may decide that it "does not want to manufacture said vehicle or pursue manufacturing through a third party." (*Id.* at 5). Gordon agrees that sole discretion was designated to Arctic Cat. (Moran Decl. Ex. 7 at 125 ("So I guess they have final at the end, yeah, let's go with that.")). Speed witness Michael Anderson advised Speed that "it's Arctic Cat's ultimate decision to adopt or not adopt your designs and we have to do it in a way that makes sense from Arctic Cat's manufacturing standpoints." (Moran Decl. Ex. 21 at 328-329).

If Arctic Cat greenlighted a Speed vehicle, the Agreement required Arctic Cat to pay Speed royalties based upon the sales of such vehicles. (Moran Decl. Ex. 6 at 3-4) ("Responsibilities of Arctic Cat"). This was the sole material obligation of Arctic Cat under the Agreement.

In March 2017, TSV acquired Arctic Cat, which became a wholly-owned TSV subsidiary. (Moran Decl. Ex. 1 at ¶ 18). Speed and TSV entered into an Addendum to the Agreement effective July 31, 2018. (Moran Decl. Ex. 11). The Addendum provided, *inter alia*, that (1) TSV was acting for Arctic Cat in connection with the Agreement; (2) the parties had developed and marketed the "Wildcat XX" vehicle pursuant to the Agreement; and (3) the parties were exploring the possibility of developing and marketing five variants of the Wildcat XX vehicle. (*Id.*). As before, the parties agreed that TSV had sole discretion and no commitment to proceed with Wildcat XX variants. (*Id.* ¶ 1) (TSV "*makes no commitment* to proceed with all or any of the five new Wildcat XX variants" (emphasis added)).

To date, the Speed relationship has not been as successful as either party intended. Throughout the relationship, Speed provided designs and prototypes that were often incomplete, defective, failed to work or pass usability analysis, failed to conform to established vehicle standards, and thus could not be developed. *See infra* at 21-23; 34-35. As well, Arctic Cat declined production of most Speed vehicles and accessories referenced in the Agreement and Addendum due to the lack of a business case, poor sales, and other business considerations. (Moran Decl. Ex. 1 ¶ 22); *see infra* at 21-23, 34-35. The only vehicles Arctic Cat has produced under the Agreement are Wildcat XX vehicles for the 2018-2021 model years (also sold under the Tracker Off Road XTR1000 model name). (Moran Decl. Ex. 10 at 139, 285-286). Arctic Cat has paid Speed

royalties of over $800,000 for those sales. (Dkt. 42-16 at ¶ 7). Arctic Cat did not terminate the Agreement or the Addendum (they expired on their own terms in July 2020) and continues to sell Speed vehicles and pay Speed royalties on vehicles sold. (Moran Decl. Ex. 10 at 174).

Speed filed this lawsuit in March 2019. Speed's Second Amended Complaint ("SAC") asserts five claims: breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), intentional misrepresentation (Count III), negligent misrepresentation (Count IV), and fraudulent concealment (Count V). (Dkt. 164, SAC ¶¶ 110-140). Those claims cannot survive summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate when the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Olga Despotis Trust v. Cincinnati Ins. Co*., 867 F.3d 1054, 1059 (8th Cir. 2017). In reviewing such a motion, the court cannot consider evidence that would not be admissible at trial, such as inadmissible hearsay. *Markel v. Douglas Technologies Group, Inc.*, 968 F.3d 888, 891 (8th Cir. 2020).

A party cannot survive summary judgment by relying on conjecture and speculation as opposed to probative evidence. *Carter v. Pulaski Cty. Special Sch. Dist.*, 956 F.3d 1055, 1059 (8th Cir. 2020). If the party moving for summary judgment presents undisputed evidence undermining the claims alleged, the

burden of producing disputed, material evidence shifts to the opposing party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## ARGUMENT

## I. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON SPEED'S BREACH OF CONTRACT CLAIM.

At the heart of Speed's action is its claim for breach of contract. (Dkt. 164, SAC ¶ 113). Speed's alleged breaches concern nonpayment of royalties, failure to develop vehicles, and refusal to acknowledge novelty. (*Id.*). These allegations are contradicted by the unambiguous language of the Agreement, create obligations that were never agreed to, and are factually unsupported. Speed also cannot establish damages of *any* type for the alleged breaches. Accordingly, Defendants are entitled to summary judgment.

Interpretation of a contract is a question of law for the court. *Katzner v. Kelleher Constr.*, 535 N.W.2d 825, 828 (Minn. App. 1995), *aff'd*, 545 N.W.2d 378 (Minn. 1996). A breach of contract claim has four elements: "(1) formation of a contract; (2) performance by plaintiff of any conditions precedent; (3) a material breach of the contract by defendant; and (4) damages." *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F.Supp.2d 951, 961 (D. Minn. 2000). Minnesota law on contract interpretation is well established:

> [W]here there is a written instrument, the intent of the parties is determined from the plain language of the instrument itself. When the language is clear and unambiguous, [courts] enforce the agreement of the parties as expressed in the language of the contract. When a contractual provision is unambiguous, [courts] do not rewrite, modify, or limit its effect by a strained construction.

[Courts] construe a contract as a whole and attempt to harmonize all of its clauses.

*Storms, Inc. v. Mathy Constr. Co.*, 883 N.W.2d 772, 776 (Minn. 2016).

> **A.   Arctic Cat had the sole discretion to produce or not to produce vehicles.**

Speed alleges Arctic Cat breached the Agreement by failing to produce Speed vehicles, based on the erroneous assertion that Arctic Cat was *required* to produce Speed vehicles. (Dkt. 164, SAC ¶ 113(b), (c), (f)-(k), (n)). The Agreement is unambiguous that Arctic Cat had no such obligation.

The Agreement requires Speed to provide vehicle and product designs and annual updates "in writing," while specifying the novel features of the designs and updates. (Moran Decl. Ex. 6 at 2). What happens next is unambiguous: "Arctic Cat shall have, *in its sole discretion*, final approval over all branding and product design decisions." (*Id.* (emphasis added)). Similarly, with respect to "Future Design Opportunities," the Agreement unambiguously states that "*Arctic Cat shall have the right of first refusal* … under this Agreement to elect to manufacture said vehicle" and:

> If after reviewing any Powersports vehicle design or prototype produced by Speed RMG pursuant to this Agreement, Arctic Cat *does not want to* manufacture said vehicle or pursue manufacturing through a third party, Speed RMG is free to manufacture said vehicle on its own, independently of Arctic Cat and this Agreement….

(*Id.* at 5 (emphasis added)). Speed fares no better under the TSV Addendum, which unambiguously states that TSV "*makes no commitment* to proceed with all or any of the five new Wildcat XX variants." (*Id.* Ex. 11 ¶ 1 (emphasis added)).

Under oath, Gordon and Speed witness Anderson agreed that sole discretion was designated to Arctic Cat under the Agreement. *See supra* at 3. There is no contractual requirement for Arctic Cat to develop or produce Speed vehicles, nor any express condition precedent, limitation, or cause requirement in the Agreement curtailing Arctic Cat's exercise of discretion to proceed (or not) with Speed vehicles.

