# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| SPEED RMG PARTNERS, LLC, ROBBY GORDON, AND TODD ROMANO, | ) ) ) | Case No.  20-cv-00609 (NEB/LIB) |
| *Plaintiffs*, | ) ) ) | |
| v. | ) ) | **SPEED RMG PARTNERS, LLC, ROBBY GORDON, AND TODD ROMANO'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| ARCTIC CAT INC., ARCTIC CAT SALES INC., TEXTRON INC., AND TEXTRON SPECIALIZED VEHICLES INC., | ) ) ) ) | |
| *Defendants*. | ) ) ) | |

## I.   *INTRODUCTION.*

After providing advance notice and requesting that the parties engage in contractually-required mediation, plaintiffs Speed Parties[1] sued defendants Arctic Cat Parties in March 2019 for fraud and contractual breaches relating to the parties' collaboration to develop and market off-road side-by-side vehicles.  The same day that Speed Parties filed suit—without providing requisite notice—Arctic Cat Parties also filed a preemptive, defensive complaint rife with claims that are entirely inconsistent with the course of the parties' dealings.  (*See* Declaration of Steven Nichols ("Nichols Decl."), ¶ 22, *Ex.* 12 at 12 (order on motion to dismiss finding that "Arctic Cat's route to litigation came without warning and contrary to the mandates of the Agreement.").)  Arctic Cat Parties' allegations are defective as a matter of law.  Speed Parties therefore request partial summary judgment as to Arctic Cat Parties' claims in their First Amended Complaint ("FAC")[2] for (1) conversion and misappropriation of intellectual property, (2) federal trademark infringement, (3) common law trademark infringement and unfair competition, and (4) punitive damages.  (*Id.* ¶ 23, *Ex.* 13 ("FAC") ¶¶ 73-89.)

*First*, Arctic Cat Sales' conversion claim is based on allegations that Speed Parties refuse to assign patents that Gordon earlier applied for and prosecuted.  (*See* FAC ¶¶ 33-

---

[1]     The term "Speed Parties" collectively refers to plaintiffs Speed RMG Partners, LLC ("Speed Partners"), Robby Gordon ("Gordon"), and Todd Romano ("Romano"). The term "Arctic Cat Parties" collectively refers to defendants Arctic Cat Sales Inc. ("Arctic Cat Sales"), Arctic Cat Inc., Textron Specialized Vehicles Inc. ("TSV Inc."), and Textron Inc.  In places, this motion also collectively refers to Arctic Cat Sales Inc. and/or Arctic Cat Inc. as "Arctic Cat," and TSV Inc. and Textron Inc. as "Textron."

[2]     Arctic Cat Parties filed the FAC in Case No. 2:19-cv-07435 in the Central District of California at CM/ECF Docket No. 85.  That action was then consolidated with Speed Parties' action in the Central District of California captioned Case No. 2:19-cv-02362, and later transferred to this Court.  For purposes of this motion, Speed Parties treat the FAC as if it were asserting affirmative claims in this action.

43; 84-89.)  Arctic Cat Sales asserts a right to an assignment of Gordon's patents based on the parties' July 30, 2015, product development and marketing agreement (the "Agreement").  (*Id.* ¶ 86 ("Speed Partners have obtained, stolen, converted, and appropriated Arctic Cat Sales Inc.'s intellectual property *related to the Agreement*"(emphasis added).)  Separately, however, Arctic Cat Sales also alleges a breach of contract claim under the Agreement demanding assignment of the same patents.  "[A] conversion claim cannot survive when it merely duplicates a breach-of-contract claim."  *Jaunich v. State Farm Life Ins. Co.*, No. 20-cv-1567, 2020 WL 6712219, at *2 (D. Minn. Nov. 16, 2020) (*Jaunich*).  Here, Arctic Cat Sales' conversion claim is entirely dependent on its contract claim seeking the same relief.  Even if Arctic Cat Sales could overcome this defect (it cannot), "under well-established Minnesota law, [a plaintiff] may not maintain a conversion claim based on [a defendant's] alleged misappropriation of its intangible property interests."  *Maxim Def. Indus., LLC v. Kunsky*, No. 19-cv-1225, 2019 WL 5079984, at *2 (D. Minn. Oct. 10, 2019) (*Maxim Dec.*) (citing *Jacobs v. Gradient Ins. Brokerage, Inc.*, No. 15-cv-3820, 2016 WL 1180182, at *3 (D. Minn. Mar. 25, 2016) (*Jacobs*); *Bloom v. Hennepin Cty.*, 783 F. Supp. 418, 440-41 (D. Minn. 1992) (*Bloom*)).  Minnesota conversion law does not protect an interest in intangible patent rights.

**Second**, Arctic Cat Inc.'s federal trademark infringement claim is barred by Speed Parties' thirteenth and fourteenth affirmative defenses of consent and acquiescence.  (*See* Nichols Decl. ¶ 24, *Ex.* 14 [Answer to FAC] at 16 (asserting defenses of consent and acquiescence).)  The doctrine of estoppel by acquiescence applies where the owner of the trademark expressly or impliedly consents to the alleged infringement.  *3M Co. v.*

*Intertape Polymer Grp.*, Inc., 423 F. Supp. 2d 958, 965 (D. Minn. 2006) (*3M Co.*).  While vaguely alleged, Arctic Cat Inc.'s Lanham Act trademark claim appears to be based on allegations that Speed Parties (1) sold modified Arctic Cat vehicles using Arctic Cat trademarks, (2) raced a "Speed Cat 77" vehicle displaying Arctic Cat trademarks without permission, and/or (3) "used the Arctic Cat trademarks on social media, weblogs."  (FAC ¶¶ 50-51.)  Arctic Cat Parties, however, consented to and encouraged these activities as part of their efforts to associate their brand with Speed Parties.  As described below, for example, Arctic Cat Parties proactively encouraged Speed Parties to create and publicize modified Arctic Cat vehicles, including by advertising such vehicles for-sale on Defendants' Instagram, inviting Speed Parties to build a modified vehicle inside a Textron booth during the preeminent industry exposition, and organizing a social media "takeover" of Arctic Cat Parties' account during which Gordon showcased a Speed-modified vehicle.  (Section II.F, *infra.*)  Arctic Cat Parties likewise asked Speed Parties to build the very race vehicles about which they now complain and even paid for them to do so.  (*Id.*)  All the while, they aggressively promoted their sponsorship and product sourcing affiliation with Speed Parties through postings on various social media accounts.  (*Id.*)  Arctic Cat Parties may not encourage Speed Parties to undertake these activities and then sue for infringement based on the same conduct.  Additionally, even if Arctic Cat Parties had not acquiesced to the alleged wrongdoing, the nominative fair use doctrine also protects Speed Parties' use of trademarks to accurately describe Arctic Cat products, including accessorized or modified Arctic Cat vehicles.  (Section III.B.2, *infra*.)

**Third,** while Arctic Cat Inc. seeks to assert a claim for common law trademark infringement, Minnesota state law trademark claims are "coextensive" with the federal

claims. *DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 935 n.3 (8th Cir. 2003) (*Daimler*). Since Arctic Cat Inc.'s federal claim is meritless, its common law claim likewise fails.

