# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| SPEED RMG PARTNERS, LLC, ROBBY GORDON, and TODD ROMANO, | Case No. 20-CV-609 (NEB/LIB) |
| Plaintiffs, | |
| v. | AMENDED ORDER ON MOTIONS FOR SUMMARY JUDGMENT |
| ARCTIC CAT SALES INC., ARCTIC CAT INC., TEXTRON SPECIALIZED VEHICLES INC., and TEXTRON INC., | |
| Defendants. | |

Speed RMG Partners, LLC, Robby Gordon, and Todd Romano (collectively, "Speed") sued Arctic Cat[1] for, among other claims, breach of contract and fraud. (ECF No. 376.) Arctic Cat filed a separate suit against Speed. (ECF No. 414.) The Court now considers Arctic Cat's motion for summary judgment on Speed's claims, (ECF Nos. 332, 384), and Speed's motion for partial summary judgment on some of Arctic Cat's claims. (ECF No. 339.) For the reasons below, the Court grants in part Arctic Cat's motion and denies the contested parts of Speed's motion.[2]

---

[1] Arctic Cat Inc. and Arctic Cat Sales Inc. merged with Textron Inc. and Textron Specialized Vehicles Inc. ("TSV"). (ECF No. 164 ¶¶ 8–9, 69.) The Court generally refers to these parties as "Arctic Cat." When relevant, the Court identifies Textron or TSV specifically. The Court also identifies Gordan or Romano specifically when relevant.

[2] The Court grants Speed's motion to the extent that Arctic Cat does not oppose it.

## BACKGROUND

### I.     Factual Background

Arctic Cat produces powersports vehicles including snowmobiles, ATVs, and side-by-side vehicles. (ECF No. 335-1, Ex. 1 ¶ 13.) These products include a line of "Wildcat" off-road motorsports vehicles. (*Id.*) Todd Romano and Robby Gordon are well-known racers of off-road motorsports vehicles. (ECF No. 343 ¶¶ 1–2; ECF No. 342 ¶¶ 1–3.) Romano and Gordon co-founded Speed Partners. (ECF No. 343 ¶ 1; ECF No. 342 ¶ 1.)

### A.     *Agreement Negotiations*

In spring 2015, Arctic Cat and Speed began negotiating a marketing agreement, which was finalized that summer. (ECF No. 1-1 ("Agreement").) During the negotiations, Romano sent Arctic Cat CEO Christopher Metz an email summarizing proposed royalties. (ECF No. 364-1 at 3–4.) The email calculates total royalties for each model by multiplying the royalties "per car" by a goal for "Vehicles sold." (*Id.* at 4.) In response, Metz agreed to the proposed royalties on limited-edition vehicles and accessories but thought the proposal was "too rich" in some ways. (*Id.* at 3.) He added that "we will need to develop a fair way to 'claw back' royalties if the limited addition [sic] vehicles need to be rebated to move them"; in other words, the parties needed a way to reduce royalty payments if they did not sell as many as they hoped. (*Id.*)

A week later, Romano emailed Metz with a chart attached and stated, "I think these numbers are realistic." (*Id.* at 8.) The left column of the chart lists vehicles by model

year for 2016–2020 and for each vehicle states the annual sales, royalty, and "annual comp." (*Id.* at 9.) Total royalties under the forecast exceed $30 million. (*Id.*) Metz agreed that the numbers were "realistic." (*Id.* at 11.) He noted that the numbers "aren't big in 2016" because Arctic Cat wanted to clear existing dealer inventory before selling new products. (*Id.*) Romano responded, "this would be my min expectation." (*Id.*) These negotiations suggest that both parties expected royalties to be based on sales: Metz and Romano each agreed that a chart that calculated royalties by multiplying annual sales by a per-vehicle royalty was "realistic." (*Id.* at 8–9, 11.)

According to Romano, Metz represented that Arctic Cat "had the funding and was prepared to invest in the necessary product development, production and distribution to meet these goals." (ECF No. 364 ¶ 5.) Romano asserts that Arctic Cat's representations about its engineering capacity and financial condition induced Speed to form the Agreement. (*Id.*) Yet before the Agreement was executed, there were signs of trouble. Craig Kennedy, a product manager for Arctic Cat, wrote to Tracy Crocker, Senior Vice President of Arctic Cat's Offroad Business, to say that Arctic Cat lacked the engineering staff to achieve the Agreement's goals. (ECF No. 363-1 at 2; ECF No. 363-2 at 120.)

**B.    *The Agreement and Alleged Breach***

The Agreement was executed on July 31, 2015. (Agreement at 1, 11.) Speed alleges two primary theories of breach: first, that Arctic Cat failed to pay minimum royalties for

vehicles not manufactured or sold; second, that Arctic Cat failed to manufacture vehicles that Speed designed.

*Royalties.* Speed's obligation under the Agreement was to design vehicles, which the Agreement calls "Special Royalty Vehicles." (Agreement ¶ 2.) Arctic Cat's obligation under the Agreement was to pay royalties, as described in a chart attached to the Agreement, marked as Exhibit D. (*Id.* ¶¶ 1, 3(a)(i).) Exhibit D is entitled "Vehicle Royalty Schedule/Vehicle Royalty." (*Id.,* Ex. D.) Much like the chart Romano attached to his pre-agreement email to Metz, the left-most column lists vehicle models for model years 2016–2020. (*Id.*) Another column lists "Target Royalty" amounts for each model; rows provide different royalties "for sales above Baseline" for each vehicle year. (*Id.*) Below the chart are a few notations, including that "there will be a 250 USD per vehicle royalty paid on the Wildcat XX unit regardless of any name change for the vehicles." (*Id.*) The second notation relevant here is that the "Limited Edition (LE) Royalty is based upon a 2/3 (Arctic Cat) and 1/3 (Speed RMG) split of price increase over base Wildcat X and Wildcat XX units." (*Id.*)

Along with these baseline royalties, the Agreement calls for "halo" and "pivot" royalties for sales of the Robby Gordon Limited Edition Vehicle. The Agreement specifies that "if Robby Gordon Limited Edition vehicles collectively meet the aggregate minimum unit sales," halo royalties will increase based on the number of sales over the "aggregate minimum unit sales." (*Id.* ¶ 3(a)(ii)(1).) "[I]f Robby Gordon Limited Edition vehicles do

not collectively meet the aggregate minimum unit sales," a "pivot royalty" may be based on the number of sales over a baseline. (*Id.* ¶ 3(a)(ii)(2).) The Agreement does not define "aggregate minimum unit sales," and the term appears nowhere in Exhibit D.

*Production and Development of Vehicles.* Speed agreed to provide vehicle and product designs for some Special Royalty Vehicles. (Agreement ¶ 2(a).) Though Speed was to provide initial designs, Arctic Cat had final decision-making authority over designs. Paragraph 2 of the Agreement explains:

> The foregoing designs and annual updates will be provided by Speed RMG to Arctic Cat in writing, will specify the novel features of the applicable vehicle and, with respect to the Special Royalty Vehicles, *must be accepted by Arctic Cat in its discretion* prior to incorporation in a vehicle and eligibility for royalty payments. Arctic Cat shall have, in its *sole discretion*, final approval over all branding and product design decisions.

(*Id.* (emphasis added).)

*Right of First Refusal.* The Agreement gave Arctic Cat a right of first refusal over vehicle designs within 90 days "after presentation of a final Powersports vehicle design or prototype." (Agreement ¶ 4.) If Arctic Cat elected not to exercise its right of first refusal, the parties could identify a third-party manufacturer. (*Id.*) If the parties did not agree on a third-party manufacturer, Speed would be "free to manufacture, market and sell" the vehicle on its own. (*Id.*) The Agreement does not define "final," nor does it specify *how* Arctic Cat should exercise this right of first refusal. And unlike paragraph two, which gives Arctic Cat discretion over product and branding decisions, it does not

state that Arctic Cat has discretion over manufacturing decisions after Arctic Cat exercises its right of first refusal.

*Integration.* The Agreement contains an integration clause, which states, "This Agreement contains the entire agreement and understanding between the parties with respect to the subject matter hereof and supersedes all prior written or oral agreements and communications between them with respect to the subject matter hereof." (*Id.* ¶ 15.)