*Steady State Imaging, LLC v. Gen. Elec. Co.*, No. 17-1048 (JRT/KMM), 2019 WL 1491934 (D. Minn. Apr. 4, 2019), is instructive. There, the parties contracted to commercialize a patented technique for medical scans. *Id.* at *1. Like Arctic Cat, the defendant had sole discretion over whether to commercialize machines with plaintiff's technique. *Id.* at *2. Plaintiff sued for breach of contract, claiming it was owed "damages for loss of royalty payments that would have resulted from successful commercialization." *Id.* at *6. The court rejected that argument and granted summary judgment in GE's favor:

> The [contract] requires that the decision to commercialize [the technique] be left **entirely** to [defendant]'s discretion. Thus, even if [plaintiff] can show that [the technique] is marketable, [plaintiff] cannot show that [defendant] would have chosen to commercialize it …."

*Id.* (emphasis added). Similarly, under the Agreement, Arctic Cat had unfettered discretion to decline development and had no duty to produce a vehicle. Any speculation as to what might have happened had Arctic Cat decided differently is irrelevant as a matter of law. *See id.* (court's task is to look to the parties' contractual obligations, "not to speculate as to benefits that could have resulted

from actions taken beyond the scope of the parties' contractual obligations"); *see also See Chambers v. The Travelers Cos., Inc.*, 764 F.Supp.2d 1071, 1087 (D. Minn. 2011) (defendant's discretion to determine whether to pay bonus "preclude[d] a finding of breach of contract" for failure to pay bonus); *Sterling Cap. Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 124 (Minn. Ct. App. 1998) (affirming summary judgment where contract gave shareholders unlimited discretion to reject any and all offers to sell company).[4]

> **B.    The Agreement does not "guarantee" "minimum" royalties.**

Speed also alleges that Arctic Cat failed "to pay royalties to Plaintiffs as required by the Agreement." (Dkt. 164, SAC ¶ 113(a)). Speed asserts it is owed *guaranteed minimum* royalties to the tune of $14 million. (Moran Decl. Ex. 12 at 11). This argument fails because the Agreement does not provide for guaranteed minimum royalties and unambiguously makes royalties contingent on sales.

> **1.    The Agreement provides that Arctic Cat is only responsible for royalties on vehicles actually sold.**

Arctic Cat had sole discretion over whether to develop, produce and sell Speed vehicles. *See supra* at 3. Recognition of Arctic Cat's "sole discretion" and "final approval" authority eviscerates the assertion that Arctic Cat had a duty to

---

[4] Speed also claims Arctic Cat breached by refusing to acknowledge novelty of designs before incorporating the designs into vehicles. (Dkt. 164, SAC ¶ 113(e)). This argument suffers from the same flaw: the Agreement states that any novel features "must be accepted by Arctic Cat ***in its discretion*** prior to incorporation in a vehicle and eligibility for royalty payments." (Moran Decl. Ex. 6 at 2 (emphasis added)). Thus, Arctic Cat/TSV had no contractual obligation to accept any designs as novel.

sell a "minimum number of Special Royalty Vehicles each year from 2016 to the present." (*See* Dkt. 164, SAC ¶ 113(c)). Further, the Addendum rebuts this notion head-on: TSV "makes *no commitment to proceed with all or any* of the new Wildcat XX variants." (Moran Decl. Ex. 11 ¶1 (emphasis added)).

The Agreement goes further, making clear that royalties are *only* due on vehicles sold. The royalties obligation is found in Agreement paragraph 3. (Moran Decl. Ex. 6 at 3). There are four categories of royalties, each of which expressly sets forth eligibility for payment:

- **Specialty Royalty Vehicles**: Agrees to "pay annual royalties on the [SRVs] as detailed for each such vehicle in Exhibit D, including bullet points one and three on Exhibit D." (*Id.*)

- **Other Wildcat Vehicles**: Provides for the payment of "halo" or "pivot" royalties depending on whether Robby Gordon Limited Edition vehicles "*collectively meet the aggregate minimum unit **sales** for such vehicles for a particular model year* as set forth" in Exhibit D. (*Id.* at 3-4 (emphasis added)).

- **Accessory Royalties**: Provides for royalties on accessories based on "*the amount purchased **and sold***." (*Id.* at 4 (emphasis added)).

- **Race Vehicle Royalties**: Provides for payment of "[a]nnual royalties **on sales** of the Robby Gordon Built Wildcat XX Race Vehicle." (*Id.* (emphasis added)).

Three of the four categories *expressly* state that royalties are paid based on "sales." The only one that does not—SRVs—simply provides that royalties would be paid in accordance with Exhibit D. For its part, Exhibit D makes no

mention of "minimum" or "guaranteed" royalties.[5] (*Id.* at D1-2). The chart simply provides a list of "target" royalties for each Speed vehicle—assuming that Speed provided appropriate designs, which were then accepted and produced by Arctic Cat and resulted in sales. Indeed, the last page of Exhibit D ("Examples of Royalty Payments") clarifies the theoretical and conditional nature of these royalty payments:

- *If* in MY 2017, **Arctic Cat sells** 1,000 Wildcat X LE units, 2,000 Wildcat XX LE units, 3,000 Wildcat XX units, and, 9,000 other Wildcat units … royalties **would be** … $2,250,000.

- *If* in MY 2017, **Arctic Cat sells** 1,000 Wildcat X LE units, 2,000 Wildcat XX LE units, 3,000 Wildcat XX units, and, 11,000 other Wildcat units … royalties **would be** … $2,425,000.

- *If* in MY 2017, **Arctic Cat sells** 500 Wildcat X LE units, 4,600 Wildcat XX LE units, 3,000 Wildcat XX units, and, 11,000 other Wildcat units … royalties **would be** … $3,400,000.[6]

(*Id.* at D3) (emphasis added).

Neither the term "target" nor a listing of aspirational vehicle sales and royalty amounts create "minimum" or "guaranteed" royalty payments. *See*, *e.g.*, *Sanchelima Int'l, Inc. v. Walker Stainless Equipment Co., LLC*, No. 16-cv-644,

---

[5] The term "minimum" appears just once in the Agreement, in relation to halo and pivot royalties. Even there, it makes the royalty amount dependent on unit sales. (Moran Decl. Ex. 6 at 3-4). And, as the Polaris agreement illustrates, both Speed and their counsel knew how to provide for an express minimum guaranteed royalty, and they did not do so here. (*See* Moran Decl. Ex. 34 § 3(c)).

[6] Of note, each example calculation is based on sales numbers for those models that are **lower** than the numbers in Exhibit D, further undercutting the assertion that Exhibit D sets forth guaranteed minimum royalty payments.