**Fourth**, Arctic Cat Parties seek punitive damages, but have never requested leave to pursue them under Minnesota Statute section 549.191.  Minn. Stat. § 549.191 ("Upon commencement of a civil action, the complaint must not seek punitive damages."). Given this procedural failure, summary judgment is also appropriate as to those allegations.  *266 Summit, LLC v. Lawyers Title Ins. Corp.*, No. 10-cv-4051, 2011 WL 3020301, at *8 (D. Minn. July 22, 2011) (*266 Summit*) (granting summary judgment as to punitive damages claims where the plaintiff "failed to meet the procedural requirements for seeking to amend the complaint to assert that claim").

## II.    *PROCEDURAL AND FACTUAL BACKGROUND.*

### A.    *The Parties Enter The Agreement.*

Gordon is a world-renowned race car driver, race team owner, and business entrepreneur.  (Declaration of Robby Gordon ("Gordon Decl.") ¶¶ 1-2.)  Romano is a professional off-road driver, stunt racer, and entrepreneur.  (Declaration of Todd Romano ("Romano Decl.) ¶ 2.)  Together, Gordon and Romano co-founded plaintiff Speed Partners and create products under the name "SPEED®," including Speed High Performance Accessories.  (Gordon Decl. ¶¶ 1, 3.)  Gordon and Romano are well-known in the off-road racing world.  In late spring and summer of 2015, they engaged in communications with Arctic Cat Sales, a vehicle manufacturer, concerning a partnership allowing Arctic Cat Sales to take advantage of Speed Parties' endorsement and designs. (Romano Decl. ¶ 3-5.)  Ultimately, the parties entered the Agreement memorializing this arrangement.  (*See* Gordon Decl. ¶ 5, *Ex.* 1 [the Agreement]; FAC, *Ex.* 1.)

As Arctic Cat Sales' CEO Christopher Metz publicly explained when launching the parties' partnership, they would have a "strategic relationship" with "three important legs of the stool," namely, "marketing," "product," and "accessories." (Romano Decl. ¶ 7, *Ex.* 1.) The Agreement addressed all three legs. With respect to marketing, it states that Romano and Gordon will "personally endorse" Arctic Cat products. (Gordon Decl. ¶ 5, *Ex.* 1, § 2.a.) Romano and Gordon agreed that their endorsements would be on an "exclusive basis" and that they would not represent other powersports manufacturers. (*Id*.) Separately, Speed Partners also agreed to provide designs and updates to develop Arctic Cat's product and accessories lines. (*Id*.)

In exchange for Speed Parties' endorsement and designs, the Agreement required Arctic Cat to pay Speed Partners "annual royalties" on "Special Royalty Vehicles," to create a "Performance Product Line which Arctic Cat shall use in the Side by Side vehicles," and to fund marketing activities. (*Id.* §§ 3.a.i; 2.c; 3.d.) Because the parties contemplated that Speed Partners' inventions would be incorporated into Arctic Cat's vehicles, they also negotiated intellectual property provisions. Section 7 of the Agreement, for example, defines the parties' rights and responsibilities concerning patents and states:

> Arctic Cat shall have the exclusive right and responsibility at its own expense to apply for any patents for the vehicles identified in this Agreement and/or their component parts as well as the accessories identified in this Agreement and any other Work contemplated hereby including Work created prior to execution of this Agreement that is related to the vehicles identified herein excepting only those vehicles as to which Arctic Cat elects not to proceed as provided in paragraph4 [sic] above.

> (*Id.* § 7.)

Section 7 of the Agreement thereby grants Arctic Cat Sales the "right and responsibility" at its expense to "apply" for patents for the vehicles as to which it exercises its right to proceed pursuant to the requirements of paragraph 4 of the Agreement. (*Id.*) Notably, Arctic Cat Sales does not have patent rights for inventions in vehicles as to which it "elects not to proceed." (*Id.*) Likewise, while the Agreement contemplates that Arctic Cat Sales has the responsibility to "apply" for patents if it seeks to own those patents, it does not provide that Arctic Cat may demand Speed Parties assign patent applications or rights after having failed to apply for them. (*See* Nichols Decl. ¶ 21, *Ex.* 11 at 3 [June 26, 2019, Hearing Transcript] (Arctic Cat Parties' counsel conceding the Agreement "might not have said specifically assign or describe the mechanics for assigning").)

In exchange for granting Arctic Cat Sales the right to apply for patents, Speed Parties negotiated the right to receive ongoing compensation for the contribution of novel intellectual property. Specifically, Section 1 of the Agreement provides that Arctic Cat Sales would pay ongoing royalties to Speed Partners, past the Agreement's five-year term, with respect to vehicles that continue "to incorporate a substantial amount of the specific intellectual property identified as novel to such vehicles to Arctic Cat by Speed RMG." (Gordon Decl. ¶ 5, *Ex.* 1, § 1.)

### B. *Arctic Cat Parties Immediately Promote The Parties' Partnership.*

Promptly after entering the Agreement, Arctic Cat Sales began to promote the parties' collaboration. For example, in late August 2015, Arctic Cat held a show for Arctic Cat dealers in Orlando, Florida. (Romano Decl. ¶¶ 6-7.) There, Metz made the partnership a centerpiece of his presentation, claiming that it was "arguably the most

exciting thing that's hit the power sports scene in a long, long, long time, if not ever." (*Id.* ¶ 7, *Ex.* 1.)  On August 24, 2015, Arctic Cat issued multiple press releases touting the new relationship, including one stating that Arctic Cat had "unveiled its first wave of 2016 model year off-road vehicles" at the Orlando dealer show and another describing the new "SPEED® brand of race-inspired accessories for side-by-sides" as "part of Arctic Cat's recently announced partnership with Gordon and Romano" who are "working under an exclusive agreement with Arctic Cat to co-develop innovative, industry leading side-by-side products and accessories." (*Id.* ¶ 8, *Exs.* 2-3.)

## C.   *Arctic Cat Parties Encourage Gordon To Apply for Patents.*

At the same time, however, that Arctic Cat was publicly announcing the parties' relationship and launching 2016 vehicles at the Orlando dealer show, it was already embarking on its years-long course of undermining Speed Parties rights.  As Arctic Cat introduced Speed Partners-inspired vehicles for the 2016 model line, it wished to preserve possible intellectual property rights in those products before introducing them to the public domain.  In that regard, the interplay between Sections 1 and 7 of the Agreement created a dilemma for Arctic Cat.  Section 7 allowed Arctic Cat to apply for certain patents incorporated in the Special Royalty Vehicles.  However, if Arctic Cat Sales applied for patents as contemplated under Section 7, it would necessarily acknowledge novelty of the inventions embodied in those patents.  *See Reinke Mfg. Co. v. Sidney Mfg. Corp.*, 594 F.2d 644, 645 n.4 (8th Cir. 1979) (*Reinke*) ("[A]n invention must be . . . novel in order to be patentable.").  By doing so, it would commit itself to paying ongoing post-term royalties to Speed Partners on novel contributions under Section 1 of the Agreement.  (Gordon Decl. ¶ 5, *Ex.* 1.)  Conversely, by not filing the patent

applications, it could still deny novelty of the designs and preserve the argument that it had no obligation to pay royalties to Speed Partners for use of the designs under Section 1.