## C.    *Partnership Announced and Orders Come In*

Though both parties began the relationship excited about its potential, it quickly soured. At a dealer show in August 2015, Arctic Cat announced its partnership with Speed, specifying that the vehicles would be available beginning in September. (ECF No. 363-1 at 5; ECF No. 342 ¶¶ 11–12.) Arctic Cat calls this a "marketing launch." (ECF No. 363-2 at 152.) Speed calls this a "product launch." (*See* ECF No. 342 ¶ 11.) Though Arctic Cat presented a Wildcat XX vehicle at the show, the model vehicle did not have all the features that the parties intended for the final Wildcat XX. (ECF No. 363-2 at 140; ECF No. 343 ¶ 8.) A few days after the show, Kennedy emailed other Arctic Cat employees stating that "orders are coming in from the dealer show." (ECF No. 363-1 at 12.)

The evidence suggests that Arctic Cat intended for production of at least some vehicles to begin in January 2016. In October 2015, an Arctic Cat engineering group leader emailed a shocks producer stating Arctic Cat planned a January 11 "SOP"—start of production date. (*Id.* at 15.) That December, Arctic Cat's certification engineer sent an

internal email commenting that he expected a January 2016 "build date" for one of the Wildcat models. (*Id.* at 21.)

But by February 2016, Arctic Cat delayed the launch of the partnership Wildcat models. (*Id.* at 43.) An internal Arctic Cat document states it planned to "shut down the project with Robby and Todd" that month. (*Id.* at 59.)

Despite this stumble, the parties seemed to recover. In May 2016, Arctic Cat sent Speed a vehicle-development timeline that included a production date. (ECF No. 362-1 at 36–48.) A month later, Crocker stated that Arctic Cat "finalized all the build dates" for two models. (ECF No. 367 at 2.) He also noted that Arctic Cat had "a final design." (*Id.*) Though Crocker called the design final, other evidence suggests that the design lacked key parts. (ECF No. 363-1 at 59.)

In September 2016, Arctic Cat publicly launched vehicles for the 2017 model year, including a Wildcat X, Wildcat X Limited, and a four-seater Wildcat 4X. (*Id.* at 46.) In its announcement, Arctic Cat stated that "[a]ll three models feature an entirely new RG PRO rear suspension that Arctic Cat designed with racing legend Robby Gordon." (*Id.*) Arctic Cat's director of dealer marketing anticipated the Wildcat X with "RG Pro Suspension" would be in dealerships starting in October. (*Id.* at 50.)

Despite these optimistic announcements, Arctic Cat produced none of these vehicles in the 2017 model year. (*See* ECF No. 362 ¶ 32.) At the same time, Arctic Cat was struggling financially. By summer 2016, it faced debt and cash-flow problems that

"became more and more apparent every week." (ECF No. 363-2 at 81; *see id.* at 79; ECF No. 363-1 at 54.) Arctic Cat struggled with excess inventory as well, creating another hurdle to adding Speed-designed products. (ECF No. 363-2 at 142.) Speed became frustrated, and asked Arctic Cat about taking their designs to another manufacturer. (*Id.* at 131–32.) Arctic Cat refused that request. (*Id.* at 132.)

Then in March 2017, Speed sent Arctic Cat an invoice for $3 million in royalties for the 2016 X LE, the 2017 X LE, and the XX LE, even though these vehicles were never produced. (ECF No. 364-1 at 13.) Speed based its calculation on Agreement Exhibit D. (*Id.*) Arctic Cat never paid the invoice.

### D.   *Textron Purchases Arctic Cat and Produces the Wildcat XX*

In winter 2017, Arctic Cat was acquired by TSV.[3] (ECF No. 362 ¶ 28; 363-2 at 165.) After the acquisition, launch of the Special Royalty Vehicles developed through the partnership was put on hold.[4] The only vehicle ultimately produced under the Agreement was the 2018 Wildcat XX. (ECF No. 362 ¶ 32.) It received many awards. For

---

[3] TSV is a wholly owned subsidiary of Textron. (ECF No. 363-2 at 165.)

[4] Speed contends that Textron's CEO Scott Donnelly was the "final decision maker" for the project and exercised authority over which vehicles would be produced. (ECF No. 361 at 43.) But when Donnelly was asked about his involvement with the Speed-Arctic Cat agreement, he said he knew nothing about the details and had no role in decision-making. (ECF No. 335-4 at 57 ("I did not make any decisions with respect to the Wildcat XX . . . I had no familiarity with the details of the contractual relationship that existed between Arctic Cat . . . with [] Speed.").) And the former President and CEO of TSV also knew nothing of the Agreement. (ECF No. 335-4 at 25–26.)

example, UTV Action Magazine selected the 2018 Wildcat XX as the "New UTV of the Year." (ECF No. 363-2 at 2; *see also id.* at 204 (stating that the Wildcat XX "gets the crown" because it "has raised the bar as far as strength and innovation.").) ATV.com selected the Wildcat XX as its "2019 Sport UTV of the Year." (*Id.* at 211.) And ATV and SxS Illustrated selected the Wildcat XX as its "2018 Side-by-Side of the Year" because of its "perfect balance between power, suspension and handling." (*Id.* at 218–19.) John Collins, TSV's Vice President of the Off-Road Division, testified that TSV did not continue with other models because it did "not believe they were marketable." (*Id.* at 10, 112–13; ECF No. 210 ¶ 1.)

Despite these comments, Collins represented to Speed that it wanted to produce more vehicles. According to Michael Anderson, Arctic Cat's Director of New Product Innovation, Collins "implied commitment to build models and work on projects and variations of the XX that going into that meeting [with Speed] he knew we did not have resources for." (ECF No. 363-2 at 93.)

In January 2019, Collins emailed Gordon stating that "[t]he XX will be part of our 2020 product offering to dealers" but that TSV "will not pursue the XX Turbo or XX Crew for 2020" because there "isn't a business case for any of the other models." (*Id.* at 201.) He encouraged Speed to "pursue other partners as appropriate." (*Id.*)

### E.     Project Zeus

Before the Agreement, Arctic Cat had developed Zeus, a 5-link rear suspension vehicle for the same market the Wildcat vehicles targeted. (ECF No. 363-2 at 70; ECF No. 362 ¶ 12.) In other words, according to Crocker, "Zeus was the original Wildcat." (ECF No. 363-2 at 123.) When Speed and Arctic Cat partnered, they planned to convert Zeus into a vehicle with a trailing-arm rear-suspension chassis designed by Gordon. (ECF No. 362 ¶ 12.) Metz told Arctic Cat that Zeus was cancelled as of August 2015—the start of the Agreement. (*Id.* ¶ 13.) Arctic Cat contends that, consistent with the Agreement, it continued Zeus only as necessary to develop Wildcat XX vehicles. (ECF No. 363-2 at 123–26.) Indeed, several witnesses from Arctic Cat testified that Arctic Cat was no longer developing Zeus. (*E.g.*, ECF No. 335-1 at 34–35, 93–94; ECF No. 335-2 at 76, 78.)

Yet according to Speed, Arctic Cat continued to fund Zeus to the detriment of the Wildcat XX project. (ECF No. 362 ¶ 29; ECF No. 363-2 at 78.) Anderson testified that Gordon and Romano "were led to believe that [the Zeus] project was cancelled" even though it was not, and that Arctic Cat executives made it "explicitly clear" that he should not mention Zeus to Speed. (ECF No. 363-2 at 71, 101.) And, according to Anderson, investments in Zeus impaired development of the Wildcat XX. (*See generally id.* at 74–79.) At some point, Anderson visited the Arctic Cat facility at Thief River Falls, Minnesota and found it "full of Zeus vehicles" even though the facility was needed to develop the Wildcat XX vehicles. (*Id.* at 77.)