2018 WL 1401195, at *8 (W.D. Wis. Mar. 19, 2018) (rejecting argument that language "target revenue" imposed a contractual requirement, since the very term "suggests flexibility"); *Unimin Corp. v. Flood*, No. C0-93-1214, 1993 WL 500521, at *2 (Minn. App. 1993) (observing that "a 'minimum royalty' is 'a fixed obligation' that is independent of any future obligation," and absent express language imposing a minimum royalty, court would not read it into the contract); *Stephenson v. Martin*, 259 N.W.2d 467, 471 (Minn. 1977) (when interpreting contract, court "cannot assume" that "either party assumed that he would secure an advantage not clearly expressed in its terms").[7]

Speed's argument reads out of the contract and nullifies: (i) Arctic Cat's right of first refusal with respect to all Speed vehicles; (ii) TSV's disclaimer of any commitment to proceed with "all or any" of the Wildcat XX variants; (iii) express contractual language linking royalties with sales for "Other Wildcat Vehicles," "Accessory Royalties" and "Race Vehicle Royalties"; (iv) the conditional nature in which "target" royalties are set forth in Exhibit D; and (v) the express language in the Addendum that royalties for Wildcat XX variants would only be paid "if all or any of the new Wildcat variants are produced." This runs contrary to a most basic rule of contract construction: to "'avoid an interpretation of the contract that would render a provision meaningless.'" *Network F.O.B., Inc. v. Great Am. Ins. Co. of*

---

[7] Even in the Addendum, TSV agreed to pay royalties according to the rates for the Limited Edition ("LE") vehicles in Exhibit D but only *"[i]f all or any of the new Wildcat XX variants are produced."* (Moran Decl. Ex. 11 at 2 (emphasis added)).

*New York*, 30 F.Supp.3d 831, 834 (D. Minn. 2014) (quoting *Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 526 (Minn. 1990)); *accord Storms,* 883 N.W.2d at 776 ("When a contractual provision is unambiguous, [courts] do not rewrite, modify, or limit its effect by a strained construction. [Courts] construe a contract as a whole and attempt to harmonize all of its clauses.").[8]

Contrary to Speed's contention, nowhere in the Agreement is there any express language guaranteeing minimum royalties without any actual vehicle development and sales. Speed's argument lacks factual support, and is contrary to both well-established legal principles and a reasonable reading of the Agreement.

> ## 2. Extrinsic evidence cannot be used to contradict the unambiguous terms of the Agreement, and even so, is unavailing to Speed.

The Court's analysis on guaranteed minimum royalties should end with the plain language of the Agreement. *Storms, Inc.*, 883 N.W.2d at 776. Beyond that, the Agreement contains an integration clause. (Moran Decl. Ex. 6 at 10). This integration clause is enforceable. *See Borgersen v. Cardiovascular Sys., Inc.*, 729 N.W.2d 619, 625 (Minn. App. 2007) (affirming validity of nearly identical integration). Thus, extrinsic evidence of other communications between the parties cannot vary, contradict, or alter the plain terms of the Agreement and

---

[8] The Agreement provides Speed with an express remedy should Arctic Cat decide to not pursue vehicle development. If this occurs, the parties can either find a third-party manufacturer to produce the vehicle, or to allow Speed to produce and sell the vehicle as they wished. (Moran Decl. Ex. 6 at 5).

Addendum. *Id.* (affirming district court's refusal to vary terms of fully-integrated, unambiguous contract). The Agreement controls, and any attempt by Speed to invoke extrinsic communications to impose extra-contractual obligations or to change the scope of the Agreement fails as a matter of law.

Even so, Speed cannot point to a single contemporaneous communication between the parties that expressly states—contrary to the unambiguous language in the Agreement and Addendum—that Speed expected to receive "guaranteed minimum royalties" or that royalties were not entirely contingent on actual sales. Nor are there earlier drafts of the Agreement that expressly provide for guaranteed minimum royalties. Indeed, no statement of what Speed believed is more telling than that of Speed's counsel, Steve Nichols, who acknowledged in a June 4, 2018 email to TSV (less than a year before litigation was filed) that: "*Obviously, Speed Partners' ability to receive royalties depends on Textron's ability to sell units….*" (Moran Decl. Ex. 18 (emphasis added)).[9] It was not until litigation that Speed suddenly claimed it was owed guaranteed royalties,

---

[9] A sample of contemporaneous evidence demonstrates that Speed understood royalties were based on sales. Speed provided invoices summarizing amounts owed for costs and services, but never mentioned royalties which would have been owed to Speed under their current theory. (Moran Decl. Ex. 16). In March 2017, Gordon made such statements as: "Arctic Cat agreed to pay royalties to us **for the sale of** UTV side by side vehicles to be refined and developed under the agreement"; "[t]he Royalty Schedule set out in Exhibit D to the agreement identifies **target royalties** beginning with Model Year 2016 vehicles, **which would mean sales beginning in 2015**"; "Arctic Cat has yet to **sell a single vehicle from which we would receive royalties** under the agreement." (Moran Decl. Ex. 17 (emphasis added)).

irrespective of actual vehicle sales. (Moran Decl. Ex. 19). This convenient flipflop contradicts both unambiguous contractual language and Speed's actual contemporaneous statements and conduct. *See*, *e.g.*, *Jensen v. Minn. Dep't of Human Services*, 897 F.3d 908, 914-915 (8th Cir. 2018) ("the interpretation the parties themselves place on the contract is entitled to great, perhaps controlling, weight in ascertaining the terms of the contract" (quoting *Fredrich v. Indep. Sch. Dist. No. 720*, 465 N.W.2d 692, 696 (Minn. App. 1991))).

      **C.**    **Speed cannot establish damages for any breach.**

Speed's contract claim separately fails because they cannot establish damages. "A breach of contract claim fails as a matter of law if the plaintiff cannot establish that he or she has been damaged by the alleged breach." *Jensen v. Duluth Area YMCA*, 688 N.W.2d 574, 578-79 (Minn. App. 2004).

Speed does not dispute that it has been paid royalties for every vehicle sold under the Agreement. The only such vehicle was the Wildcat XX. Arctic Cat paid royalties on that vehicle, and provided Speed with detailed calculations of the numbers of vehicles sold each calendar quarter, and how royalties were calculated on those sales. (*See* Dkt. 255-20). Speed's own damages expert acknowledged the payment of over $800,000 in royalties to Speed on the sale of 3,777 vehicles through June 30, 2020, and admitted he did not analyze whether that amount was insufficient for the sales that had actually occurred in that time period. (Moran Decl. Ex. 12 ¶ 23; Ex. 25 at 151). Speed witness Anderson further confirmed that royalties were paid for the Wildcat XX units that were sold, and

that Speed was "good on the final number" of royalties paid to it for those sales. (Moran Decl. Ex. 21, 391).