Despite the fact that the Agreement had been drafted to protect Speed Partners' intellectual property rights, Arctic Cat Sales began in 2015 to evade its obligations by (1) encouraging Gordon *himself* to apply for patents (not Arctic Cat Sales), and (2) then later demanding assignment of those patents, while also denying novelty of the inventions embodied in them.  (*See* Nichols Decl. ¶¶ 5-8, *Exs.* 1, 2.)  As described further below, Arctic Cat thus set up a scheme to frustrate the purposes of the Agreement by not acknowledging novelty to avoid paying Speed Parties post-term royalties while retaining claims to patent ownership if patents were issued.  In August of 2015, shortly before the Orlando dealer show, Arctic Cat's counsel Michael Okerlund wrote Gordon's counsel noting a concern that inventions might be "dedicate[d] to the public" if not properly protected.  (*Id.* ¶ 6, *Ex.* 1.)  He therefore asked that Gordon's counsel "confirm that [Gordon] has filed" patents related to the vehicle and expressly stated "it's good if he has."  (*Id.*)  After Okerlund was informed that Gordon would—at his own expense—be "filing provisional applications listing [Gordon] as inventor," he responded, "Great." (*Id.*)  Arctic Cat Parties were therefore aware that Gordon intended to file patent applications and expressly encouraged him to do so.

> **D.**      ***Arctic Cat Parties Direct Speed Parties To Participate In Races Using Race Variants Of The Wildcat XX Vehicle.***

Despite launching 2016 model year vehicles at the Orlando dealer show—and over the protest of Speed Parties—Arctic Cat unilaterally announced in February of 2016

that it would not release vehicles as model year 2016 vehicles, and would instead delay and then release them as model year 2017 vehicles. (Gordon Decl. ¶ 16, *Exs.* 2, 3.) This harmed Speed Parties' reputation, undermined the production program, and denied Speed Partners royalties. (*Id.* ¶ 17.) Nonetheless, Speed Parties continued to work diligently to promote the collaboration. In that regard, the Agreement contemplated that Arctic Cat would fund marketing activities, including racing at the Baja 1000 off-road race held on the Baja California Peninsula. (*Id.* ¶ 5, *Ex.* 1, § 3.d and *Ex.* B.) In the summer of 2016, Arctic Cat and Speed Parties agreed that, as a marketing initiative before the planned 2017 release of a Speed-inspired side-by-side called the "Wildcat XX," Speed Parties would build a limited number of custom race vehicles for competition in the Baja 1000 in November of 2016 using the Wildcat XX body work and other Wildcat components supplied by Arctic Cat. (*Id.* ¶ 19.)

Arctic Cat agreed in writing that Speed Parties would race these vehicles and also sell a limited number to other racing customers to create interest. (*Id.* ¶ 20, *Ex.* 4.) On July 16, 2016, Artic Cat Sales' Vice President Tracy Crocker sent an email to Romano and Gordon which instructed them, "Build 4 Race Only cars for Baja and selected other races in December and January." (*Id.*) Crocker stated that those vehicles' purpose was to "win trophies [and] create buzz." (*Id.*) Thereafter, Arctic Cat repeatedly confirmed its instructions. On July 19, 2016, for example, Arctic Cat Sales' Director of New Product Innovation Michael Anderson asked Speed Parties advise "exactly what [components] you want and don't want on these cars this week," because Arctic Cat would "have to push our suppliers to expedite parts for a late September build." (*Id.* ¶ 21, *Ex.* 5.) That same day, Crocker confirmed that "we will provide BOM [bill of materials] at our cost so

you *can build and sell*." (*Id.* (emphasis added).)  In late September of 2016, Arctic Cat internally confirmed with its public relations firm that Gordon was to race in the Baja 1000.  (Nichols Decl. ¶ 27, *Ex.* 16 at 2.)

Consistent with Arctic Cat's directions and expectations, Speed Parties devoted significant personnel-hours and resources to building the race vehicles.  (Gordon Decl. ¶ 22.)  As the Baja 1000 race approached, however, in October of 2016, Arctic Cat advised Speed Parties that it did not wish to "fully activate" the marketing race program.  (*Id.* ¶ 22, *Ex.* 6.)  This gave rise to friction among the parties and Arctic Cat acknowledged the parties' "arrangement" to "build Baja Race vehicles way back in July," and proposed a solution whereby Speed Parties could "still race/sell the cars at Baja." (*Id.*)  Ultimately, consistent with Arctic Cat's direction to build and race the car, and subsequent ratification of these instructions, Speed Parties raced the vehicles at the Baja 1000 during the week of November 14, 2016.  (*Id.* ¶ 23.)

After the Baja 1000 race, Arctic Cat personnel expressed concerns that the race vehicles had received unexpected social media publicity before the formal launch of the Wildcat XX model in February 2017.  (*Id.* ¶ 24.)  The parties then agreed that in subsequent races before that launch (specifically, the January 2017 Parker 250 race in Parker, Arizona and the February 2017 King of the Hammers race in Johnson Valley, California), Speed Parties would be authorized to race the vehicles under the Speed Cat 77 name, but would remove any Arctic Cat markings and would not register the cars in the Arctic Cat name pending the formal public launch of the Wildcat XX production vehicle in February of 2017.  (*Id.* ¶ 25, *Ex.* 9.)  Speed Parties complied with this agreement, and on February 24, 2017, Arctic Cat publicly launched the Wildcat XX

vehicle to its dealers.  (*Id.* ¶ 26-27, *Ex.* 10.)  At that dealer show, Arctic Cat prominently

displayed a Speed Cat 77 vehicle alongside the stock Wildcat XX:



(Gordon Decl. ¶ 27, *Ex.* 11.)

As reflected by Arctic Cat's pro-active use of the Speed Cat 77, this launch

resolved any publicity issues.  By April of 2017, Arctic Cat's website also featured the

Speed Cat 77 race vehicle.  (*Id.* ¶ 28, *Ex.* 12.)  Arctic Cat never again raised any issue

concerning the Speed Cat 77 until it rushed together and filed its preemptive complaint

with less than 24 hours' notice, through which complaint it now falsely claims Speed

Parties violated Arctic Cat's trademarks by racing the Speed Cat 77 despite Arctic Cat's

express encouragement and written authorization.  (Gordon Decl. ¶ 29; FAC ¶ 50.)

### E.   *Arctic Cat Parties Seek To Undermine Speed Parties' Royalty Rights.*

Shortly after refusing to proceed with the contractually required 2016 model year

vehicles in February of 2016, Arctic Cat Parties began demanding that Gordon assign his

patent applications to Arctic Cat, despite Arctic Cat's failure to take on the expense of

applying for the patents and failure to attest to the designs' novelty—which was its "exclusive responsibility" under the Agreement.  (Nichols Decl. ¶ 7, *Ex.* 2.)

In December 2016, the parties held a meeting to address matters including the patent applications.  (Nichols Decl. ¶¶ 9, 10.)  After that meeting, at the request of Okerlund, Speed Parties sent in January of 2017 additional information regarding novelty of the designs, and renewed the request that Arctic Cat Sales acknowledge the designs as novel.  (*Id.* ¶ 10-11, *Ex.* 3.)  Contemporaneously, in January of 2017, it was announced that Arctic Cat would be acquired by Textron as part of a $247,000,000 merger transaction, which closed in March of 2017.  (*Id.* ¶ 12.)  This sale once again put on hold the production of all launched and later re-launched vehicles including the Wildcat XX which had been publicly launched in February of 2017.  (Gordon Decl. ¶ 30.)