In late March 2017, Gordon and Romano met with Collins, who explained that Arctic Cat continued to develop the Zeus 5-link design during development of the Wildcat XX vehicles. (ECF No. 362 ¶ 29.) TSV later held a competition in Georgia to compare the Zeus 5-link with the Wildcat XX. (ECF No. 362 ¶ 31; ECF No. 363-2 at 198.) After the contest, TSV planned to "charge forward with the XX" because it outperformed Zeus. (ECF No. 363-1 at 62–64.)

### F.   *Speed's Use of Arctic Cat's Trademarks*

While Speed brings breach-of-contract and tort claims against Arctic Cat, it moves for summary judgment on the trademark claims Arctic Cat asserts against Speed. (ECF No. 414.) These facts are relevant to that motion.

Under the Agreement, Speed "may use Arctic Cat trademarks and/or logos . . . only as authorized by Arctic Cat in writing." (Agreement ¶ 8(a).) Exhibit F lists two Arctic Cat trademarks: the name "Arctic Cat" and an outline of a leaping cat. (Agreement Ex. F.) Arctic Cat also owns registered trademarks to Arctic Cat, Bearcat, Firecat, Thundercat, and Wildcat. (ECF No. 357-1 at 28, 71–99.) The Agreement allows for use of the Arctic Cat mark in limited circumstances and "only as authorized by Arctic Cat in writing, in forms pre-approved in writing by Arctic Cat, and only in connection with the activities described [in the Agreement]." (Agreement ¶ 8(a).) The Agreement further provides that Speed "shall not use any of the AC Trademarks as a part of its firm, trading, or corporate

11

name, and shall not display or use the AC Trademarks except in a form or manner approved by Arctic Cat in writing in advance." (*Id.*)

*Baja 1000.* In summer 2016, after Arctic Cat decided against producing Special Royalty Vehicles for the 2016 model year, Speed and Arctic Cat agreed that Speed would race a Wildcat XX at the Baja 1000 in November 2016. (ECF No. 342 ¶¶ 18–19.) In July, Arctic Cat authorized the use of some vehicles at Baja, but as the event approached, Arctic Cat asked Speed to limit exposure. (ECF No. 357-1 at 112.) A month before the race, Arctic Cat told Speed that it did not want to "fully activate" the marketing program at the Baja 1000. (ECF No. 342-1 at 40.) Speed raced the Wildcat XX—with its own modifications— at the event. The vehicle featured prominently the Arctic Cat marks. (ECF No. 342 ¶ 23; ECF No. 342-1 at 43.)

After the race, Arctic Cat expressed concern that the race gained too much attention before the formal vehicle launch. (ECF No. 342 ¶¶ 24–25; *see* ECF No. 342-1 at 45 (stating that negative exposure from the Baja 1000 "was far more than we anticipated").) In an email to Speed, Crocker said that Arctic Cat does "not authorize ANY Arctic Cat/Wildcat vehicle to enter or race in any event. That includes the 77 inch Wildcat/SpeedCat (the contract requires written authorization)[.] In addition, the public display of this vehicle at Baja may have effectively disclosed to third parties novel IP. We can't let that happen again." (ECF No. 357-1 at 113.) The next day, Crocker reiterated to Speed that Arctic Cat did "not want any Wildcat XX plastic on any vehicles or in any

races" until after a public launch of the designs. (*Id.* at 108.) In early December, Crocker sent another email to Speed stating that unauthorized use of the Arctic Cat/Wildcat trademarks was a breach of the Agreement. (*Id.* at 118.)

In February 2017, Arctic Cat formally launched the Wildcat XX next to the Speed Cat 77. (ECF No. 342 ¶ 27.) In March, someone in Arctic Cat's Legal Affairs office wrote to Speed's lawyer, stating that Speed Cat "is not a vehicle offered 'by' Arctic Cat. . . . As a favor to Mr. Gordon and Romano, we permitted them to promote their heavily modified vehicle at our recent dealer show. But [this] does not change the fact that this is not a stock Arctic Cat vehicle." (ECF No. 357-1 at 137.)

Gordon seems to have been unhappy with this communication, so he took matters into his own hands. Despite Arctic Cat's refusal to present the Speed Cat design as its own, Gordon asked Sheri Paxton, a Speed employee, to write an email on Arctic Cat letterhead stating that Arctic Cat presented the Speed Cat 77 and that it was available to purchase from Arctic Cat dealerships. (ECF No. 357-2 at 10–11.) Gordon asked Paxton to say the email came from Anderson and to place "(SVP) Special Vehicle Products" under his name. (*Id.* at 10.) Gordon asked for the same letter under Crocker's name. (*Id.*) It is unclear what, if anything, Gordon did with these documents.

*Speed's Trademark Application.* During the Agreement term, Speed applied for its own trademark for the mark "Speed Cat." (*Id.* at 15.) The application was published for opposition in the Trademark Official Gazette in March 2017. (*Id.* at 17.) When Arctic Cat

learned about the application, it opposed Speed's filing and instituted a formal proceeding before the USPTO's Trademark Trial and Appeal Board. (ECF No. 357-1 at 25–47; ECF No. 357-2 at 15–26.) Arctic Cat alleged that Speed Cat was confusingly similar to Arctic Cat's marks and asserted that the use of "-CAT" is distinctive. (ECF No. 357-2 at 15–26; ECF No. 357-1 at 40.) Speed answered, asserting no likelihood of confusion, mistake, or deception. (ECF No. 357-2 at 28–35.) Speed also asserted defenses of estoppel and acquiescence. (*Id.* at 34.) Later, Speed filed for abandonment of the application, and the USPTO entered judgment against Speed. (*Id.* at 38.)

*Reselling Vehicles.* After the release of the Wildcat XX for model year 2018, Speed "garnered attention and sales for the Wildcat XX" by reselling customized Wildcat XX vehicles to consumers through the website "speedsxs.com" and other channels. (ECF No. 343 ¶ 10.) Speed received Wildcat XX vehicles to modify in two ways: through the Agreement and through a "Textron Specialized Vehicles U.S. Dealer Agreement" executed in January 2018 between Speed and TSV. (ECF No. 349 at 2, 17.) The Dealer Agreement granted Speed permission to use TSV's trademarks to advertise and sell the Wildcat XX. (*Id.* at 17.) It required that any use be pre-approved by TSV in writing. (*Id.*) Speed also advertised accessories with Arctic Cat trademarks. (*See e.g.*, ECF No. 357-2 at 7; ECF No. 343-1 at 13–19.) Arctic Cat purchased some accessories, so it seems Arctic Cat knew Speed used Arctic Cat's trademarks to sell accessories and to resell vehicles produced under the Agreement. (ECF No. 343 ¶ 13; ECF No. 343-1 at 13–19.)

*Website.* Speed continued to use Arctic Cat logos on its website even after Arctic Cat sued to enforce its trademarks. Even after this litigation began, Speed featured factory graphics kits on its website, featuring the name "Wildcat XX." (ECF No. 356 ¶ 4; *see also* ECF No. 357-2 at 110–11 (featuring Arctic Cat marks in October 2020).)

*Social Media.* Speed also featured some of Arctic Cat's trademarks on its social media. At some point, Speed posted a video featuring a nine-year-old child racing one of Arctic Cat's vehicles, which Arctic Cat asked Speed to remove, "We view this as an unauthorized use of the Arctic Cat/Wildcat name and a breach of contract." (ECF No. 357-1 at 118.) Despite Arctic Cat's request, Speed continued its practices, featuring vehicles with Wildcat and Textron logos and references on YouTube, Instagram, and Facebook. (ECF No. 357-2 at 112–14.)

*Expert Opinion.* As part of this suit, Arctic Cat hired an expert to review Speed's website social media accounts to evaluate the likelihood consumers would be confused about the source of Speed's products. (*See generally* ECF No. 357-2 at 69–183.) The expert developed a survey, which found "a high level of confusion between the marks involved," with nearly 30% of respondents indicating that the vehicle for sale on Speed's site "was manufactured by or sponsored, licensed or approved by Arctic Cat/Textron." (*Id.* at 90.)