The other portion of Speed's alleged damages—its assertion that Arctic Cat was contractually obligated to manufacture and sell a certain minimum number of vehicles or accessories per year (Dkt. 164, SAC ¶¶ 110-14), and that they are owed *guaranteed minimum* royalties of $14 million (Moran Decl. Ex. 12 at 11)—defies both contractual analysis and judicial scrutiny. *See supra* at 9-15. If the Court agrees with Defendants' arguments that (i) the Agreement and Addendum unambiguously provide Arctic Cat with sole discretion over whether to produce a vehicle and (ii) that nothing in those documents guarantees minimum royalty payments or royalties without actual sales, Speed's damages argument disappears and they cannot recover damages based on conduct that Arctic Cat had no obligation to perform.[10] *See*, *e.g.*, *Lipka v. Minnesota Sch. Emps. Ass'n, Loc. 1980*, 537 N.W.2d 624, 631 (Minn. App. 1995) (summary judgment proper

---

[10] Arctic Cat/TSV's sole discretion over whether to produce a vehicle has a cascading effect on Speed's other claimed breaches. For instance, any obligation to develop and sell vehicle accessories required the production of a vehicle to accessorize. (Dkt. 164, SAC ¶ 113(d)). The same is true for any obligation to perform certain marketing programs—without a vehicle, there is nothing to market. (*Id.* ¶ 113(l)-(m)). Hence, under a plain reading of the Agreement and Addendum, Speed cannot establish damages for these claimed breaches. In any event, Romano conceded that he had no information suggesting that Arctic Cat has failed to pay royalties on Speed royalties actually sold. (Moran Decl. Ex. 5 at 181).

where plaintiff "is barred from recovering under a contract theory absent an injury from the claimed breach").[11]

## II. SPEED'S CLAIM FOR BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING FAILS AS A MATTER OF LAW.

Count II alleges that Arctic Cat breached the implied covenant of good faith and fair dealing. Speed claims that Arctic Cat unfairly interfered with its right to receive benefits of the contract by failing to pursue reasonable efforts to design and sell vehicles, by allegedly launching and then cancelling vehicles, by selling vehicles at lower prices, and by using resources on other projects. (Dkt. 164, SAC ¶ 118). What is entirely absent from the record is any evidence that Arctic Cat acted in bad faith based upon some ulterior motive. As such, this claim fails as a matter of law.

An implied covenant of good faith and fair dealing is read into every Minnesota contract, but it has significant limitations. First, it "does not extend to actions beyond the scope of the underlying contract." *Watkins Inc. v. Chilkoot Distributing, Inc.*, 719 F.3d 987, 994 (8th Cir. 2013). It "serves only to enforce existing contractual duties, and not to create new ones." *Teng Moua v. Jani-King*

---

[11] Speed allege that Arctic Cat/TSV breached the Agreement by refusing to acknowledge novelty. (Dkt. 164, SAC ¶ 113(e)). However, Speed's damages expert Bergmark never assigned damages to a refusal to acknowledge novelty, and Speed has not identified any other resulting damages under this theory. Speed's failure to identify damages, which is fatal to their novelty theory, is explainable. There are no novelty damages because for any design that Arctic Cat/TSV allegedly refused to accept novelty, Speed applied for and received patents, and *Speed still claims ownership of those patents*. (Moran Decl. Ex. 20 at 28).

*of Minnesota, Inc*., 810 F.Supp.2d 882, 893 (D. Minn. 2011). Second, "the covenant is breached only by conduct that is dishonest or malicious or otherwise in subjective bad faith." *BP Prod. N. Am., Inc. v. Twin Cities Stores, Inc*., 534 F.Supp.2d 959, 965 (D. Minn. 2007). "This speaks not of objective reasonableness, but of subjective motivation." *Id.* The burden is on Speed to demonstrate bad faith. *See Minnwest Bank Cent. v. Flagship Props. LLC,* 689 N.W.2d 295, 303 (Minn. App. 2004) ("a party must establish bad faith by demonstrating that the adverse party has an ulterior motive for its refusal to perform a contractual duty").

Following these principles, the *Sterling* decision is instructive. In *Sterling*, the plaintiff sought to restrict the shareholders' unlimited discretion in a contract that permitted them to reject offers to buy the company by imposing the implied covenant of good faith and fair dealing onto the right-to-reject clause. 575 N.W.2d at 125. The Court flatly rejected this argument, holding that even under an implied covenant analysis, "Sterling still has not raised a fact issue" because "the shareholders were exercising a contract right when they rejected the offers and decided to wait to sell the holding company." *Id.* at 125. "[A] party to a contract 'does not act in bad faith by asserting or enforcing its legal and contractual rights.'" *Id.* (quoting *Burgmeier v. Farm Credit Bank*, 499 N.W.2d 43,

50 (Minn. App. 1993)).[12] Further, the Court rejected Plaintiff's argument that the shareholders acted in bad faith, explaining:

> The minutes of the shareholders' meeting reveal that they legitimately considered the offers to purchase the bank, but, finding the bids unacceptably low, decided to exercise their contractual right to reject. The shareholders attributed the problems with sale to the poor financial condition of the bank and decided to wait to sell until it recovered financially."

*Id.*; *see also id.* ("Actions are done in 'good faith when done honestly, whether it be negligently or not'" (quoting Minn. Stat. § 520.01, subd. 6 (1996))).

The court reached a similar decision in *Palm v. Calhoun Realty Co.*, where a sales agent sued the broker for lost commissions due to the broker's failure to pursue litigation against two clients who signed (and breached) exclusive listing agreements. Citing *Sterling* for the proposition that a "*party to a contract does not act in bad faith by asserting or enforcing its legal and contractual rights*," the court affirmed summary judgment dismissal on the ground that the contract between the broker and the salesperson gave the broker sole right to make litigation decisions without any input from the salesperson. 2016 WL 363505 at *6 (emphasis added); *see also Kamboo Mkt., LLC v. Sherman Assocs., Inc.,* No.

---

[12] As exemplified by *Sterling*, courts routinely grant summary judgment on implied covenant of good faith and fair dealing claims. *See, e.g., Palm v. Calhoun Realty Co.*, No. A15-0895, 2016 WL 363505 (Minn. App. Feb. 1, 2016) (affirming summary judgment); *Sports & Travel Mktg., Inc. v. Chicago Cutlery Co.,* 811 F.Supp.1372, 1383–84 (D. Minn. 1993) (same, where defendants "merely terminated the agreement in accordance with its terms"); *Am. Warehousing & Distrib., Inc. v. Michael Ede Mgmt., Inc.*, 414 N.W.2d 554, 557–58 (Minn. App. 1987) (same, where alleged bad faith concerned matter outside scope of contract).

A10-1810, 2011 WL 2518972, at *5-*6 (Minn. App. June 27, 2011) (affirming summary judgment because "landlord had the contractual right not to renew the lease, it did not breach the implied covenant of good faith and fair dealing").

Analysis of Arctic Cat's conduct must begin with the indisputable proposition that Speed and Arctic Cat share the same profit motive—if Arctic Cat can sell Speed vehicles, *both* parties make money. (*See* Moran Decl. Ex. 24 at 280). In that light, and in view of the indisputable facts, Speed's covenant claim makes little sense and does not support a finding of subjective bad faith.

Arctic Cat indisputably invested significant resources to develop products under the Agreement. (Moran Decl. Ex. 21 at 364; Ex. 22 at 70-71). Likewise, it partnered with Bass Pro Shops in an effort to sell more vehicles. (*See* Moran Decl. Ex. 23 at 49-50). In fact, Arctic Cat *did* launch a vehicle developed under the Agreement—the Wildcat XX—and has paid over $800,000 in royalties to Speed on the sale of 3,777 vehicles through June 30, 2020. *See supra* at 5, 15. To date, Arctic Cat continues to sell Wildcat XX vehicles through independent dealers and pay royalties to Speed. (Moran Decl. Ex. 5 at 159; *see also* Moran Decl. Ex. 35) ("We are continuing to sell the XX to our Arctic Cat Independent Dealer Network. The XX will be part of our 2020 product offering to dealers.")