After a lengthy delay following the acquisition, in August of 2017, Textron sent a response to Speed Parties' January 2017 communication asserting that none of the specified inventions were novel.  (Nichols Decl. ¶ 13, *Ex.* 4.)  In particular, two of the key design elements under discussion were the Universal Wishbone Trailing Arm design and the Camber Adjusting Assembly design.  Those designs were later embodied in patents which apparently now form the basis of Arctic Cat Parties' patent-assignment claims.  With respect to those designs, Arctic Cat's response to Speed Parties' explanation of novelty states, "rear trailing arm setups are not new" and "[c]amber adjustment on a trialing [sic] arm is not new."  (*Id.*)

On January 2, 2018, contrary to Arctic Cat Parties' assertions relating to novelty, the U.S. Patent Office issued the formal patent certificate for Gordon's Universal Trailing

Arm design.[3]  (*Id.* ¶ 15, *Ex.* 6.)  Almost immediately after this patent issued, Arctic Cat Parties suddenly reversed course with respect to their novelty arguments.  On March 1, 2018, Textron attorney Brian Tidwell sent an email stating that (despite everything Arctic Cat had said before), Textron had decided to provide a "detailed description of the claims that [it] consider[ed] novel."  (*Id.* ¶ 16, *Ex.* 8.)  This constituted a transparent attempt to benefit from Gordon's work and expense prosecuting the patents embodying inventions that Arctic Cat had earlier argued were not novel.  In response to this abrupt change, Speed Parties explained that Arctic Cat Parties' earlier denial of novelty rendered then unable to legitimately enforce the patents.  (Nichols Decl. ¶¶ 17-19.)  Ultimately, Arctic Cat Parties' abandoned its demands that Gordon assign his patents and did not raise the issue again until their hastily filed preemptive complaint in this litigation.  (*Id.* ¶ 20.)

### F.   *Arctic Cat Parties Encourage Speed Parties' Sales of Vehicles.*

While this transpired behind the scenes, Arctic Cat Parties continued to publicly take advantage of their collaboration with Speed Parties.  At the February 25, 2018, dealer show following the Textron acquisition, TSV, Inc.'s VP John Collins announced that Gordon and the Textron team had become "fantastic partners" and played promotional video explaining that the Wildcat XX suspension was built with "inspiration" from Gordon.  (Gordon Decl. ¶ 30, *Ex.* 13.)  Collins' rosy assessment coincided with Textron's long-belated production of Wildcat XX vehicles in model year 2018—the only vehicles ever made under the Agreement.  The Speed-designed Wildcat XX was highly successful and won multiple industry awards.  (*Id.* ¶ 31.)

---

[3]      A patent for the Camber Adjusting Assembly that Arctic Cat had said was "not new" also subsequently issued.  (Nichols Decl. ¶ 15, Ex. 7.)

Following this production release, Speed Parties garnered attention and sales for the Wildcat XX by purchasing, customizing, and re-selling Wildcat XX vehicles to consumers through various channels, including the website "speedsxs.com." (*Id.* ¶ 32.) Speed Parties' modifications included converting the stock 64-inch width Wildcat XX into vehicles with 72-inch and 77-inch widths, modifying body plastics to include Speed logos, and otherwise installing performance-enhancing accessories and modifications, such as roofs, light bars, and custom wheels and tires. (*Id.*) The below, for example, is a comparison of a stock Wildcat XX (left) and a modified Speed vehicle (right):

 

(Declaration of Lucas Hori ("Hori Decl."), ¶ 25, *Ex.* 20; Gordon Decl. ¶ 32, *Ex.* 14.)

Speed Parties received Wildcat XX vehicles for these modification in two ways. First, the Agreement obligated Arctic Cat to transfer the title to Speed Parties for five vehicles per year. (Gordon Decl. ¶ 5, *Ex.* 1, § 3.f.) Second, Gordon's company Team Gordon Inc. d/b/a Speed Unlimited entered a Textron Specialized Vehicles U.S. Dealer Agreement dated January 1, 2018, authorizing Gordon to purchase Textron vehicles and use its trademarks and tradenames in connection with the advertising and sale of dealer vehicles. (*Id.* ¶ 33, *Ex.* 15 at 16.) Under that agreement, Gordon purchased Wildcat XX

vehicles at wholesale pricing and then accessorized them for sale in-person and online at retail price.  (*Id.* ¶ 34.)  Arctic Cat Parties and their executives were fully aware of, and supported, Speed Parties' creation and sale of the modified and accessorized Wildcat XX vehicles for sale.  For example:

- As early as the February 2017 dealer show, Arctic Cat launched the Wildcat XX alongside the heavily modified Speed Cat 77 race vehicle.  (*Id.* ¶ 27, *Ex.* 11.)

- On March 28, 2018, Textron sponsored a "Robby Gordon Instagram takeover" during which Gordon took over the Textron Offroad Instagram account to display and answer questions about Speed-modified Wildcat XX vehicles during an offroad event in Glamis, California.  (*Id.* ¶ 35; Hori Decl. ¶¶ 5-8, *Exs.* 2-5.)  Textron's internal documents celebrated the success of this event.  (Nichols Decl. ¶ 28, *Ex.* 17.) Gordon also displayed an accessorized Wildcat XX at the Glamis event and discussed the vehicle with in-person guests.  (Gordon Decl. ¶ 35.)

- Shortly after, in early April 2018, Textron sponsored the Stadium Super Trucks Series in Long Beach, California and paid for a Speed-modified Wildcat XX vehicle to serve as the pace car.  (Gordon Decl. ¶ 36, *Ex.* 16.)

- In September of 2018, at the Sand Sports Super Show in Costa Mesa, California—the preeminent off-road exposition—Speed Parties set up a booth at which it displayed and sold the Speed-modified Wildcat XX vehicles that had the "speedsxs.com" website displayed prominently on the vehicles' rocker panel.  (*Id.* ¶ 37, *Ex.* 17.)  At that show, and with knowledge of the resale activity, Arctic Cat Parties invited Gordon into their display booth to convert a stock Wildcat XX vehicle into a Speed-modified vehicle

(77-inch width) before a live audience.  (*Id.* ¶ 38.)  TSV, Inc.'s Director of Strategy and Product Management Philip Jhant, and its Partner Relations Manager Ben White, among other Textron marketing personnel, were present and encouraged Gordon to create the modified vehicle in the Textron booth.  (*Id*.; *see also* Romano Decl. ¶¶ 14-16, *Ex.* 5.)

- Following the Sand Sports Super Show event, Textron also provided Speed Partners a Product Customization and Delivery Agreement in October 2018 through which it paid Speed Partners for modified vehicles.  (Romano Decl. ¶ 17, *Ex.* 6.)

Arctic Cat Parties Parties were thus fully aware that modified Wildcat XX vehicles were being created and sold, and proactively encouraged that activity to promote their brand.  In fact, Michael Anderson, an "insider" at Textron as its former director of Product and Strategy, who was actively involved in marketing the Wildcat XX vehicle, confirms that Textron was aware of the sale and marketing efforts, and were "pleased" with them.  (Declaration of Michael Anderson ("Anderson Decl."),¶ 6.)  Consistent with this fact, shortly after the September 2018 Sand Sports Super Show, when Gordon raced in the January 2019 Dakar Rally offroad event in a modified Wildcat XX vehicle, Arctic Cat Off-Road's Instagram sought to further the parties' with the following post of a Speed-modified Wildcat XX vehicle:

/ / /

/ / /

/ / /

/ / /

/ / /



(Hori Decl. ¶ 10, *Ex.* 7.)