II.     **Procedural History**

This case began as two separate cases in two different districts. Arctic Cat (minus Textron Inc.) sued Speed in the District of Minnesota. *Arctic Cat Inc. v. Speed RMG Partners, LLC,* No. 19-CV-873 (NEB/LIB), ECF No. 1 (D. Minn. Mar. 28, 2019). The same day, Speed sued Arctic Cat in the Central District of California. *Speed RMG Partners, LLC v. Arctic Cat Sales, Inc.,* No. 2:19-CV-2362-FMO-GJS, ECF No. 1 (C.D. Cal. Mar. 28, 2019). This Court ordered the case transferred to the Central District of California and consolidated with the case brought by Speed. *Arctic Cat,* No. 19-CV-873 (NEB/LIB), ECF No. 52 (D. Minn. Aug. 16, 2019). In February 2020, the case was transferred back to this Court. *Speed RMG,* No. 2:19-CV-7435-FMO-GJS, ECF No. 85 (C.D. Cal. Feb. 25, 2020). Because of this, two separate but related cases share a docket.

Both cases have endured several rounds of new pleadings, so the Court will explain the docket with more detail than is typical. When Arctic Cat moved for summary judgment on Speed's claims, (ECF No. 332), Speed's second amended complaint, (ECF No. 164), was operative. While the motion was pending, this Court issued an order permitting Speed to amend its complaint to seek punitive damages. (ECF No. 375.) Speed filed a third amended complaint to add a request for punitive damages. (ECF No. 376.) Arctic Cat then amended its motion for summary judgment to request summary

judgment on Speed's punitive damage claim. (ECF No. 384.) Speed also moved for summary judgment on some of Arctic Cat's claims.[5] (ECF No. 339.)

## ANALYSIS

### I.      Legal Standard

"Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012) (citing Fed. R. Civ. P. 56(c)). A dispute of fact is "genuine" if a factfinder could reasonably determine the issue in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A court considering a summary judgment motion must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences supported by the evidence.[6] *B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882, 886, 888 (8th Cir. 2013). "The burden of demonstrating an absence of a genuine

---

[5] When Speed moved for summary judgment, Arctic Cat's operative complaint was buried in the docket as an attachment to a declaration. (ECF No. 408 at 11 n.5 (citing ECF No. 344, Ex. 13).) For convenience, the Court ordered Arctic Cat to re-file the complaint, (*id.* at 11), and Arctic Cat did so. (ECF No. 414.) As a result, for both motions, the operative complaint appears on the docket *after* the initial motion for summary judgment.

[6] In this order the Court considers two distinct motions for summary judgment. When the Court considers Arctic Cat's motion for summary judgment, the Court views the facts in the light most favorable to Speed. And when the Court considers Speed's motion for summary judgment, it views the facts in the light most favorable to Arctic Cat.

dispute of material fact is on the moving party." *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and citation omitted).

## II. Arctic Cat's Summary Judgment Motion in *Speed Partners v. Arctic Cat*

### A. *Breach of Contract*

As noted above, Speed offers two separate theories of breach of contract. First, Speed argues that Arctic Cat owes it mandatory minimum royalties under paragraph 3 and Exhibit D of the Agreement, even for vehicles not made or sold. Second, Speed contends that Arctic Cat breached the right of first refusal in paragraph 4 by failing to manufacture vehicles for which Speed presented designs.

### 1. *Arctic Cat's Failure to Make Minimum Royalty Payments*

The Agreement unambiguously bases royalties on sales. Exhibit D lists "target" royalties—the word "target" suggests an aspirational goal. *See Target*, Merriam-Webster, https://www.merriam-webster.com/dictionary/target (last visited March 16, 2022) (defining target as "a goal to be achieved"); *see also Sanchelima Int'l, Inc. v. Walker Stainless*

*Equip. Co.*, 16-CV-644-JDP, 2018 WL 1401195, at *8 (W.D. Wis. Mar. 19, 2018) (finding revenue target an "aspirational goal" in part because "[t]he very term 'revenue target' suggests flexibility"). Exhibit D also provides for different royalties "for *sales* above baseline." (Agreement Ex. D (emphasis added).) And Exhibit D's examples use conditional language based on sales. (*See id.* ("*If* in MY 2017, *Arctic Cat sells* 1,000 Wildcat X LE units, 2,000 Wildcat XX LE units, . . . royalties *would be* . . . $2,250,000.") (emphasis added).) Nothing in Exhibit D suggests the parties intended a minimum royalty absent a sale of vehicles produced under the Agreement.

Moreover, Speed's interpretation cannot stand because it would render portions of the Agreement superfluous. *See Pfoser v. Harpstead*, 953 N.W.2d 507, 517 (Minn. 2021) ("Whenever it is possible, no word, phrase, or sentence should be deemed superfluous, void, or insignificant.") (citation omitted). If the parties intended a minimum royalty payment, Arctic Cat could have paid Speed nearly $14 million for Speed to develop new designs. There would be no need for Exhibit D.

Thus, the Court finds the Agreement does not require a minimum royalty payment.

*Extrinsic Evidence.* Because the Court concludes that the Agreement expressly does not entitle Speed to minimum payments and contains an integration clause, the parol evidence rule prohibits consideration of any agreements or representations made before the Agreement. *Alpha Real Est. Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d

303, 312 (Minn. 2003). Even if the Court considers extrinsic evidence, the case resolves the same way:

*First,* in a June 2015 email from Romano to Metz, Romano stated that Arctic Cat would manufacture models from 2016–2020 and calculated expected royalties of over $30 million. (ECF No. 364-1 at 8–9.) But Romano's email referred to these numbers as "realistic" and a "forecast," so they do not suggest a minimum payment any more than the "target" language used in the Agreement. (*Id.* at 8.)

*Second,* the chart attached to that email is nearly identical to the final Exhibit D—apparently a precursor. (*Id.* at 9.) In this chart, the second column reflects annual sales, and the "Annual Comp" column is calculated by multiplying annual sales by royalties. (*Id.*) This evidence suggests that when Romano sent this email to Metz, he contemplated royalty payments based on sales.

*Third,* Crocker testified that he knew that "minimum units" were part of the Agreement. (ECF No. 335-1 at 98.) But the testimony includes no specificity, and indeed, the Agreement includes the term "minimum units" when it explains halo and pivot royalties. (Agreement ¶ 3(a)(ii).) So this does little to support Speed's interpretation of the Agreement.

*Fourth,* Speed sent Arctic Cat an invoice for $3 million, which it claimed was based on contract minimums. (ECF No. 364-1 at 13.) But Arctic Cat never paid it and Speed never followed up. This invoice does not advance Speed's theory and does not show that

the parties understood that contract minimums were in place. *See Fredrich v. Indep. Sch. Dist. No. 720*, 465 N.W.2d 692, 695–96 (Minn. Ct. App. 1991) (evaluating the parties' intent based on their course of dealing after entering a contract).

*Finally,* email exchanges between the parties show Speed acknowledged that its "ability to receive royalties depends on Textron's ability to sell units," and otherwise referenced royalties based on sales. (ECF No. 358-3 at 5; ECF No. 335-2 at 55–56.) These communications show that Speed contemplated royalties based on sales.

In sum, although the Court need not consider extrinsic evidence, it supports the Court's conclusion. Because Speed's interpretation belies the unambiguous, plain language of the Agreement, Arctic Cat is entitled to summary judgment on the issue of mandatory minimum royalties.

### 2. *Arctic Cat's Failure to Manufacture Vehicles*

As an alternative to its minimum-royalties theory, Speed argues that Arctic Cat exercised its right of first refusal on particular vehicle designs, requiring Arctic Cat to produce them. According to Speed, Arctic Cat exercised its right of first refusal, which made a contract to manufacture certain vehicles. And Speed asserts that Arctic Cat breached that contract because it did not manufacture those vehicles. Arctic Cat responds that (1) it did not exercise its right of first refusal because Speed did not tender a final design as required by the Agreement, and (2) even if Arctic Cat did exercise its right of

first refusal, the Agreement gave it unfettered discretion to decide whether to manufacture a vehicle.