Similarly, Arctic Cat provided Speed with good faith, common sense reasons for its actions not proceeding with certain models. For example, in January 2019, John Collins of Arctic Cat wrote to Speed confirming that Arctic Cat would not pursue two Wildcat XX variants nor "any of the other models listed

in the agreement" due to the lack of "business case" that "justifies moving forward." (*Id.*). As well, Collins explained that the company had shifted internal engineering focus to taking cost out of existing products rather than developing new ones, and was focused on reducing channel inventory (including stopping production at its Thief River Falls location "until the channel inventory is in check"). (*Id.*). Lack of sales, focus on decreasing production costs, and problems with excess channel inventory are well-documented in the record. (Moran Decl. Ex. 10 at 61-63, 157, 187, 190, 303, 340-342; Ex. 22 at 116; Ex. 23 at 63-64, 90, 94-96; Ex. 33 at 10, 28, 38, 52). In the end, as Collins told Speed: "We cannot and will not produce units which are margin losers for us after rebating."[13] (Moran Decl. Ex. 35).

It is likewise well-documented that Speed repeatedly failed to provide vehicle designs that conformed to established vehicle standards. (Moran Decl. Ex. 9 at 135-138). The designs and prototypes that Speed provided were often incomplete, defective, failed to work as Speed represented, and/or failed to pass usability analysis. (Moran Decl. Ex. 10 at 216-218). For example, one such vehicle developed by Speed (the Wildcat X RG Pro) was planned to go to market but ultimately was cancelled because it did not pass durability testing. (Moran

---

[13] Any allegation by Speed that they were harmed by Arctic Cat rebating or reducing sales prices on Wildcat XX vehicles is a red herring since under the Agreement, Speed got paid the same royalty rate regardless of what Arctic Cat sold the vehicle for. (*See* Moran Decl. Ex. 6 at D-2 (setting a $250 royalty "per vehicle" for the Wildcat XX)).

21

Decl. Ex. 10 at 196; Ex. 21 at 363; Ex. 22 at 62). Even Anderson was in favor of not proceeding with the Wildcat X RG Pro and agreed that its cancellation was a reasonable decision.[14] (Moran Decl. Ex. 21 at 365).

Because Speed's vehicle designs were problematic, Arctic Cat committed considerable, additional resources to overcome those deficiencies before such designs could be considered for commercial production. (*Id*. Ex. 1, ¶ 32). This was not contemplated under the Agreement due to the representations made by Speed of their capabilities as powersports vehicle designers. (*Id*.)

While Speed may disagree with Arctic Cat's business decisions not to sell certain vehicles or accessories, to delay or forego other vehicle releases, or to refocus its business strategy on cost reduction and clearing channel inventory, there is no evidence that Arctic Cat acted to spite Speed or with the intent to deprive Speed of the benefit of the contract, nor does such an argument make sense.[15] To the contrary, the evidence more than satisfies the requirement that

---

[14] Speed knew that vehicles and components were required to meet certain standards specified by ROHVA (Recreational Off-Highway Vehicle Association), before Arctic Cat would elect to take the vehicles to mass production. (Moran Decl. Ex. 9 at 311-312). Speed engineering staff testified that they were either unaware of or familiar with only some of the ROHVA standards applicable to vehicles under the Agreement, did not document any testing for compliance with industry standards, did not enlist any testing organization to validate industry standard compliance of any designs provided by Speed, and relied on Arctic Cat to determine compliance with these standards. (Moran Decl. Ex. 30 at 62-67; Ex. 31 at 67-69).

[15] Speed also allege that TSV diverted resources to develop an alternative vehicle, the so-called "Zeus" project. However, there is no requirement in either

Arctic Cat acted in good faith. Speed cannot carry its burden and its Implied Covenant of Good Faith and Fair Dealing claim must be dismissed.

## III.   SPEED'S ALLEGED TORT CLAIMS LACK SEPARATE, INDEPENDENT DAMAGES AND FAIL ON THE MERITS.

Counts III, IV, and V of Speed's SAC allege intentional misrepresentation, negligent misrepresentation and fraudulent concealment. (Dkt. 164, SAC ¶¶ 120-140). These three claims cannot survive summary judgment for two reasons. First, Speed merely repackages its breach of contract claims as fraud and misrepresentation claims, and fails to present evidence of fraud damages independent from their contract claims. Second, even if Speed could establish independent fraud damages, Speed's fraud claims fail for lack of evidence to support other elements of the claims. Summary judgment is therefore appropriate on Counts III, IV, and V.

### A.   Speed cannot establish independent damages attributable to the alleged fraudulent conduct.

In denying Speed's motion to amend the SAC to add punitive damages, Magistrate Brisbois comprehensively summed up the law on this issue. (Dkt. 286 at 4-5).

---

the Agreement or the Addendum that (i) requires Arctic Cat to devote all of its resources to developing Speed vehicles, nor (ii) prohibits Arctic Cat from allocating resources elsewhere or developing additional vehicles. As such, this allegation creates duties outside of the scope of the contractual relationship and cannot support a breach of implied covenant claim. *Watkins*, 719 F.3d at 994; *Teng Moua,* 810 F.Supp.2d at 893; *Am. Warehousing*, 414 N.W.2d at 557-558. There is also no factual basis for this allegation. *See infra* at 31-34.

"Under Minnesota law, extra-contractual damages cannot be recovered for a breach of contract unless the breach is accompanied by an independent tort." *Lunde v. Cincinnati Ins. Co.*, No. 18-cv-238 (JNE/HB), 2018 WL 1972475, at \*2 (D. Minn. Apr. 26, 2018); *see also Wild v. Rarig*, 234 N.W.2d 775, 789 (Minn. 1975). "Minnesota courts have repeatedly refused to expand contract claims into tort claims." *Fette v. Columbia Ca. Co.*, No. C0-93-242, 1993 WL 377091, at \*2 (Minn. Ct. App. Sept. 28, 1993). "Thus, even a malicious or bad-faith motive in breaching a contract does not convert a contract action into a tort action sufficient to support … extra-contractual damages, such as punitive damages." *Lickteig v. Alderson, Ondov, Leonard & Sween*, P.A., 556 N.W.2d 557, 561 (Minn. 1996); *see also Toyota-Lift of Minn., Inc. v. Am. Warehouse Sys., LLC*, 868 N.W.2d 689, 697 (Minn. App. 2015) ("A bad-faith breach of contract does not become a tort.") (quoting *McNeill & Assocs., Inc. v. ITT Life Ins. Corp.*, 446 N.W.2d 181, 185 (Minn. App. 1989))). "To recover under theories of both contract and tort, a plaintiff must prove separate damages for fraud and for breach.'" *Best Buy Stores, L.P. v. Developers Diversified Realty Corp.*, No. 05-2310 (DSD/JJG), 2007 WL 4191717, at \*5 (D. Minn. Nov. 21, 2007) (quoting *Hanks v. Hubbard Broadcasting, Inc.*, 493 N.W.2d 302, 308 (Minn. App. 1992)). "When the gravamen of the complaint is the breach of contract, the plaintiff may not recover tort damages." *McNeill*, 446 N.W.2d at 185. Under this well-established body of law, Speed's tort claims fail and must be dismissed.

Speed have acknowledged that this is a breach of contract case. (Dkt. No.