At no time did Arctic Cat Parties object to the resale of the Speed modified or accessorized Wildcat XX vehicles or any of the descriptions or depictions of vehicles on the speedsxs.com website or anywhere else, as Anderson confirms.  (Gordon Decl. ¶ 40; Anderson Decl. ¶ 6.)  To the contrary, Arctic Cat Parties actively ordered modified Speed vehicles and Speed products through the speedsxs.com website in August 2018, confirming that they were aware of the marketing and sales of the modified Wildcat XX vehicles and consented to it.  (Romano Decl. ¶ 13, *Ex.* 4.)

> ### G.    *Arctic Cat Parties File Their Preemptive Claims.*

Despite promises to the contrary, Collins sent an email on January 25, 2019, indicating that Textron did not intend to produce vehicles as required and encouraging Speed Parties to "pursue other partners."  (Gordon Decl. ¶ 41, *Ex.* 18.)  On March 28, 2019, Speed Parties sued Arctic Cat Parties in California for breaches of the Agreement and for fraud and concealment.  (*See* Case No. 19-cv-02362 (C.D. Cal.), Dkt. 1.)

/ / /

On that same day, Arctic Cat correspondingly filed its defensive Complaint in the District of Minnesota.  (*See* Case No. 19-cv-873 (D. Minn.), Dkt. 1.)  This Court transferred Arctic Cat's lawsuit to California on the grounds that it was preemptive, noting that "[t]he Agreement . . . requires timely notice of a material breach and a 30-day cure period" but "Arctic Cat never requested mediation, provided Speed RMG with notice and an opportunity to cure, or alerted Speed RMG of possible litigation" until the night before they sued.  (Nichols Decl. ¶ 22, *Ex.* 12 at 6, 11.)  Arctic Cat Parties then filed the FAC in the Central District of California in Case No. 2:19-cv-07435-FMO-GJS.  (Nichols Decl. ¶ 23, *Ex.* 13.)  That action was consolidated with Speed Parties' action in the Central District of California (Case No. 2:19-cv-02362) and transferred back to this Court.  (*Id.* ¶ 24.)  Arctic Cat Parties' FAC asserts, *inter alia*, claims for (1) breach of contract on behalf of Arctic Cat Sales and TSV, Inc., (2) "conversion and misappropriation of intellectual property" on behalf of Arctic Cat Sales, (3) federal trademark infringement under the Section 32(a) of the Lanham Act 15 U.S.C. § 1114 on behalf of Arctic Cat Inc., and (4) common law trademark infringement and unfair competition on behalf of Arctic Cat Inc.  (FAC ¶¶ 58-66; 73-89.)

- ***Conversion*:**  The FAC's contract and conversion claims both rely on allegations that Gordon improperly failed to assign patents that he had applied for and obtained.  (*See* FAC ¶¶ 61.e; 84-89.)  In support of their contract claim, for example, Arctic Cat Sales and TSV, Inc. allege that "Speed Partners breached the Agreement by . . . [f]ailing to assign intellectual property rights to Arctic Cat Sales Inc., and/or attempting to convert such intellectual property rights for themselves."  (*Id.* ¶ 61.e.)

Likewise, in support of its conversion claim, Arctic Cat Sales asserts that it "has a common law right to ownership of certain intellectual property relating to the Agreement and Addendum, for which Speed Partners has refused to assign to Arctic Cat and attempted to keep for itself." (*Id.* ¶ 85.) Arctic Cat Sales' claim to possession of any patents therefore arises from, and is derivative of, its contract claim.

- ***Trademark Infringement***: Arctic Cat Inc.'s trademark claims are based on vague allegations that (1) "Speed Partners have used and displayed the Arctic Cat Trademarks on its '77 Speed Cat' vehicle, offering the vehicle for sale and holding out the vehicle as an Arctic Cat production vehicle, when it was not an Arctic Cat production vehicle," and (2) "Speed Partners have used the Arctic Cat Trademarks on social media, weblogs, and/or in conjunction with its own race activities without Arctic Cat's approval." (FAC ¶¶ 50-51; *see also* FAC ¶ 80 (alleging common law trademark claims).) The FAC does not describe any specific instances or examples of alleged violations. Near the close of discovery, Arctic Cat Parties produced an expert report from Dr. Dan Sarel which asserts that Speed Parties created confusion by selling modified Wildcat XX vehicles on a speedsxs.com page containing variants of the words "Speed Wildcat XX." (Nichols Decl. ¶ 25, *Ex.* 15 at 24, 51 ("2019 Speed Wild Cat XX Score and BITD Legal Race Car"); ("2019 Speed Wildcat XX Baja Pre Runner Red Rocket"); ("2019 Speed Wildcat XX King Shocks IBP").) These modified Wildcat XX vehicles—which apparently now form the sole basis of Arctic Cat Inc.'s trademark claim—are the same vehicles that Textron earlier encouraged and sponsored.

/ / /

### H.   *Arctic Cat Parties Continue To Associate Themselves With Speed Parties.*

Despite suing for trademark infringement in March 2019, Arctic Cat Parties have continued to benefit from their association with Speed Parties, and have even actively advertised Speed Parties' modified Wildcat XX vehicles.  On January 18, 2020, for example (nearly a year after the FAC was filed), Textron Offroad Racing's Instagram account posted a video of Gordon filming at Speed Parties' North Carolina facilities to promote a Speed-modified "Rock Rider" version of the Wildcat XX and advertising that the car could be delivered for sale to a buyer at the 2020 King of the Hammers off-road event.  (Hori Decl. ¶ 22, *Ex.* 18.)  Similarly, on January 11 and 12, 2020, Textron Offroad Racing's Instagram account celebrated Gordon's "unprecedented 3rd place" finish at the Parker 250 race, announcing that he was "Racing a stock [Wildcat] XX with SpeedSXS accessories" with the hashtags "#wildcatxx" and "#speed77."  (*Id.* ¶¶ 20-21, *Exs.* 16-17.)  Again, on March 7, 2020, Textron Offroad Racing's Instagram account shared Gordon's post announcing a victory at the Las Vegas Mint 400 race.  (*Id.* ¶ 23, *Ex.* 19.)  Even more glaring, *as of today*, Textron's offroad webpage continues to list for sale Speed accessories and parts.  (*Id.* ¶ 25-26, *Exs.* 21-22.)  These are not the actions of a company legitimately concerned about consumer confusion.  To the contrary, Arctic Cat Parties continue to seek to benefit from their partnership with Speed Parties, while simultaneously suing them for it.