<u>a.</u>      <u>Exercise of the Right of First Refusal</u>

Under paragraph 4 of the Agreement, Arctic Cat has 90 days from when Speed presents a final powersports vehicle design or prototype to decide whether it wants to manufacture the vehicle. (Agreement ¶ 4.) So once Speed tendered a final vehicle design, it created a power of acceptance in Arctic Cat. *See Anderson v. United States*, 468 F. Supp. 1085, 1092–93 (D. Minn. 1979) (explaining that a right of first refusal creates a power of acceptance when the condition of the right is met). If Arctic Cat accepted by conveying that it intended to manufacture the final vehicle design, the parties would have a contract to manufacture with the terms set in paragraph 4. *See Park-Lake Car Wash, Inc. v. Springer*, 352 N.W.2d 409, 412 (Minn. 1984) (holding that a contract was formed once a right of first refusal was exercised). The parties disagree about whether Speed presented a final design and about whether Arctic Cat accepted any final design.

*Definition of "Final."* The Agreement does not define "final," and extrinsic evidence does not clarify the parties' intended meaning for the term. At a hearing on the motion, the parties disagreed on whether Speed tendered a final design. The parties did not brief the issue and produced a minimal record on what designs Speed gave to Arctic Cat during the relationship. A question of fact thus remains on the meaning of "final" and whether Speed ever presented a final design to Arctic Cat.

22

*Acceptance.* Even if Speed presented a final design, a question of fact also exists about whether Arctic Cat exercised its right of first refusal. According to Speed, Arctic Cat exercised its right of first refusal on at least four vehicles (Wildcat X RG Pro in 2- and 4-seat configurations, Wildcat Sport RG Edition, and Wildcat XX RG Pro in two-seat configuration). As with all contracts, a right of first refusal "must be accepted according to its terms." *Van Santen v. Van Santen*, No. A07–0899, 2008 WL 2340546, at *3 (Minn. Ct. App. June 10, 2008) (citing *Rose v. Guerdon Indus.*, 374 N.W.2d 282, 284 (Minn. Ct. App. 1985)). The Agreement does not provide for a specific method of acceptance, so any objective manifestation of acceptance could create a contract. *See Gresser v. Hotzler*, 604 N.W.2d 379, 382 (Minn. Ct. App. 2000) ("Whether a contract is formed is judged by the objective conduct of the parties and not their subjective intent.").

Speed urges the Court to consider several of Arctic Cat's actions and communications as objective indications of its intent to produce vehicles: launching the vehicles at 2015 dealer shows, accepting orders and assigning part numbers, conveying its intent to produce the vehicles to Speed, refusing Speed's request to have the vehicles produced by a third party, announcing build dates and launch dates, and making other public announcements. Speed presents no case law suggesting the Court can find these actions objective manifestations of an intent to produce vehicles. Indeed, fact questions abound. Thus, the Court denies Arctic Cat's motion for summary judgment on the issue of the exercise of the right of first refusal.

b.      Arctic Cat's Discretion

According to Arctic Cat, paragraph 2 of the Agreement gives it total discretion to

produce vehicles or not, so it is entitled to summary judgment even if it exercised its right

of first refusal under paragraph 4. Paragraph 2 states in part that:

> [Special Royalty Vehicle] designs and annual updates will be provided by
> Speed RMG to Arctic Cat in writing, will specify the novel features of the
> applicable vehicle and, with respect to the Special Royalty Vehicles, must
> be accepted by Arctic Cat in its discretion prior to incorporation in a vehicle
> and eligibility for royalty payments. Arctic Cat shall have, in its sole
> discretion, final approval over all branding and product design decisions.

(Agreement ¶ 2(a).)

Paragraph 2 and paragraph 4 can be harmonized, and so the Court must. *Storms,*

*Inc. v. Mathy Const. Co.*, 883 N.W.2d 772, 776 (Minn. 2016). Paragraph 2 gives Arctic Cat

authority to determine which design features and updates will be incorporated into

vehicles. Under paragraph 2, Arctic Cat has final authority to approve physical

characteristics of the vehicle related to branding and product design. Paragraph 4 then

gives Arctic Cat a right of first refusal for 90 days to determine whether it wants to

manufacture a vehicle—with its design characteristics incorporated. Once that right of

first refusal is exercised, Arctic Cat retains authority to make branding and product

design decisions, but it loses the right to decide not to manufacture after that 90-day

period expires, because it has created a contract with Speed to manufacture under

paragraph 4.[7] Thus, paragraph 2 of the Agreement does not entitle Arctic Cat to summary judgment on Speed's breach of contract claim.[8]

c.    Summary

In sum, under Speed's theory that Arctic Cat breached a contract created when it exercised its right of first refusal, several fact questions remain for a jury. The first is when and whether Speed presented "final" designs, thus triggering the right of first refusal. The second is whether Arctic Cat timely exercised the right of first refusal on any vehicle designs and created a contract. If a contract exists, the third question is whether Arctic Cat breached the contract by failing to manufacture that vehicle. Arctic Cat's motion for summary judgment on this theory of breach is denied.

3.    *Other Breach-of-Contract Claims*

Arctic Cat also seeks summary judgment on Speed's remaining theories—that Arctic Cat breached the contract by: (1) failing to develop accessories and aftermarket

---

[7] Similarly, the addendum between TSV and Speed, which states that TSV "makes no commitment to proceed with all or any of the five new Wildcat XX variants," expresses that TSV does *not* exercise its right of first refusal through the addendum. (ECF No. 335-2 at 3.) But the addendum does not specify which vehicles it covers, nor does it address any contracts to manufacture that the parties may have created before the TSV addendum. Thus, the addendum does not change the Court's interpretation of the Agreement.

[8] At the hearing on this motion, Arctic Cat made a "business case" argument—that it would make no sense to require the manufacture of vehicles that would not be safe, profitable, or otherwise good for Arctic Cat's business. While this argument is compelling, it is not based in the text of the Agreement, so it is suited for a jury and not a finding as a matter of law.

product lines; (2) failing to transfer titles to Arctic Cat vehicles for personal use and marketing; and (3) failing to acknowledge novelty.

*Accessories.* Agreement paragraph 2(c) states that Speed "will provide product design and annual updates, as set forth in Exhibit C . . . which Arctic Cat shall use in the Side By Side vehicles identified in Section 2(a)." Speed presents no evidence to show that it provided product design and annual updates for accessories as required by paragraph 2(c) and Exhibit C. Arctic Cat did not breach the Agreement by not producing accessories because it did not have to produce accessories unless Speed presented designs.[9] *See Minnwest Bank Cent. v. Flagship Props. LLC*, 689 N.W.2d 295, 300 (Minn. Ct. App. 2004) (granting summary judgment when nonmoving party did not present evidence to show there was a genuine issue for trial as to whether a condition precedent was satisfied). Because Speed has not shown that it fulfilled its obligations under the Agreement, the Court grants summary judgment to Arctic Cat.

*Marketing Vehicles.* The Agreement requires Arctic Cat to provide Speed with title to five vehicles for marketing each year. (Agreement ¶ 3(f).) Nothing suggests this obligation turns on the production of vehicles; Arctic Cat had to provide vehicles whether it produced particular vehicles or not. Speed did not present evidence to show how many

---

[9] In addition, Arctic Cat produced accessories, like custom wheels and tires, for the one vehicle that was produced under the agreement. (ECF No. 364 at 8; *see* ECF No. 342 ¶ 32 (describing accessories).)

vehicles Arctic Cat has yet to deliver, and only Arctic Cat moved for summary judgment, so the Court will not rule on how many vehicles—if any—Arctic Cat must produce.[10] Speed may present evidence about how many vehicles it received and how many it is owed at trial.

*Novelty.* Arctic Cat argues Speed has not calculated damages for failure to acknowledge novelty and so the Court should grant summary judgment to Arctic Cat. Speed's expert calculated damages for failure to acknowledge novelty, which he based on a requirement that Arctic Cat produce all of the Special Royalty Vehicles. (ECF No. 335-2 at 23.) Thus Arctic Cat's argument fails. A question of fact remains about whether Speed is entitled to damages for failure to acknowledge novelty.