235, at 6) ("[a]t the core of this case lies [Defendants'] intentional misconduct and breaches related to a Product Development and Marketing Agreement dated July 31, 2015"). The complete overlap of Speed's contract and tort claims was obvious to Magistrate Judge Brisbois:

> Here, Plaintiffs allege that Defendants made several pre-contract, as well as, post-contract fraudulent misrepresentations. (See, e.g., Second Am. Compl. [Docket No. 164] ¶ 121). Plaintiffs also allege that Defendants fraudulently concealed several facts from Plaintiffs. (See, e.g., Id. ¶ 135). However, Plaintiffs' fraud claims *are inextricably intertwined* with Plaintiffs' breach of contract claim….
>
> In fact, each of the alleged misrepresentations and concealed facts directly relate to the scope of the Agreement, Plaintiffs' intention to perform obligations allegedly owed under the Agreement, and/or Plaintiffs' ability to perform obligations allegedly owed under the Agreement. *Plaintiffs are simply repackaging their breach of contract claim as fraud*. In essence, *Plaintiffs merely allege that Defendants falsely represented to Plaintiffs that they would perform their obligations owed under the Agreement, and Defendants falsely concealed that they would not perform their obligations*.

(Dkt. 286 at 6 (emphasis added)).[16] Speed's failure to allege facts sufficient to support a tort claim independent of its contract claims is fatal. *See Lunde*, 2018 WL1972475, at *2; *see also* (Dkt. 286 at 6).

Speed's failure to allege an independent tort claim is confirmed by Speed's lone expert, Brian Bergmark, who failed to distinguish between breach of contract

---

[16] Speed has appealed Magistrate Brisbois' punitive damages denial order on the ground that it applied the wrong standard for amendment. That appeal remains pending. Even if that order is overturned on technical grounds, the Magistrate's logic and analysis remain valid and compelling and support summary judgment. Arctic Cat also discusses each category of allegedly fraudulent conduct below.

and fraud damages:

> Q. Okay. So are you saying that your analysis, your—your damage analysis is for losses experienced as a result of the breach of contract as well as fraud?
>
> A. Yes. I think you can be—it could be used for either.
>
> Q. Okay. **And so there's no difference in your view as to the— the damages experienced in fraud versus the damages experienced as a result of the alleged breach of contract here**?
>
> A. **Correct.** Either one, before the—before including prejudgment interest, would be the 72,428,419.

(Moran Decl. Ex. 25 at 137-138 (emphasis added)). Bergmark further conceded that he did not do a separate damages analysis for the three alleged tort claims. (*Id*. at 139-140). Under Minnesota law, this testimony alone bars Speed's tort claims by admitting that Speed cannot prove separate contract and tort damages. (*See* Dkt. 286 at 5 (citing *Best Buy Stores*, 2007 WL 4191717, at *5)); *see also Golden v. wwwrrr, Inc.*, No. CIV.01-346 ADM/SRN, 2002 WL 264947, at *3 (D. Minn. Feb. 22, 2002) (summary judgment granted on fraud claim where damages were "the same damages sought in Plaintiff's contract claims").

**B.    Speed have failed to develop any evidence in support of other requisite elements necessary to sustain independent fraud claims.**

Speed's fraud claims fit into four categories: (1) Statements made during negotiations leading up to execution of the Agreement; (2) Statements about Arctic Cat's financial condition; (3) Statements about the "Zeus" vehicle development project; and (4) Statements about Arctic Cat's intentions to develop,

produce and sell SRVs. All of these fail as a matter of law.

**1.    Statements made prior to execution of the Agreement.**

Speed lists several pre-contractual "misrepresentations" allegedly made by Arctic Cat's Chris Metz regarding goals and hopes to manufacture vehicles.[17] Speed's reliance on pre-Agreement discussions is nullified by the plain language of the integration clause within the Agreement:

> 15. <u>**Entire Agreement:**</u> This Agreement contains the entire agreement and understanding between the parties with respect to the subject matter hereof and **supersedes all prior** written or oral agreements and **communications** between them with respect to the subject matter hereof.

(Moran Decl. Ex. 6 at 10 (emphasis added)); *see Burnsville Sanitary Landfill, Inc. v. Edward Kraemer & Sons, Inc.*, No. Civ.02-273 JNE/JGL, 2004 WL 1465828, at *5 (D. Minn. June 28, 2004) (reliance on prior oral misrepresentations unreasonable given integration clause); *Borgersen*, 729 N.W.2d at 625 (affirming validity of integration clause nearly identical to the one in the Agreement and excluding evidence extrinsic evidence); *Cady v. Bush*, 166 N.W.2d 358, 361 (Minn. 1969) (representations as to future acts are "not a sufficient ground for the charge of fraud merely because the represented act or event did not take place").

Moreover, these allegedly false representations all concern Arctic Cat's *precontractual willingness and ability to perform under the contract*. They are not

---

[17] Speed contends, among other alleged statements, that Metz said Arctic Cat was committed to growing its market share (Dkt. 164, ¶ 25); wanted to revamp its product line (*id.*, ¶ 26); and that Arctic Cat was properly funded and prepared to invest in product development. (*Id.*, ¶ 29).

collateral to the contract but, as Magistrate Judge Brisbois reasoned, "were subsumed into the Agreement as express or implied obligations. Thus, they are not 'independent' torts." (Dkt. 286 at 6 (citing *Arctic Cat, Inc. v. Polaris Indus. Inc.*, No. 13-3579 (JRT/FLN), 13-3595 (JRT/FLN), 2014 WL 5325361, at *21 (D. Minn. Oct. 20, 2014) and *GBJ Corp. v. E. Ohio Paving Co.*, 139 F.3d 1080, 1088 (6th Cir. 1998) (for fraud to be independent, "inducement must be a promise other than merely pledging to perform the terms of the contract")).

Finally, the factual record demonstrates that any alleged pre-contractual discussions are not actionable as independent fraud claims. Romano, Speed's designated negotiator of the Agreement (Moran Decl. Ex. 5 at 30-31, 84-85), testified that: (i) his discussions with Metz were general discussions to formulate parameters for the final Agreement (*id.* at 91-92); (ii) he could not identify who made specific representations to him regarding Arctic Cat's financial condition before entering the Agreement (*id.* at 55-56); and (iii) these preliminary discussions *were not relied upon* as defining the commitments of the parties but that the "definitive agreement" controlled the relationship (*id*. at 254-256, 263 ("If it's in a conversation, it's a conversation. Like I said, we haven't even gotten to the contract. So I've done tons of contracts over the years. So to me I don't care what happens before. It's only what you sign at the end of the day. I mean a deal is not a deal until you execute it."). By Romano's own admission, there is no viable fraud in the inducement claim at all, let alone independent of the Agreement. *See Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 369

(Minn. 2009) (fraudulent inducement requires proof of both a false representation *and reliance*).

### 2.    Statements about Arctic Cat's financial condition.

Speed next alleges that Arctic Cat misrepresented its financial status during negotiations. These allegations fail for the same reasons as the previous ones: the Agreement's integration clause and the lack of a tort independent from the contract claims. *See supra* at 13-15; 23-28. Even if these allegations were true, they relate to Arctic Cat's ability to perform under the contract, and Speed would be limited to whatever contractual damages might exist from Arctic Cat's failure to perform.