## III.   *LEGAL ARGUMENT.*

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Rule 56 dictates that summary judgment be

granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Further, if the Court does not "grant all the relief requested by the motion," it may "may enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

### A. Summary Judgment Should Be Granted As To Arctic Cat Sales' Conversion Claim.

#### 1. Arctic Cat Sales' Conversion Claim Duplicates Its Breach of Contract Claim.

Arctic Cat Sales' claim for conversion and misappropriation of intellectual property fails because it is duplicative of Arctic Cat Sales' breach of contract claim.  A plaintiff seeking breach of contract damages is limited to "damages flowing from such breach except in exceptional cases where the defendant's breach of contract constitutes or is accompanied by an independent tort." *McNeill & Assocs., Inc. v. ITT Life Ins. Corp.*, 446 N.W.2d 181, 185 (Minn. Ct. App. 1989) (citing *Wild v. Rarig*, 234 N.W.2d 775, 789 (1975)).  "The issue becomes whether there is a breach of duty which is distinct from the breach of contract . . . . The test is whether a relationship would exist which would give rise to the legal duty without enforcement of the contract promise itself." *Hanks v. Hubbard Broad., Inc.*, 493 N.W.2d 302, 308 (Minn. App. 1992).  The existence of an independent legal duty is a question of law, which is reviewed de novo. *Id.* at 307.

Here, FAC establishes that there is no legitimate distinction between Arctic Cat Sales' contract and conversion claims.  A conversion claim can proceed only where

"(1) the plaintiff has a property interest and (2) the defendant deprive[d] the plaintiff of that interest." *Strei v. Blaine*, 996 F. Supp. 2d 763, 791 (D. Minn. 2014) (citation omitted).  Arctic Cat Sales' alleged interest in any patents arises solely from its allegations that Section 7 of the Agreement entitles Arctic Cat Sales to apply for and own those patents.  As described above, Arctic Cat Sales' contractual claim to patent assignments is baseless because it did not apply for the patents at issue as required; it affirmatively requested that Gordon apply for the patents; and it thereafter denied novelty[4] of the designs for which patents were applied.  Regardless, Arctic Cat Sales has no grounds for possessing the patents outside Agreement.  (*See* Dkt. 103 at 8 [Second Joint Rule 26(f) Report] (Arctic Cat arguing Speed Parties "violated the Agreement by failing to assign to Arctic Cat ownership of patent applications that Plaintiffs had filed.").)  Its tort claim thus rises or falls with the contractual issues and the allegations of the FAC themselves confirm the interplay of the breach of contract and conversion claims.  (*Compare* FAC ¶ 61.e *with* ¶ 85.)

A well-established body of Minnesota case law makes clear that a plaintiff cannot transform contract allegations into claims for conversion.  In *RC Fam. Farms, Inc. v. Compeer Fin., ACA*, No. 19-cv-2706, 2020 WL 556882 (D. Minn. Feb. 4, 2020), for example, the plaintiffs alleged that the defendant financial institutions improperly wired large sums of money to foreign thieves, and alleged contract and conversion claims.  *Id.* at *2.  The district court dismissed the conversion claim, concluding that "Plaintiffs' conversion allegations are the same as their breach-of-contract allegations, and Plaintiffs

---

[4]      Novelty is a foundational requirement for patentability.  *Reinke*, 594 F.2d at 645 n.4.

cannot allege damages separate from the damages they claim for breach of the parties' contracts." *Id.* at *4. This result is consistent with case law holding that a plaintiff cannot "recover via conversion and civil theft where its property interest is based solely on a contract." *4Brava, LLC v. Sachs*, No. 15-cv-2743, 2017 WL 1194195, at *22 (D. Minn. Mar. 30, 2017) ("[Plaintiff] contends that it can plead conversion and civil theft claims in the alternative to the breach of contract claim; but, those claims do not add anything to the breach of contract claim. If the breach of contract claim fails, then [Plaintiff] does not have a right to the property and no theft or conversion has occurred."); *Weiss v. Priv. Cap., LLC*, No. A13-2029, 2014 WL 4175867, at *3 (Minn. Ct. App. Aug. 25, 2014) (reversing denial of motion for judgment as a matter of law relating to conversion claim because the property right did "not exist independently from the operating agreement, and the gravamen of the conversion claim is that [defendant] did not allocate [plaintiff's] money as required under the operating agreement, which is a breach-of-contract claim."); *Jaunich*, 2020 WL 6712219, at *2.

### 2. Minnesota Law Does Not Recognize A Claim For Conversion Of Intellectual Property.

Even if Arctic Cat Sales' conversion claim could exist independent of the Agreement (it cannot), Arctic Cat Sales has not raised any property interest that is subject to a conversion claim. Its allegations are based on Speed Parties' claimed refusal to assign intangible patent rights, but Minnesota law does not support a claim for conversion of intangible property interests. *Maxim Def.*, 2019 WL 5079984, at *2 (citing *Jacobs*, 2016 WL 1180182, at *3; *Bloom*, 783 F. Supp. at 440-41 (*Bloom*)); *see also Beaulieu v. Stockwell*, No. 16-cv-3586, 2018 WL 6437075, at *5 (D. Minn. Dec. 7, 2018)

("Minnesota law does not recognize a claim for conversion of intellectual property.")
(citing *Bloom*).  In *Bloom*, 783 F. Supp. 418, for example, the Court analyzed Eight
Circuit case law, including *H.J., Inc. v. International Tel. & Tel. Corp.*, 867 F.2d 1531
(8th Cir. 1989), to conclude that the plaintiff could not assert a conversion claim based on
the alleged misuse of medical protocol.  *Id.* at 440.  It noted, "theoretically, the tort of
conversion could be broadened to apply to any interference with a property interest,
whether tangible or intangible," but concluded that the Eight Circuit had "rejected such
an expansion, thus following the recommendation of Prosser and Keeton, who advocate
other means, such as unfair competition laws, to protect against the unfair use and
appropriation of intangible interests."  *Bloom*, 783 F. Supp.at 441.[5]

Arctic Cat Sales has never identified any tangible property that was allegedly
converted and intangible patent rights do not fit within the categories of protected
interests under Minnesota conversion law.  To the contrary, Arctic Cat Sales' claim is
inconsistent with the long-established maxim that "[c]onversion is primarily 'an offense
against *possession* of property' that 'consists of an act in derogation of the plaintiff's
*possessory* rights.'"  *Wilkinson v. United States*, 564 F.3d 927, 932 (8th Cir. 2009)
(emphasis original) (applying North Dakota law).  Thus, "[t]he law of conversion 'is
concerned with possession, not title.'"  *Superior Edge, Inc. v. Monsanto Co.*, 964 F.
Supp. 2d 1017, 1039 (D. Minn. 2013) (applying Missouri law).  What Arctic Cat Sales
ultimately seeks is an adjudication relating to its exclusive "title" to rights under those

---

[5]     *Bloom* noted that the tort of conversion may be applied to "the kind of intangible
rights which are customarily merged in or identified with some document."  *Id.* at 440.
Here, as in *Bloom*, any intellectual property right asserted by Plaintiffs "arises not from
[a] document, but from the law of intellectual property."  *Id.* at 441.

patents so that it can assert them against the world.  As *Bloom* noted, a common law conversion claim is not the proper vehicle for this kind of claim; Arctic Cat Sales' breach of contract claim will fully address the parties' dispute.