## B.    *Breach of the Implied Warranty of Good Faith and Fair Dealing*

Under Minnesota law, the Agreement between Speed and Arctic Cat also "includes an implied covenant of good faith and fair dealing requiring that one party not unjustifiably hinder the other party's performance of the contract." *In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995) (quotation marks and citation omitted). A party breaches the implied covenant when it acts in bad faith,[11] that is, when

---

[10] The record suggests that Arctic Cat provided up to 15 vehicles. (ECF No. 364 ¶ 18.)

[11] Speed suggests bad faith is not an element of breach of the implied warranty of good faith and fair dealing under Minnesota state law. It cites *W. Nat'l Mut. Ins. Co. v. Prospect Foundry*, No. A17-0992, 2018 WL 1787687, at *4, n.3 (Minn. Ct. App. Apr. 16, 2018). The *Western National* court considered whether a district court's jury instruction stating, "[a]cting in good faith means a person acts honestly in performing this part of the

it "refus[es] to fulfill some duty or contractual obligation based on an ulterior motive."

*Residential Funding Co. v. Terrace Mortg. Co.*, 725 F.3d 910, 918 (8th Cir. 2013) (quoting

*Sterling Cap. Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 125 (Minn. Ct. App. 1998)); *see also*

*Team Nursing Servs. v. Evangelical Lutheran Good Samaritan Soc'y*, 433 F.3d 637, 641–42 (8th

Cir. 2006) ("[T]he implied covenant of good faith and fair dealing governs the parties'

performance and prohibits a party from failing to perform for the purpose of thwarting

the other party's rights under the contract."). A party does not act in bad faith when it

exercises its legal and contractual rights. *Residential Funding*, 725 F.3d at 918; *Herzog*, 575

N.W.2d at 125.

There is a genuine issue of material fact over whether Arctic Cat breached the

implied warranty of good faith and fair dealing by continuing to develop Zeus vehicles.

Although Arctic Cat officers consistently deny providing funding and resources to Zeus

at the detriment of the Wildcat project, another Arctic Cat employee, Anderson, testified

---

contract, whether it be negligently or not" adequately described the covenant of good
faith and fair dealing. *Id.* at *4. The court found that this instruction properly described
the claim, *id.* at *5, and explained that "Minnesota's appellate courts have not settled
whether the state's common law limits an implied-covenant claim only to the
unjustifiable hindrance of performance or if this claim could include the behaviors
[described] in Section 205, comment d, of the Restatement (Second) of Contracts." *Id.* at
*4 n.3; *see id.* at *4 ("'[E]vasions of the spirit of the bargain, lack of diligence and slacking
off, willful rendering of imperfect performance, abuse of power to specify terms, and
interference with or failure to cooperate in another party's performance' also qualify as
violations of the covenant.") (citing Restatement (Second) of Contracts § 205, cmt. d
(1981)). This Court need not resolve the exact standard, because a question of fact remains
regardless.

Arctic Cat dedicated considerable time and effort to Zeus at Wildcat's expense. And after the acquisition, TSV officials told Speed that Arctic Cat had continued to develop Zeus.

If Arctic Cat did prioritize Zeus to the detriment of Wildcat vehicles, a factfinder could find that Arctic Cat breached the implied warranty of good faith and fair dealing. In *LeMond Cycling, Inc. v. PTI Holding, Inc.*, another court in this district found a dispute of fact about whether the defendant acted in good faith in performing a contract when evidence showed the defendant focused on another business relationship despite a continuing obligation to the plaintiff.[12] No. 03-CV-5441 (PAM/RLE), 2005 WL 102969, at *7 (D. Minn. Jan. 14, 2005). The *LeMond* defendant argued that it did not abandon its obligation, but "that there was no demand or market" for the plaintiff's product. *Id.* The

---

[12] Arctic Cat points to *Herzog* and *Palm* to argue it cannot be liable for breach of the implied warranty of good faith and fair dealing. In *Herzog*, the Minnesota Court of Appeals held that shareholders had not breached the covenant by acting in "bad faith" because the shareholders were exercising a contractual right. 575 N.W.2d at 125; *see also Palm v. Calhoun Realty Co.*, No. A15–0895, 2016 WL 363505, at *6 (Minn. Ct. App. Feb. 1, 2016) (finding party to a contract did not act in bad faith by asserting its contractual right). But *Herzog* is distinct from this case. The *Herzog* court explained that plaintiff "did not present sufficient evidence to raise a fact issue that the shareholders acted in bad faith" because evidence suggested they legitimately considered the presented offers and found them unacceptably low. 575 N.W.2d at 125. And in *Palm*, the court found the defendant did not breach the covenant of good faith and fair dealing by not pursuing a lawsuit to recover commissions owed to plaintiff because the contract gave full discretion to the defendant to decide whether to pursue such a suit. 2016 WL 363505, at *6. Speed does not argue that Arctic Cat acted in bad faith by not exercising its right of first refusal; Speed argues that Arctic Cat acted in bad faith by exercising its right of first refusal when it had no intent to produce the vehicles, so *Herozg* and *Palm* do not support Arctic Cat's motion for summary judgment.

court found that this merely created a dispute of fact. *Id.* Similarly, Arctic Cat asserts that it refused to manufacture vehicles based on financial considerations and design shortcomings.[13] Arctic Cat may show there was no business case for Wildcat products as evidence that it acted in good faith, but if Arctic Cat continued to invest in its own product at the expense of Wildcat, a jury could conclude that Arctic Cat breached the implied warranty of good faith and fair dealing. The Court denies Arctic Cat's motion for summary judgment on this claim.

### C.    Tort Claims

Speed raises three tort claims: (1) Arctic Cat's pre-Agreement misrepresentations; (2) its concealment and misrepresentations about Zeus during the term of the Agreement; and (3) its false statements after entering the Agreement about its intent to sell vehicles. (ECF No. 376 ¶¶ 121–41.) As explained below, the Court finds a question of fact remains

---

[13] Arctic Cat contends that it cannot have breached the covenant of good faith and fair dealing because the parties shared a profit motive. Although Arctic Cat and Speed shared a profit motive because both earned profit on Wildcat vehicles, Arctic Cat may also have been motivated to produce vehicles for which it owed no royalties, and so there may not have been "an agreed common purpose and consistency with [Speed's] justified expectations." *LeMond*, 2005 WL 102969, at *7.

on the first claim, and grants summary judgment on the second and third, because the
latter two are merely repackaged contract claims.[14]

Speed cannot recover extra-contractual damages "unless the breach is
accompanied by an independent tort." *Lunde v. Cincinnati Ins. Co.*, No. 18–CV–238
(JNE/HB), 2018 WL 1972475, at *2 (D. Minn. Apr. 26, 2018) (collecting cases). A tort is
independent of a breach of contract claim only if "a relationship would exist which would
give rise to the legal duty without enforcement of the contract promise itself." *Hanks v.
Hubbard Broad., Inc.*, 493 N.W.2d 302, 308 (Minn. Ct. App. 1992). "In effect, the existence
of the contract is ignored when determining whether the alleged misconduct is actionable
in tort." *Fette v. Columbia Cas. Co.*, No. C0-93-242, 1993 WL 377091, at *3 (Minn. Ct. App.
Sept. 28, 1993).

*Pre-Agreement   Misrepresentation.*   Speed's   claim   for   pre-Agreement
misrepresentation is weak given the expert's analysis that its damages cannot be
separated from breach-of-contract damages. *See Hanks*, 493 N.W.2d at 308 ("To recover
under theories of both contract and tort, a plaintiff must prove separate damages for

---

[14] In a prior order, this Court found that the separate tort claims could stand under Rule 15
of the Federal Rules of Civil Procedure. (ECF No. 375.) Unlike a motion for summary
judgment, Rule 15 does not set an evidentiary requirement. *Dolphin Kickboxing Co. v.
Franchoice, Inc.*, 335 F.R.D. 393, 398 (D. Minn. 2020). This Court found that Speed might
be able to make out a separate tort claim for pre-Agreement misrepresentations and for
Arctic Cat's misrepresentations about Zeus, and so, applying the Rule 15 standard, the
Court granted Speed's motion to amend to seek punitive damages. (ECF No. 375.) With
the evidence now presented, the Court finds that any misrepresentations about Zeus
would merely be a breach of contract.

fraud and for breach."). But "fraud in inducing a contract and a later breach of that contract represent two distinct causes of action." *McDonald v. Johnson & Johnson*, 776 F.2d 767, 770 (8th Cir. 1985) (collecting cases). The Court will not resolve the conflict over damages at this stage of litigation; a reasonable jury might find Speed is entitled to damages on one claim but not the other. *See id.* at 771 (explaining that a fraud-in-the-inducement claim requires a showing of fraudulent intent at a different time in the relationship than a breach-of-contract claim).