But they are not true and not supported by the record. There are no representations in the Agreement as to any parties' financial condition. (*See* Moran Decl. Ex. 6). Nor did Romano recall any specific discussions regarding Arctic Cat's financial status prior to signing of the Agreement:

> Q. And so prior to that [July 31, 2015] -- tell me specifically what was discussed regarding the financial condition of the company.
>
> A. That they had the ability to do what was going to be executed in the agreement.
>
> Q. And what was that discussion specifically?
>
> A. I can't remember.

(Moran Decl. Ex. 5 at 55-56). Speed's allegations on this point fall well short of the specificity required to sustain a claim for fraud. *See, e.g.*, *McPartlin v. McPartlin*, No. A05-1723, 2006 WL 1738222, at *2–3 (Minn. App. June 27, 2006)

(affirming summary judgment on fraud claim because appellant did not provide sufficient facts to sustain claim). Romano testified that Arctic Cat's financial position at the time the Agreement was entered was *immaterial* to him. (Moran Decl. Ex. 5 at 53). This too is fatal to Speed's claim. *See*, *e.g.*, *See Martens v. Minnesota Mining & Mfg. Co.*, 616 N.W.2d 732, 747 (Minn. 2000) (for fraud claim, statement must be material).

In sum, there is no material factual dispute that the Agreement memorialized an arms-length business transaction negotiated with assistance of counsel. Speed was a sophisticated, successful business entity, and Romano conceded that they conducted due diligence using its current counsel generally and with this Agreement specifically. *See supra* at 3; *see also* (Moran Decl. Ex. 5 at 51-52, 67-68; Ex. 29 ¶ 3). When the Agreement was negotiated and executed, Arctic Cat was a publicly traded entity, meaning its financial information was available through required SEC financial filings, and Speed knew this fact before entering into the Agreement. (Moran Decl. Ex. 5 at 50). Gordon was familiar with off-road vehicle design partnerships, having previously contracted with Polaris, to design a sport performance vehicle. (*Id*. at 18).

Lastly, the Agreement specifically disclaimed a fiduciary relationship between the parties. (Moran Decl. Ex. 6 § 11 ("Speed RMG, Gordon and Romano for all purposes shall be independent contractors, and not agents, employees, partners, or joint venture partners of Arctic Cat. ***No fiduciary relationship or obligation is created by this Agreement.*** (emphasis added)).

"Absent certain special circumstances, such as a fiduciary relationship, one party to a business transaction has no duty to disclose material facts to the other party." *Driscoll v. Standard Hardware, Inc.*, 785 N.W.2d 805, 812-13 (Minn. App. 2010).

Dismissal of this category of claims is appropriate. *See SuperValu, Inc. v. Associated Grocers, Inc.*, 428 F.Supp.2d 985, 996 (D. Minn. 2006) ("When the parties are sophisticated business entities engaged in arm's length negotiations, there is no duty to disclose."); *Stephenson v. Deutsche Bank AG*, 282 F.Supp.2d 1032, 1061-62 (D. Minn. 2003) (dismissing negligent misrepresentation claim as "no duty of care exists between sophisticated equals negotiating an arm's length business transaction").

### 3. Statements allegedly made or facts concealed post-Agreement.

Speed's remaining allegations concern statements allegedly made or facts concealed after formation of the Agreement. These allegations likewise fail to allege either a tort or damages independent from Speed's contractual claims.

Speed claims that Arctic Cat made false representations post-Agreement (i) related to their intent to produce vehicles under the Agreement, and (ii) stating that their resources were being fully devoted to the SRVs under the Agreement. (*See, e.g.*, Dkt. 164, SAC ¶¶ 77-78 (alleging that "competition" between "the secret Zeus vehicle" and the Wildcat XX was "inconsistent with Arctic

31

Cat/Textron's *express and implied obligations under the Agreement*" (emphasis added)).

As Magistrate Judge Brisbois observed, these assertions "are indistinguishable from Plaintiffs' breach of contract allegations" so "they too are not 'independent' torts." (Dkt. 286 at 7 (citing *Arctic Cat*, 2014 WL 5325361, at *21 and *MAS Prods., Inc. v. MAS Acquisition, Inc*., No. A11-1254, 2012 WL 612318, at *8 (Minn. App. Feb. 27, 2012) (misrepresentation claims not independent where "the alleged misrepresentations [we]re part of the agreement")).

On fraudulent concealment, Speed alleges that Arctic Cat concealed facts related to their intention and ability to perform their obligations under the Agreement. (*See, e.g*., Dkt. 164, SAC ¶ 135). Once again, Magistrate Judge Brisbois correctly analyzed that "Defendants' duty to disclose those facts, if any, was derived solely from their obligations under the Agreement. Therefore, Plaintiffs' fraudulent concealment claims are also not 'independent' torts." (Dkt. 286 at 7 (citing *Arctic Cat*, 2014 WL 5325361, at *20, and *Marvin Lumber and Cedar Co. v. PPG Indus., Inc*., 223 F.3d 873, 887 (8th Cir. 2000) ("independent fraudulent concealment claim will not lie where the fraudulent concealment relates to a promisor's duties under the contract")). Similarly, Speed's alleged damages—that they were deprived of their right to take their designs to other manufactures—"is itself an intrinsic symptom of the alleged breach of contract" and is not independently actionable as a tort claim. (*Id*. at 8 (quoting *RG Golf*

*Warehouse, Inc. v. Golf Warehouse*, Inc., No. 19-cv-0585 (WMW/DTS), 2019 WL 4016169, at *4 (D. Minn. Aug. 26, 2019) ("Because there is no claim of injury that the law would protect if there were no contract, the fraud and contract claims are not independent of one another.")).

Having failed to allege either an independent tort or independent damages, these post-Agreement fraud allegations must also be dismissed. As well, as discussed below, they have no factual support in the record.

### a.   Statements regarding the Zeus vehicle.

Speed assert fraud claims based upon the assertion that Arctic Cat worked on a secret, covert project named "Zeus" during the same time period that Arctic Cat and Speed developed the Wildcat XX. Even if true, Arctic Cat had no express obligation under the Agreement to exclusively develop vehicles included in the Agreement. There is simply no such provision that requires Arctic Cat to forego all other research and development projects at the company. (*See* Moran Decl. Ex. 6). Speed cannot cite a contractual provision for support of this allegation. The suggestion is absurd given the many product lines at Arctic Cat and TSV unrelated to this Agreement. (*See* Moran Decl. Ex. 36).

Furthermore, every witness with actual knowledge of the Zeus project testified that (i) Zeus was shut down and no longer being pursued, and (ii) no attempt was made to conceal the project from Speed. (*See* Moran Decl. Ex. 9 at 83-87, 155, 179 (Tracy Crocker, former VP and GM at Arctic Cat); Ex. 3 at 105-106, 109 (Chris Metz, former President and CEO of Arctic Cat); Ex. 22 at 79-80,

256, 258) (Craig Kennedy, director of Arctic Cat off-road strategy). In contrast, Speed's sole source for this allegation, Speed affiant Michael Anderson, admits to not working at the Thief River Falls facility, where the "shadow" Zeus project was allegedly being pursued. (Moran Decl. Ex. 21 at 399). Gordon and Romano, for their part, admit to having no evidence about Zeus whatsoever. (Moran Decl. Ex. 7 at 97; Ex. 28 at 347-349).