**B.     Summary Judgment Should Be Granted As To Arctic Cat Parties' Claim For Federal Trademark Infringement Under 15 U.S.C. § 1114.**

1.     *Arctic Cat Inc. Actively Acquiesced To All Challenged Uses of Its Trademarks.*

Like Arctic Cat Sales' conversion claim, Arctic Cat Inc.'s trademark claims also fail as a matter of law.  The undisputed facts establish that Arctic Cat Parties acquiesced to the conduct forming the basis of the infringement action, such that Speed Parties' thirteenth and fourteenth affirmative defense of consent and acquiescence bar trademark claims.  (Nichols Decl. ¶ 24, *Ex.* 14 [Answer to FAC] at 16.)  "An estoppel can be created by a plaintiff's knowing acquiescence in a defendant's activities." *Minnesota Mining & Mfg. Co. v. Shurtape Techs., Inc.*, No. 98-cv-2134, 2001 WL 530551, at *7 (D. Minn. May 17, 2001) (*Minnesota Mining*) (citing 5 McCarthy on Trademarks and Unfair Competition § 32:105 (4th ed.)).  "Generally, an infringement action may be barred by the doctrine of estoppel by acquiescence where the owner of the trademark, by conveying to the defendant through affirmative word or deed, expressly or impliedly consents to the infringement."  *Id.* (citations omitted); *3M Co.*, 423 F. Supp. 2d. at 965.  "Reliance on the consent or acquiescence of the trademark owner can create an estoppel which will preclude an effective termination of the consent."  *Minnesota Mining*, 2001 WL 530551, at *7.  "The basic elements of estoppel are (1) knowledge of the facts giving rise to the particular claim; (2) reliance on the misleading conduct or false representations of the

party to be estopped; and (3) change in position based thereon to his injury, detriment or prejudice." *Id.* (citing *Hiland Potato Chip Co. v. Culbro Snack Foods, Inc.*, 720 F.2d 981, 984 (8th Cir. 1983)).

In *Visual Dynamics, LLC v. Chaos Software Ltd.*, 309 F. Supp. 3d 609 (W.D. Ark. 2018), for example, the district court found that Chaos, the manufacturer of V-Ray software products, had acquiesced to a sub-reseller's (Visual Dynamics) use of the "vray.com" domain name where it made "directly contradictory representations" concerning its consent to use of the mark and the defendant could "fairly wonder then whether the left hand knew what the right hand was doing, and who truly spoke for Chaos." *Id.* at 627.  Likewise, in *Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*, No. 11-cv-5052, 2021 WL 1176242, at *24 (D.S.D. Mar. 29, 2021), the Court found that "[b]y purchasing 'Sturgis' and 'Sturgis Motor Classic' items from [the defendant] and then reselling them through its own retail locations, [the plaintiff] expressly or impliedly represented that it would not assert a right or exclusive claim to use those terms."  Here, Arctic Cat Inc.'s trademark claim appears to be based on Speed Parties' (1) production and sale of modified Wildcat XX vehicles, (2) entry of the Speed Cat 77 vehicles in the Baja 1000 race or subsequent races, and/or (3) alleged, unspecified use of the Arctic Cat marks on social media.  (FAC ¶¶ 50-51.)  The undisputed facts, though, make clear that Arctic Cat Parties acquiesced to all of these actions.

a.      Arctic Cat Inc. Acquiesced To The Creation And Sale Of Modified Wildcat XX Vehicles.

First, the evidence is overwhelming that Arctic Cat Parties acquiesced to the production and sale of modified Wildcat XX vehicles.  Arctic Cat Parties provided the

vehicles, and through its dealer agreement, Arctic Cat Parties expressly authorized Gordon to use trademarks in connection with the advertisement and sale of such vehicles. (Gordon Decl. ¶ 33, *Ex.* 15 at 16.)  Moreover, beginning in July 2016 and continuing even ***after*** the parties sued each other in March 2019, Arctic Cat Parties knew of, consented to, and affirmatively encouraged Speed Parties' sale of modified / accessorized Wildcat XX vehicles.  As described above, this included (1) requesting that Speed Parties create Speed Cat 77 race vehicles, (2) launching the Wildcat XX at the February 2017 dealer next to a Speed Cat 77 race vehicle, (3) inviting Gordon to take over the Textron Instagram account to discuss a Speed-modified Wildcat XX, (4) paying Speed Parties to use a Speed-modified Wildcat XX vehicle as a public pace car at a Stadium Super Trucks event, (5) asking Gordon to build a Speed-modified Wildcat XX live in the Textron booth at the September 2018 Sand Sports Super Show while he simultaneously sold them at the same show, (6) paying Speed Partners to modify Wildcat XX vehicles for use at marketing events, and (7) repeatedly broadcasting and advertising these activities on social media, including in January 2020, when Textron's Instagram account shared a video of Gordon selling a modified vehicle.  (Gordon Decl. ¶¶ 20, 27, 30-40, *Exs.* 13-17; Romano Decl. ¶¶ 9-18, *Exs.* 4-6.)  There could be no clearer indication that Arctic Cat Parties actively consented to the conduct they now claim is wrongful, including because Arctic Cat Parties wished to create an association with Speed Parties and viewed the use as favorable to sales.  (*See* Anderson Decl. ¶ 6.)  Speed Parties relied on that consent to purchase and create modified vehicles, and Arctic Cat Inc. is now estopped from alleging that Speed Parties' resulting actions constitute infringement.

/ / /

b.      Arctic Cat Inc. Acquiesced To Racing The Speed Cat 77.

To the extent that Arctic Cat Parties' trademark infringement claim is based on allegations that Speed Parties have violated Arctic Cat Parties' trademarks "in conjunction with its own race activities without Arctic Cat's approval" (FAC ¶ 51), these claims are likewise barred by Arctic Cat Inc.'s acquiesce.  Speed Parties raced the Speed Cat 77 vehicles with Arctic Cat Parties' encouragement and support.  (Gordon Decl. ¶¶ 18-29.)  Arctic Cat Parties' vague allegations appear to be based on claims that Speed Parties should not have entered the Speed Cat 77 vehicle at the Baja 1000 in November 2016, before the February launch of the Wildcat XX.  Written communications from that period, however, indicate that Arctic Cat personnel affirmatively directed Speed Parties to build the vehicle for the very purposes of the Baja 1000 race and sales to a limited set of customers.  (*Id.* ¶¶ 20-21, *Exs.* 4, 5.)  In fact, even after the Baja 1000, Crocker memorialized to Speed Parties that, on "July 19th [2016], [he] sent [Gordon] an email that authorized building 4 vehicles to race at Baja."  (*Id.* ¶ 24, *Ex.* 8.)  Arctic Cat also consented to the use of the Speed Cat 77 at subsequent races (including the Parker 250 and Kings of the Hammers race) so long as Speed Parties' did not use the Arctic Cat mark at those races.  (*Id.* ¶ 25, *Ex.* 9.)  Speed Parties complied with this arrangement, and the record again undermines Arctic Cat Inc.'s claim.  (*Id.* ¶ 26.)

c.      Arctic Cat Inc. Acquiesced To Social Media Posts.

Further, although Arctic Cat Inc. has never specifically identified any of Speed Parties' social media posts ostensibly infringing on its marks, the doctrine of acquiescence likewise bars any such claim.  Arctic Cat Parties were fully aware of Speed Parties' social media accounts, and repeatedly used social media themselves to attempt

create an association between themselves and Speed Parties, even going so far as to have Gordon take over the Textron Instagram account.  (Hori Decl. ¶¶ 3-23, *Exs.* 1-19.)  As a result, any claim that Speed Parties violated Arctic Cat Inc.'s trademarks by posting Speed-modified vehicles or otherwise referencing an Arctic Cat mark also fails.