And Speed presents evidence showing that Arctic Cat misrepresented its ability to perform before the parties entered the Agreement. Metz represented to Speed that Arctic Cat could fulfill the Agreement, even while Arctic Cat business leaders questioned whether Arctic Cat had sufficient engineering staff to do so. (*Compare* ECF No. 364-1 at 11, *with* ECF No. 363-1 at 2.) This evidence suggests that Arctic Cat may have made promises it did not intend to honor to induce Speed to enter the Agreement, thus a jury could find fraud. *See McDonald*, 776 F.2d at 770 ("Plaintiffs' fraud claim arose when [defendant] first made the promises, without intending to honor them, that allegedly induced plaintiffs to enter into the . . . agreement; plaintiffs' breach of contract claim arose only after [defendant] later failed to fulfill those promises.").

*Post-Agreement Torts.* But Speed's other tort claims—for concealment and misrepresentation of Zeus and for false statements about Arctic Cat's intent to sell vehicles—are only actionable to the extent there is an underlying contract. *See AKA*

*Distrib. Co. v. Whirlpool Corp.*, 137 F.3d 1083, 1087 (8th Cir. 1998) (finding that claims for fraud and misrepresentation were not independent of a breach of contract claim after examining the nature of the claims and the parties' contractual obligations). Arctic Cat owed no independent duty to tell Speed about Zeus, except that Arctic Cat's continued efforts to produce Zeus may have led Arctic Cat to breach the Agreement. And any duty Arctic Cat owed Speed to be honest about its intent to sell Special Royalty Vehicles stemmed from the Agreement and its implied warranty of good faith and fair dealing because the Agreement contemplated producing the vehicles. *See id.* (finding no independent duty to be truthful about the length of a relationship because "duration was a term of the contract"). Any damages could only result from Arctic Cat's failure to produce vehicles required under the Agreement, so Speed cannot maintain its tort claims based on Arctic Cat's actions during the Agreement term. The Court grants summary judgment to Arctic Cat on those claims.

### D.    *Punitive Damages*

This Court must grant Arctic Cat's motion for summary judgment on Speed's claim for punitive damages because Speed presents no evidence of deliberate disregard. *See Lundgren v. Eustermann*, 370 N.W.2d 877, 882 (Minn. 1985) ("Notwithstanding the stringent standard applied to summary judgment motions, there are punitive damages cases in which summary judgment is appropriate.") (citation omitted). Minnesota law permits punitive damages "only upon clear and convincing evidence" that the

defendant's actions "show deliberate disregard for the rights or safety of others." Minn. Stat. § 549.20, subdiv. 1(a). "Punitive damages are an extraordinary remedy, and are awarded only where the harm complained of is the result of conduct done in malicious, willful, or reckless disregard for the rights of others." *Wikert v. N. Sand & Gravel, Inc.*, 402 N.W.2d 178, 182 (Minn. Ct. App. 1987). "[S]omething more than mere indifference to the rights and safety of others . . . must be present to allow the 'extraordinary' remedy of punitive damages." *Id.* at 183.

Nothing in evidence suggests any alleged misrepresentation by Arctic Cat was made with deliberate disregard.[15] A defendant acts with "deliberate disregard for the rights or safety of others" if it "has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and . . . deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others." Minn. Stat. § 549.20, subdiv. 1(b). Arctic Cat's alleged misrepresentation about its financial state does not suggest that it deliberately disregarded a risk of injury to Speed; Arctic Cat's representations before and after the Agreement was executed suggest that Arctic Cat honestly believed the deal would be successful for both parties. Plus, Speed represents itself as having a high business acumen; indeed, Speed retained counsel

---

[15] Because this Court grants summary judgment on the tort claims for Arctic Cat's actions after the Agreement was executed, Speed could only receive punitive damages on its claim for pre-Agreement misrepresentation. So the Court only evaluates whether Arctic Cat acted with deliberate disregard *before* the parties executed the Agreement.

to conduct due diligence before the Agreement. Because Speed presents no evidence that Arctic Cat acted with deliberate disregard, the Court grants Arctic Cat's motion for summary judgment on punitive damages. *See Lundgren*, 370 N.W.2d. at 882 (holding that summary judgment was appropriate because "the facts presented . . . simply fail[ed] to raise a fact issue on punitive damages").

### E.     *Alter Ego*

Arctic Cat asks the Court to dismiss Textron from the suit because there are no direct claims against Textron—as TSV's parent company, it is only in the case on an alter-ego theory. There is a presumption of separateness between parent and subsidiary corporations; absent fraud or bad faith, a parent corporation is not liable for the acts of its subsidiaries. *Ass'n of Mill & Elev. Mut. Ins. Co. v. Barzen Int'l, Inc.*, 553 N.W.2d 446, 449 (Minn. Ct. App. 1996). A subsidiary may be liable if it is the alter ego of the parent. *Id.* To prevail on an alter ego theory, a plaintiff must show that several factors favor piercing

the corporate veil.[16] *Urban ex rel. Urban v. Am. Legion Post 184*, 695 N.W.2d 153, 161 (Minn.

Ct. App. 2005) (citation omitted).

It does not take the multi-factor test to see that TSV was a real corporation and not

an alter ego of Textron.[17] TSV operates separately from Textron. TSV is separately

incorporated, has separate corporate headquarters in a different location, generated

annual revenue of over $1 billion in 2018, 2019, and 2020, maintains its own bank

---

[16] These factors are "insufficient capitalization for purposes of corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation at time of transaction in question, siphoning of funds by dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and existence of corporation as merely facade for individual dealings." *Victoria Elev. Co. v. Meriden Grain Co.*, 283 N.W.2d 509, 512 (Minn. 1979). Together with these factors, there must "be an element of injustice or fundamental unfairness." *Id.*

[17] Even under the *Victoria Elevator* analysis, Arctic Cat prevails. Just one factor weighs in Speed's favor—TSV acknowledges it does not pay dividends. (ECF No. 363-2 at 173.) But this factor alone does not support an alter-ego theory. *See generally Trs. of Graphic Comms. Int'l Union Upper Midwest Local 1-M Health & Welfare Plan v. Bjorkedal*, No. 04-CV-3371 (PJS/JJG), 2006 WL 3511767, at *14 (D. Minn. Dec. 6, 2006) (finding that the fact that a company did not pay dividends did not suggest it was a façade).

 That Textron and TSV prepare consolidated financial statements does not show that they did not observe corporate formalities. TSV is not required to hold directors' meetings or shareholders' meetings, so its failure to do so does not suggest that it ignored corporate formalities. *See* Del. Code tit. 8, § 141(f) (2020) (permitting action without a meeting if the board consents).

Nor does the "insufficient capitalization" factor support an alter ego theory. Textron's initial capital contribution of $10 million to BB Buggies Inc.—TSV's name before acquisition—does not suggest insufficient capitalization. (ECF No. 363-2 at 188–89.) Textron made this transfer right after acquiring BB Buggies/TSV and made no other large transfers to it, so it does not suggest insufficient capitalization. (*Id.*)

accounts, and generally functions as an independent entity. (ECF No. 252-5 at 2 (stating that TSV is separately incorporated); ECF No. 252-10 at 17 (stating that Textron's world headquarters is in Providence, R.I., and TSV's headquarters is in Augusta, Ga.); ECF No. 252-7 at 27, 60 (documenting TSV's revenue); ECF No. 252-11 at 6 (stating that Textron and TSV do not share any bank accounts).) Speed has not shown that TSV is the alter ego of Textron, so the Court grants summary judgment on this issue and dismisses Textron from this action.