      **b.**      **Statements about decisions to proceed with vehicles.**

Speed next contend that Arctic Cat fraudulently enticed it with promises to produce vehicles. This assertion is flawed because (as discussed above) the Agreement and Addendum gave Arctic Cat sole and ultimate discretion to decide which vehicles to produce, if any, without any contractual restrictions, conditions precedent, or requirements that the company could not change course. *See supra* at 3. Speed have never alleged that Arctic Cat waived its right to decide which Speed vehicles to develop. Given such sole and exclusive discretion, there is no basis for a fraud claim as a matter of law if Arctic Cat changed its mind.

Further, the record shows that Arctic Cat *repeatedly* attempted to produce vehicles covered by the Agreement, but many vehicles and designs generated by Speed failed testing and were not feasible for mass production and consumer sale. *See supra* at 21-23. Goals and development timelines were set, and due to design issues often turned out (as Anderson testified) to be "too aggressive" and needed to be changed. (Moran Decl. Ex. 27 at 207). Forced delays and decisions

to discontinue development (such as with the Wildcat X RG Pro) was just as disappointing and frustrating for Arctic Cat, and neither party made money off vehicles not produced. (Moran Decl. Ex. 22 at 70-71).

Finally, the record also shows that Arctic Cat did produce certain Speed vehicles, compensated Speed for those sales, and continues to sell Wildcat XX vehicles to this day. *See supra* at 4-5; 15-16.

For all these reasons, Speed cannot establish the elements of its fraud claims, either standing alone or as independent of its contract claims, and Counts III, IV, and V must be dismissed.

## IV.    <u>TEXTRON IS ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS.</u>

Textron Inc. is entitled to summary judgment for the additional reason that Speed has no evidence to support an alter ego theory against Textron.

Speed acknowledges that the *only* way to hold Textron liable (as opposed to TSV or Arctic Cat) is by piercing the corporate veil. (Dkt. 244 at 7). The SAC contains *only* a single, unsupported, conclusory statement about Textron: "On information and belief, Textron is owner and alter ego of Textron Specialized Vehicles Inc." (Dkt. 164, SAC ¶ 11).

As its parent company, Textron is presumed separate and immune from liability for the conduct of TSV. *Ass'n of Mill & Elevator Ins. Co. v. Barzen Int'l, Inc.*, 553 N.W.2d 446, 449 (Minn. App. 1996). "Piercing the corporate veil is an equitable remedy that may be applied in order to avoid an injustice." *Equity Tr. Co. Custodian ex rel. Eisenmenger IRA v. Cole*, 766 N.W.2d 334, 339 (Minn.

App. 2009). Courts follow a two-step analysis when determining whether to pierce, beginning with the *Victoria Elevator* factors:

> [1] insufficient capitalization for purposes of corporate undertaking, [2] failure to observe corporate formalities, [3] nonpayment of dividends, [4] insolvency of debtor corporation at time of transaction in question, [5] siphoning of funds by dominant shareholder, [6] nonfunctioning of other officers and directors, [7] absence of corporate records, and [8] existence of corporation as merely façade for individual dealings.

*Victoria Elevator Co. of Minneapolis v. Meriden Grain Co.,* 283 N.W.2d 509, 512 (Minn. 1979). "[T]o disregard the corporate entity in a particular case 'requires *not only* that a number of these factors be present, *but also that there be an element of injustice or fundamental unfairness.*'" *Great Lakes Gas Transmission Ltd. P'ship v. Essar Steels Minnesota, LLC*, No. 09-3037 (SRN/LIB), 2011 WL 13134917, at *13 (D. Minn. Mar. 3, 2011) (quoting *Victoria Elevator*, 283 N.W.2d at 512) (emphasis added). "The alter ego doctrine is limited, and 'invoked only where recognition of the corporate form would work an injustice.'" *M-I Drilling Fluids UK Ltd. v. Dynamic Air Ltda.*, No. 13-cv-02385 (ADM/HB), 2015 WL 12803577, at *4 (D. Minn. Nov. 9, 2015) (quoting *Stewart v. Screen Gems-EMI Music, Inc.*, 81 F.Supp.3d 938, 960 (N.D. Cal. 2015)).

There is no evidence to support an alter ego. As Defendants explained in excruciating detail in opposition to Speed's motion to compel alter ego discovery (Dkt. 242), Textron has never treated TSV as its alter ego. (*See* Dkt. 249 at 7-13, 25-26 (detailing the many ways in which Textron and TSV are separate, independently-functioning corporate entities). For this reason, Magistrate Judge

Brisbois denied alter ego discovery. (Dkt. 286 at 20-21) (stating that Speed have "little-to-no evidence in support of their bare, conclusory alter ego allegations" and noting "the utter lack of evidence provided by" Speed to support their alter-ego theory). Speed never appealed that order.

Speed deposed Scott Ernest, the former TSV President and CEO, and Scott Donnelly, Textron's CEO, President and Board Chairman. Both apex witnesses confirmed what Defendants have maintained all along: Textron did not decide strategy for TSV; TSV's Collins made the decision not to proceed with vehicles under the Agreement; and neither Textron nor Donnelly played a part in that decision or in the earlier decision to greenlight the Wildcat XX. (Moran Decl. Ex. 33 at 13; Ex. 37 at 23, 25-27, 52, 57-59, 146). Donnelly further testified he had never seen or read the Agreement, and had only a cursory knowledge of Gordon. (*Id.* at 44, 110-111, 149)

The lack of *any* competent evidence to support Speed's alter ego claim, let alone to establish any "injustice" to Speed, mandates that summary judgment be granted on all claims against Textron. *See, e.g.*, *A.P.I., Inc. Asbestos Settlement Trust v. Home Ins. Co.*, 877 F.Supp.2d 709, 731-732 (D. Minn. 2012) (even if Zurich exercised some influence over Home's operations "the record does not demonstrate that Zurich used that control to perpetrate a fraud or injustice, or that failure to pierce the veil would result in the kind of fundamental unfairness that the law requires") (citing *Trustees of the Graphic Comm'cns. Int'l Union Upper Midwest Loc. 1M Health and Welfare Plan v. Bjorkedal*, 516 F.3d 719, 731

(8th Cir. 2008); *Carpenters and Joiners Welfare Fund v. Wayne*, Civ. No. 02-779, 2003 WL 21730105, at *3 (D. Minn. July 21, 2003)).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant summary judgment in its entirety on Speed's claims.

Respectfully submitted,

Dated: June 1, 2021                     **HKM, P.A.**

*s/ William L. Moran*
Daniel A. Haws (#193501)
William L. Moran (#0177167)
Cody M. Bauer (#0401470)
Kathleen K. Curtis (#388279)
30 East Seventh Street, Suite 3200
St. Paul, MN 55101-4919
(651) 227-9411
dhaws@hkmlawgroup.com
wmoran@hkmlawgroup.com
cbauer@hkmlawgroup.com
kcurtis@hkmlawgroup.com

*Attorneys for Defendants*
*Arctic Cat Sales Inc., Arctic Cat Inc.,*
*Textron Specialized Vehicles Inc., and*
*Textron Inc.*

4851-9268-5292, v. 1