2.      *The Nominative Fair Use Doctrine Protects The Use Of Marks In Connection With Resale Of Modified Wildcat XX Vehicles.*

Even if Arctic Cat Parties had *not* repeatedly acquiesced to the conduct at the core of the infringement claim (i.e., Speed Parties' sale of modified Wildcat XX vehicles), which they did, Speed Parties use of the Wildcat mark in connection with those sales would also be protected under the nominative fair use doctrine.  "[W]hether a defendant is entitled to nominative fair use depends on whether [1] the product or service is readily identifiable without use of the mark, [2] whether only so much of the mark is used as is reasonably necessary to identify the product, and [3] whether the user has done anything that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder."  *Infogroup, Inc. v. Database LLC*, 95 F. Supp. 3d 1170, 1189 (D. Neb. 2015) (citations omitted) (describing Ninth Circuit law and stating "the broad parameters of the doctrine are consistent"); *see also Edina Realty, Inc. v. TheMLSonline.com*, No. 04-cv-4371, 2006 WL 737064, at *6 n.5 (D. Minn. Mar. 20, 2006) (*Edina*).

Here, Speed Parties' use (if any) of Arctic Cat marks to describe modified Wildcat XX vehicles is a textbook example of protected fair use.[6]  Arctic Cat Parties' expert Sarel

---

[6]      Arctic Cat Inc. did not reveal that its trademark claim relied on website listings of modified Wildcat XX vehicles until the disclosure of Sarel's report.  (Nichols Decl. ¶ 25.) Speed Parties' current answer to the FAC therefore does not assert fair use as an affirmative defense.  To the extent necessary, Speed Parties request that this filing be deemed as a request to amend to raise an fair use defense.  *See Financial Timing Publ'ns,*

complains that, when listing modified Wildcat XX vehicles for sale on the speedsxs.com website, Speed Parties used words such as "2019 Speed Wild Cat XX Score and BITD Legal Race Car." (Nichols Decl. ¶ 25, *Ex.* 15 at 24, 51.) That description, however, accurately describes the vehicle as a modified Wildcat XX side-by-side. It is common knowledge that cars and other vehicles are best identified through the use of the manufacturer's make and model (i.e., "Honda Civic" or "Ford F-150"), and the webpage Sarel cites contains only a passing reference to the "Wild Cat XX," along with photos of vehicles for sale. (*Id.*) It does not otherwise use Arctic Cat marks, nor suggest any false sponsorship or endorsement—despite the fact that Gordon was, in fact, both an authorized Textron dealer and a participant in the Wildcat XX's design. Indeed, if Arctic Cat Inc.'s claim could succeed, dealers and sellers would be precluded from accurately describing a resale product using the manufacturer's mark. The law does not sanction that absurd result.

### C.    *Summary Judgment Should Be Granted As To Arctic Cat Parties' Claim For Common Law Trademark Infringement And Unfair Competition.*

Numerous courts have held that Minnesota state law trademark infringement claims are coextensive with federal trademark claims. *Daimler*, 315 F.3d at 935 n.3 (Minnesota state law claims are "coextensive" with the federal claims.); *Edina*, 2006 WL 737064 at *3, n.2 ("Claims under Minnesota law require the same analysis as claims under the Lanham Act . . . . Claims for common law unfair competition and common law

---

*Inc. v. Compugraphic Corp.*, 893 F.2d 936, 944 n.9 (8th Cir. 1990) ("[W]hen an affirmative defense 'is raised in the trial court in a manner that does not result in unfair surprise, . . . technical failure to comply with Rule 8(c) is not fatal.'").

trademark infringement similarly parallel claims under the Lanham Act. . . . .”); *Phoenix Entertainment Partners, LLC v. Lapadat*, 123 F. Supp. 3d 1114, 1122 (D. Minn. 2015). As described above, Arctic Cat Parties federal trademark claims are without merit. Their common law claims are also subject to summary judgment. (FAC ¶¶ 80-81.)

> **D.    *Summary Judgment Should Be Granted As To Arctic Cat Parties' Demand For Punitive / Exemplary Damages.***

Separately, summary judgment should also be granted as to Arctic Cat Parties' requests for punitive and/or exemplary damages because they failed to seek leave to amend to seek such relief. Arctic Cat Parties apparently rely on their conversion claim to pursue punitive damages. (FAC ¶ 88; *see also* FAC, Prayer for Relief, ¶ 7 (seeking exemplary damages).) Per Minnesota Statute section 549.191, “[u]pon commencement of a civil action, the complaint must not seek punitive damages.” Instead, “[a]fter filing the suit a party may make a motion to amend the pleadings to claim punitive damages.” *Id.* Arctic Cat Parties never sought leave to allege punitive damages. At this stage, the discovery deadline and the deadline to seek punitive damages have passed. Therefore, Arctic Cat Parties claim for punitive damages may not proceed. *Myrlie v. Countrywide Bank*, 775 F. Supp. 2d 1100, 1110 (D. Minn. 2010), adopted 775 F.Supp.2d 1103 (“Pleading punitive damages in an initial complaint is barred by Minn. Stat. § 549.191. Therefore, this Court recommends that Defendant's Motion for Summary Judgment be granted with respect to the issue of punitive damages.”); *266 Summit*, 2011 WL 3020301, at *8 (D. Minn. July 22, 2011) (granting summary judgment); *Shovein v. Sgm Grp. United States*, No. 06-cv-1553, 2008 WL 11348494, at *2 n.4 (D. Minn. Mar. 5, 2008) (same); *Laffey v. Indep. Sch. Dist. No. 625*, 806 F. Supp. 1390, 1406 (D. Minn. 1992)

(striking punitive damages claim that was pled but not moved for); *Zeelan Indus., Inc. v. de Zeeuw*, 706 F. Supp. 702, 705 (D. Minn. 1989) ("plaintiff's claim for punitive damages should be stricken").

## III.   *CONCLUSION.*

The FAC does not seek to vindicate any legitimate injury to Arctic Cat Parties. Instead, it was filed for tactical purposes so that Arctic Cat Parties could gain leverage. Speed Parties' respectfully request that the Court grant partial summary judgment to narrow the issues at trial.

Dated:  June 1, 2021                                       Respectfully submitted,

By:  */s/ Steven A. Nichols*

RUTAN & TUCKER, LLP
Steven A. Nichols (*Pro hac vice*)
snichols@rutan.com
Bradley A. Chapin (*Pro hac vice*)
bchapin@rutan.com
Benjamin C. Deming (*Pro hac vice*)
bdeming@rutan.com
Steven J. Goon (*Pro hac vice*)
sgoon@rutan.com
Lucas K. Hori (*Pro Hac Vice*)
lhori@rutan.com
18575 Jamboree Road, 9th Floor
Irvine, CA 92612
Tel:  (714) 641-5100
Fax:  (714) 546-9035

DADY & GARDNER, P.A.
Michael Dady (#0389434)
jmdady@dadygardner.com
John D. Holland (#028614X)
jholland@dadygardner.com
5100 IDS Center,
80 South 8th Street
Minneapolis, MN  55402
Tel:  (612) 359-3504
Fax:  (612) 359-3507

*Attorneys for Plaintiffs*
*Speed RMG Partners, LLC, Robby*
*Gordon, and Todd Romano*