### III.    Speed's Partial Summary Judgment Motion in *Arctic Cat v. Speed Partners*

#### A.    *Conversion, Misappropriation, and Punitive Damages*

Arctic Cat does not oppose summary judgment on conversion, misappropriation, and punitive damages claims. The Court thus grants Speed's motion for summary judgment on those claims.

#### B.    *Trademark Claims[18]*

Speed moves for summary judgment on Arctic Cat's trademark infringement claims about Speed's use of Arctic Cat's marks. Speed does not assert that it did not

---

[18] Arctic Cat brings a federal trademark infringement claim and a state common law claim. (ECF No. 414 ¶¶ 73–83.) Minnesota state law trademark infringement requires the same analysis as claims under federal law, so the Court analyzes them together. *DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 935 n.3 (8th Cir. 2003).

infringe; it instead argues that its defenses—acquiescence and nominative fair use—should be decided as a matter of law, foreclosing Arctic Cat's claims.

1.    *Acquiescence*

The defense of "acquiescence" would bar Arctic Cat's trademark claim if Speed could show that Arctic Cat conveyed "through affirmative word or deed" express or implied consent to infringement. *Masters v. UHS of Del., Inc.*, 631 F.3d 464, 469 (8th Cir. 2011) (citation omitted). One way to show acquiescence is by showing the plaintiff knew about the infringement and did not act. *See Visual Dynamics, LLC v. Chaos Software Ltd.*, 309 F. Supp. 3d 609, 626–27 (W.D. Ark. 2018) (finding valid defense of acquiescence when defendant made conflicting representations about whether plaintiff could use the marks and took no action for more than three years); *Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*, 529 F. Supp. 3d 940, 975–77 (D.S.D. 2021) (finding acquiescence when plaintiff purchased the allegedly infringing products for years without objection). Because the evidence shows that Arctic Cat repeatedly objected to Speed's use of its marks while allowing other uses, the Court cannot grant summary judgment to Speed on its defense of acquiescence.[19]

*Use on Products.* Arctic Cat consistently objected to Speed's use of its marks, including by opposing Speed's attempt to register "Speed Cat" with the USPTO. (*E.g.*,

---

[19] Neither party analyzes this claim citing particular instances of infringement, so neither will the Court.

ECF No. 357-1 at 108, 113, 118; ECF No. 357-2 at 15–26.) Evidence also suggests Arctic Cat might have agreed to some of Speed's uses. Arctic Cat presented the Speed Cat next to Arctic Cat vehicles in its February 2017 product launch.[20] (ECF No. 342 ¶ 27; ECF No. 342-1 at 62.) And Arctic Cat ordered "Textron Baja Rugged Radios" from Speed in 2018. (ECF No. 343-1 at 13.) According to Romano, Arctic Cat never objected to Speed selling modified Wildcat XX vehicles and even encouraged the activity at times. (ECF No. 343 ¶¶ 16, 18.) Thus, questions of fact remain about whether Arctic Cat acquiesced to Speed's use of "Speed Cat" or to Speed's use of Arctic Cat's trademarks on its other products.

*Use on Social Media.* Questions also remain about whether Arctic Cat acquiesced to Speed using its marks on Speed's social media.[21] Romano attests that Textron personnel were aware that Speed used Arctic Cat's marks on its website and social media. (ECF No. 343 ¶ 12.) The Court cannot grant summary judgment to Speed, though, because Arctic Cat objected to Speed's uses in at least some instances. For example, in December 2016

---

[20] The Court considers this weak evidence of acquiescence, given that the launch was Arctic Cat's and so this might be considered Arctic Cat's use. (ECF No. 342 ¶ 27.)

[21] Evidence shows the opposite—that Arctic Cat used Speed's marks on Arctic Cat's social media without objection. Speed asserts that Arctic Cat acquiesced when it requested that Gordon take over Textron's Instagram account. Arctic Cat's request could not possibly be acquiescence to Speed using Arctic Cat's marks because it is Arctic Cat's use—it comes from Arctic Cat's account. How Arctic Cat used its own marks does not affect the analysis of whether Arctic Cat acquiesced to Speed's use. And the Agreement gave Arctic Cat the right to use Speed's marks but limited Speed's rights to use Arctic Cat's marks. (*See* Agreement ¶ 8; ECF No. 349 at 16–17.) This Court will not find acquiescence to trademark infringement when the alleged instances of acquiescence may have been expressly permitted by contract.

Arctic Cat objected to Speed posting a video featuring Arctic Cat trademarks and a child racing the vehicle. (ECF No. 357-1 at 118.) Taken together in the light most favorable to Arctic Cat, the evidence suggests that Arctic Cat reviewed Speed social media posts and objected when it found degradation of its mark. Thus, a question of fact remains as to which, if any, uses of Arctic Cat marks on social media Arctic Cat acquiesced to.

2.      *Nominative Fair Use Doctrine*

Speed also invokes the nominative fair use doctrine, which applies when a trademark is "the only word reasonably available to describe a particular thing." *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992). Nominative fair use analysis has three prongs: (1) the product "must not be readily identifiable" without the trademark; (2) only as much of the mark as necessary may be used "as is reasonably necessary to identify the product"; and (3) the user cannot do anything in conjunction with the mark to suggest sponsorship or endorsement by the trademark owner. *Select Comfort Corp. v. Baxter*, 156 F. Supp. 3d 971, 987 (D. Minn. 2016) (citing *New Kids*, 971 F.2d at 308–09), *overruled on other grounds*, 996 F.3d 925 (8th Cir. 2021).

As to the first prong, Speed argues that the best way to identify a vehicle is by make and model. Thus, the argument goes, Arctic Cat's success on this claim would mean that dealers and sellers would not be able to accurately describe products on resale. Speed persuasively urges that it must use the Wildcat XX mark to identify the make and model of the vehicle. The Court cannot resolve this issue. The question of whether make and

model are necessary to describe powersports vehicles should be resolved by the trier of fact.

The second and third prongs of nominative fair use analysis also raise questions of fact. As to the second prong, reasonable people might disagree about whether Speed used more of Arctic Cat's trademarks than necessary to identify the Wildcat XX, so this question should be resolved by a jury. As to the third prong, Arctic Cat's expert found that Speed's use of Arctic Cat's marks caused confusion about whether Arctic Cat sponsored the marks. (ECF No. 357-2 at 90); *see Bluetooth SIG, Inc. v. FCA US LLC*, 463 F. Supp. 3d 1169, 1188 (W.D. Wash. 2020) (finding that the second and third prong of the analysis should be decided by the trier of fact). So the Court will not grant summary judgment for Speed when Arctic Cat presented evidence directly contradicting an element of the analysis.

Thus, the motion for summary judgment on trademark infringement claims is denied.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.  Arctic Cat's motion for summary judgment (ECF No. 332) is GRANTED IN PART and DENIED IN PART as follows:

    a.   summary judgment on Speed's claim for breach of contract for failure to make minimum royalty payments is GRANTED;

    b.   summary judgment on Speed's claim for breach of contract for failure to manufacture vehicles is DENIED;

    c.   summary judgment on Speed's claim for breach of contract for failure to make accessories is GRANTED;

    d.   summary judgment on Speed's claim for breach of contract for failure to transfer marketing vehicles and failure to acknowledge novelty is DENIED;

    e.   summary judgment on the implied warranty of good faith and fair dealing is DENIED;

    f.   summary judgment on the pre-Agreement tort claims is DENIED;

    g.   summary judgment on all other tort claims is GRANTED;

    h.   summary judgment on the alter-ego theory is GRANTED; and

    i.   Defendant Textron Inc. is DISMISSED from this action.

2.   Arctic Cat's motion for summary judgment on the punitive damages claim (ECF No. 384) is GRANTED.

3.   Speed's motion for summary judgment (ECF No. 339) is GRANTED IN PART and DENIED IN PART as follows:

    a.   summary judgment on Arctic Cat's conversion, misappropriation, and punitive damages claim is GRANTED; and

   b.   summary judgment on Arctic Cat's trademark claims is DENIED.


Dated: April 11, 2022                    BY THE COURT:

                                         s/Nancy E. Brasel
                                         Nancy E. Brasel
                                         United States District Judge